18 CV 63 33 FPG

# Notice of Complaint and Request for Emergency Injunction

**Hon. Frank P. Geraci, Jr.**
**Chief United States District Judge**
**U.S. Courthouse,  100 State Street**
**Rochester, New York 14614**
**Telephone:  (585) 613-4090**
**Fax:  (585) 613-4095**

May2, 2018

Greetings Judge Geraci,

This Notice of Complaint and Request for Injunction is provided to inform you of the proceedings in the UNITED STATES DISTRICT COURT WESTERN DISTRICT, 2 Niagara Square in Buffalo, New York 14202 under the direction of JUDGE RICHARD J. ARCARA. MAGISTRATE HUGH B. SCOTT also participated in the early proceedings.

This Notice of Complaint and Request for Injunction is constructed pursuant to the **RULES FOR JUDICIAL-CONDUCT AND JUDICIAL-DISABILITY PROCEEDINGS.** Adopted March 11, 2008 Effective April 10, 2008 Amended September 17, 2015

I, Charles Weber, accuse of JUDGE RICHARD J. ARCARA of engaging in the act of intentional official **Cognizable Judicial Misconduc**t in the obstruction of justice by the denial of due process for the enumerated reasons listed below. The allegations contained herein do not contain allegations directly related to the merits of a decision or procedural ruling. The evidence presented will constitute probable cause to believe that RICHARD J ARCARA and Hugh B. Scott engaged in misconduct did occur and that requested Relief be granted.

## I.    PARTIES TO THE COMPLAINT

Complainant          Charles Weber
                            c/o  25 Greenbrier Road
                            Snyder, New York 14226  716-510-3047

Sixty-two year old white male of sound mind, have firsthand knowledge of the facts contained herein, and am fully competent to testify in this matter. One of the People of New York by direct ancestry. See Exhibit 1- 3, 10

Subject Judge 1          Richard J. Arcara
                              2 Niagara Square
                              Buffalo, New York  14202
Subject Judge 2          Magistrate Judge Hugh B. Scott
                              2 Niagara Square
                              Buffalo, New York 14202

II.     BASIS FOR JURISDICTION     28 U.S.C. § 1331, a case arising under the United
        States Constitution, federal laws or treaties.

Federal statutes, federal treaties, and/or provisions of the United States Constitution
that are at issue in this case.


Article 4 Sec. 2 Cl.1 Privileges and Immunities     4th Amendment Probable Cause
5th Amendment Due Process                           6th Amendment Competency of Counsel
14th Amendment Sec. 1                               8 USC Ch. 12 Subch. 3 Sec. 1401-1409
18 USC 911                                          18 USC 1622
1789 Federal Judiciary Act                          26 USC 7206 (1)
26 USC Sec. 1                                       28 USC 1652
28 USC 1654                                         28 U.S.C. § 2072, and § 2072(b)
42 USC 1981-2000

III.    STATEMENT OF CLAIMS

Statement of Facts in Evidence to Support Claims 1-9

Facts in evidence in support of Claim 1   Federal Court Judge Richard J. Arcara has violated Due Process rights guaranteed by the 5th Amendment by intentionally allowing the US Attorney Mary Ellen Kresse and Magistrate Hugh B. Scott to mischaracterize my citizenship without any facts in evidence on the record to support that claim.

Magistrate Scott states "Defendant (Charles Weber) is a citizen of the United States, U.S. Const. Amend. XIV, § 1, cl. 1 ("all persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."; 8 U.S.C. § 1401(a) (national and citizen of United States at birth of a person born in the United States. Docket 38 at 8 Exh. 7

Magistrate Scott is saying is that I would have to be a foreigner in order to be clothed with naturalization law. Title 8 is Aliens and Nationality law.

The US Attorney states  'The defendant claims that as a 'direct descendant of one of the People as their Posterity' (Docket 40 at 13) he is not a citizen of the United States for purposes of the 14th Amendment and Magistrate Scott erred  when he found otherwise. Id. At 13-14.  The defendant's arguments are without merit.  As Magistrate Scott properly found, the defendant is a citizen of the United States and subject to the jurisdiction of the United States." Docket 41 at 3-4 Exh 8

The statements representing the positions from Magistrate Scott and US Attorney Kresse are in conflict with the 1. United States government own positions, 2. US Supreme Court Decisions, 3. Federal Appellate and District Court decisions, and 4. State Supreme Court decisions (Article 4 Sec. 1 Full Faith and Credit).

Arcara knows Kresse and Scott have testified to facts not in evidence and are unable to testify as a competent witness without first hand knowledge of the facts. Attorneys  and judges cannot testify in a case they are involved in.  Arcara has violated due process by not striking their testimony from the record.

1 Scott and Kresse statements in conflict with their own government.  The government states in its own 14th Amendment Treatise self-authenticating publication at page 1566 citing the holding in the Slaughterhouse Cases: 83 U.S. 36, 73-74.,… "While clearly establishing a national rule on national citizenship and settling a controversy of long standing with regard to the derivation of national citizenship, the Fourteenth Amendment did not obliterate the distinction between national and state citizenship, but rather preserved it." Exh. 4

2  Scott and Kresse statements in conflict with their own Supreme Court

*"By the first section of the bill, all persons born in the United States, and not subject to any foreign power, excluding Indians not taxed, are declared to be citizens of the United States. This provision comprehends the Chinese of the Pacific states, Indians subject to taxation, the people called gypsies, as well as the entire race designated as blacks, persons of color, negroes, mulattoes, and persons of African blood. Every individual of those races, born in the United States, is, by the bill, made a citizen of the United States."* Elk v Wilkins 112 U.S. 94 at 114

*"After the adoption of the 14th Amendment, a bill which became the first Civil Rights Act was introduced in the 39th Congress, the major purpose of which was to secure to the recently freed*

*Negroes all the civil rights secured to white men... (N)one other than citizens of the United States were within the provisions of the Act."* Hague v. C. I. O., 307 U. S. 496, 509.

*"The object of the 14th Amendment, as is well known, was to confer upon the colored race the right of citizenship."*  United States v. Wong Kim Ark, 169 U. S. 649, 692.

*"It is true that the chief interest of the people in giving permanence and security to citizenship in the 14th Amendment was the desire to protect the Negroes."* Afroyim v. Rusk (1967), 18 L.Ed. 2d 758, 764.

*"...**that the distinction between citizenship of the United States and citizenship of a state is clearly recognized and established...** (2nd clause of the 1st section), which is the one mainly relied on by the plaintiffs in error, **speaks only of privileges and immunities of citizens of the United States, and does not speak of those of citizens of the several states**. The argument, however, in favor of the plaintiffs, rests wholly on the assumption that the citizenship is the same and the privileges and immunities guaranteed by the clause are the same."* Slaughterhouse Cases: 83 U.S. 36, 73-74.

3  Scott and Kresse statements in conflict with US Appellate and District courts.

*" if rights of a citizen are thereby violated, they are of that fundamental class, derived from his position as a citizen of the state, **and not those limited rights belonging to him as a citizen of the United States;** and such was the decision in Corfield v. Coryell."*
The United States v. Susan B. Anthony 2nd. Jud. Cir. 200, (1873)

*"Privileges and immunities clause of the Fourteenth Amendment protects only those rights peculiar to being a citizen of the federal government; it does not protect those rights which relate to state citizenship. 14,§ 1."* Jones v Temmer, 829 F.Supp. 1226 (D.Colo. 1993)

4  Kresse and Scott statements in conflict with State Supreme Court.  *"No white person born within the limits of the United States and subject to their jurisdiction, or born without those limits and subsequently naturalized under their laws, owes his status of citizenship to the recent amendments to the Federal Constitution."* Van Valkenburg v. Brown, 43 Cal 43.

*"The amendment referred to slavery. Consequently, the only persons embraced by its provisions, and for which Congress was authorized to legislate in the manner were those then in slavery."*
Bowlin v.Commonwealth (1867), 65 Kent. Rep. 5, 29.

---

Claim 2.    Arcara has allowed a Grand Jury Indictment on the presumption of 14th Amendment citizenship without the US Attorney providing facts in evidence in support of that claim.  The condition(s) at birth that require 14th Amendment attachment are found in Title 8 United States Code Aliens and Nationality Sections 1401 -1409.  Exh. 5
A false statement before a grand jury or in court is a violation of 18 USC 1623.
Complainant entered a Motion for Amended Discovery January 19, 2018 in Buffalo federal court demand the US Attorney to state the condition of birth attaching the 14th Amendment to my person and to place that evidence on the record for rebuttal. 1401-1409 (Exh. 5) states 18 different conditions of birth for the purposes of 14th Amendment attachment.
The US Attorney has refused to answer and place that evidence on the record.  Arcara is allowing the US Attorney to stonewall that evidence and is a violation of due process.

Silence can only be equated with fraud when there is a legal and moral duty to speak or when an inquiry left unanswered would be intentionally misleading. We cannot condone this shocking conduct... U.S. v. Prudden, 424 F.2d. 1021; U.S. v. Tweel, 550 F. 2d. 297, 299, 300 (1977)
SUBCHAPTER III—NATIONALITY AND NATURALIZATION
PART I—NATIONALITY AT BIRTH AND COLLECTIVE NATURALIZATION Exh.5

Claim 3.          Arcara is engaging in official misconduct by willfully violating due process to gain a wrongful conviction based on hearsay, intentional mischaracterization, and faulty forensic evidence provided by a US Attorney, a US Magistrate judge, and a psychiatrist providing unreliable testimony outside her area of knowledge and expertise.

Arcara is well aware of the equal protection clause of the 14th Amendment. The rights guaranteed were equal to that of the white citizen as stated in the 1866 Civil Rights Act of 1866.

The Civil Rights Act of 1866 is codified in Title 42 USC 1981 *et seq*. Those civil rights codes were originally housed in Title 8 Aliens and Nationality Exh. 9

Psychiatrist Ana Cervantes vaguely testified to some concepts of a sovereign citizen belief that just came out of nowhere, false testimony as to employing both allopathic and naturopathic health practitioners, and other irregular statements outside her specific area of expertise too numerous to mention from pp. 184 – 196.

Complainant's testimony in court January 24, 2018 cited Supreme Court opinions stating the separate and distinct differences of the Privileges and Immunities of Article 4 Sec. 2 Cl. 1 Citizens of the several States and the Privileges or Immunities in section 1of the 14th Amendment citizenship. Testimony 1 24 2018 pp.335-338 Exh.12

The evidence shows the contrast between the testimony backed by Constitutional authorities(Weber)  and testimony backed by youtube. (Cervantes)

Claim 4.          Arcara is willfully allowing testimony of a psychiatrist to base an erroneous licensed medical opinion on her unlicensed legal opinion unsupported by any facts in evidence and with no evidence of law school legal education in her resume. Arcara knows or should know, Dr. Cervantes is practicing law without a license, legal accreditation and that all testimony of Dr. Cervantes should be stricken from the record. Transcript 1-23-18 pp 169-172 shows evidence Cervantes has no legal training or law school experience. Ex. 13

Fed. R. of Ev. 702 governs admissibility of expert testimony with specialized knowledge in that area of education or expertise.  As the trier of facts, Arcara allowed Cervantes testify in court January 23, 2018 outside her area her legal opinion.  Dr. Cervantes actually testified going online to youtube videos to educate herself on the legal matters in this proceeding, she did not testify ever cracking a lawbook in a law library. Law libraries contain appellate and Supreme Court caselaw, annotated versions of the Constitution and US Codes and other reference documents used by the legal profession. Pp. 183-184 Ex. 12

Allowing an expert to testify outside their area of specialized knowledge is a violation of the caselaw from Daubert v Merrell Dow Pharmaceuticals, Inc. doctrine, 509 US 579 and Kumho

5

Tire Co. v. Carmichael 119 S. Ct. 1167. In Daubert, the Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony and the Court in Kumho clarified this gatekeeper function to all expert testimony, not just testimony based in science.

Arcara has allowed this unreliable testimony where Cervantes admitted to being outside her area of knowledge to decide my mental competency. I do not consent.

Claim 5.        Arcara is willfully violating due process by allowing Kresse and Dr. Cervantes to make false declarations in violation of 18 USC 1622 and accept them as true in order to suppress exculpatory evidence. Arcara is willing to allow an unlawful pharmaceutical attack on my physical   and mental well being.

As a result of this sham competency hearing the US Attorney and Dr. Cervantes are planning to weaponize pharmaceutical intervention with a very real possibility to damage my brain under the guise of intervention.  Adverse reactions to anti-psychotics are well known.  I do not consent.

From page 275, line 18 to page 276 line 21 DR. CERVANTES replies to questioning from the US Attorney stating that a trial of an anti-psychotic medication may 'be beneficial to restore mental competency during a three to four-month incarceration at a mental facility.' Exh 13.

The restoration of mental competency is an evil construct to artificially suborn perjury. It is a violation of 18 USC 911 to falsely claim US citizenship.

Claim 6.        Arcara has violated due process by engaging in a pattern of willful conduct by the suppression of exculpatory evidence presented by me to the Court clerk in order to prevent my right to appear in propria persona and give testimony and evidence, confront my accusers, and right to common law procedural due process as recognized by Article 35 of the Federal Judiciary Act of 1789 on the pretense of trying to protect my right to conduct a fair trial.

Complainant filed three unanswered motions from June of 2017, October of 2017, and January 2018 for the purpose of suppressing exculpatory evidence that would prove my innocence.

A New York State ORDER was granted for my express intent to have a court of record recognize my given name associated with Article 4 Sec. 2 Clause 1 citizenship of the several States and not that of the 14th Amendment citizen.

The federal court has refused to acknowledge the political status correction to date.  Refusing to acknowledge a State court of decision is a violation of 28 USC 1654

Claim 7.        Arcara has violated due process by the suppression of genealogical evidence proving I am a direct descendant of three of the Founding Fathers.  The genealogical history proves as direct evidence the fact I am one of the People as the Posterity and cannot be a 14th Amendment citizen as that is a physical, legal, and historical impossibility.  Exh. 1- 3

Claim 8.        Arcara is attempting to force acceptance incompetent legal representation in violation of the 6th Amendment recognition of the right to competent assistance of counsel. The Public Defender, Brian Comerford, did not know the 14th Amendment was intended to grant citizenship as a privilege to the freed Negro slaves and Negro freemen and does not apply to white citizens subject to the jurisdiction of the several States., who were never considered as Citizens according to the meaning of the term Citizen at the time of the adoption of the 1789 Constitution. This conversation took place between myself and Mr. Comerford April 13, 2018 after the last 'competency' hearing.

Claim 9.        In a matter related to Claim #1 and  #2, Arcara knows or should know the difference between natural born of the several States eligible for the Presidency and naturalized citizens (14th) in the United States (foreigner to State Citizenship under Art. 4 Sec. 2 Cl. 1) not eligible for the Presidency. Arcara is violating due process by willfully allowing hearsay evidence placed into the record by Kresse and Scott to presume Complainant is a foreigner in need of naturalization by force of law.

All 14th Amendment citizens are naturalized by operation of law either by condition of birth or by naturalization law process in a court of record.  14th Amendment citizens are conferred citizenship only the Congressional grant of authority pursuant to Art. 1 Sec. 8 Cl. 4, one has to be a foreigner to be naturalized.

The position taken by Arcara, Scott, and Kresse is in conflict with the Preamble to the United States Constitution, "We the People, ....do establish and Ordain this Constitution for ourselves and our Posterity" Supreme Court decisions, and the position of Alexander Porter Morse, a graduate of Georgetown Law first class, a well renown attorney in international affairs and attorney for the State Department. By Alexander Porter Morse (ALBANY LAW JOURNAL VOL. 66 (1904-1905)) pp. 2-4 Ex. 14

"The act is declaratory; but the reason that such children are natural born remains; that is, their American citizenship is natural—the result of parentage—and is not artificial or acquired by compliance with legislative requirements..... 1789 Act for An Uniform Rule of Naturalization. Further, Porter Morse in this treatise, ." This provision, as its terms express, is declaratory; it is not the statute that constitutes children of American parentage citizens; it is the fact of American descent, the jus sanguinis, that makes them citizens at the moment of birth—a fact which, for sufficient and convenient reasons, the legislative power of the State recognizes and announces to the world.... A natural-born citizen has been defined as one whose citizenship is established by the jurisdiction which the United States already has over the parents of the child, not what is thereafter acquired by choice of residence in this country." Exh.14

In another treatise/essay, Porter Morse further explains naturalization. "Naturalization being an act by which political status is affected..." p. 593..."In its popular etymological and legal sense it signifies the act of adopting a foreigner, and clothing him with all the privileges of a native citizen or subject". P. 597  The American Law Register, CITIZENSHIP BY NATURALIZATION, October 1879. Exh. 15

7

IV.    INJUNCTION REQUIRED TO PREVENT IRREPARABLE HARM

How do I get my good name back?

Complainant's dental practice, practice building and equipment, home, marriage, and ability to earn a living are gone as a result of an intentional mischaracterization of citizenship and political status by the US Attorney and allowed by Judge Arcara and Scott.

At this time there is no adequate remedy at law to stop a miscarriage of justice.

Complainants good will and name in the business and doctoral candidate educational communities also irreparably harmed.

Further imminent harm will result by the likelihood of incarceration if Arcara continues to violate due process and substantive rights.

In addition, forced, unneeded and potentially destructive anti-psychotic pharmaceutical intervention suggested by a psychiatrist out of touch with reality is likely without outside judicial intervention that respects the rule of law and the ends of justice.

The likelihood of success is very good I will succeed on the merits of the evidence in the record once the suppression of evidence by Judge Arcara has been removed.

There are no hardships of the State to abide by the constitutional requirements.

There are no hardships on the courts to apply the law as written.

The injunction would not negatively affect public policy or public interest.

The effect on the public interest would be served by requiring the wrongdoers to abide by due process requirements, statutory standards, rules of evidence, and probable cause determination.

V.    CONCLUSION AND RELIEF REQUESTED

The fact of my citizenship is not in question.  The evidence proves I am a Citizen of New York, one of the People of New York.  The 14th Amendment did not displace the original State citizenship under Article 4 Sec. 2 Cl. 1. There are no facts in evidence to rebut this claim to this day from the US Attorney.

The facts in evidence support the allegation Arcara has conducted these proceeding without subject matter jurisdiction.

Injunctive Relief will not harm the public.

First Relief Requested.  Complainant moves the Court to grant immediate injunctive relief from any further activity in this matter recusing Judge Richard J. Arcara and voiding the July 20, 2015 Findings and Recommendations of Judge Hugh B. Scott.

Second Relief Requested.  Complainant moves the Court to strike all past testimony and hearsay evidence from Grand Jury records and void faulty indictment ab initio.

Third Relief Requested.  Complainant moves the Court to strike all motions and testimony brought by the US Attorney ab initio.

Fourth Relief Requested.    Complainant moves the Court to strike all Cervantes' and Antonius' testimony as expert witnesses.

Fifth Relief Requested.  Complainant moves the Court to dismiss all charges with prejudice for want of *in personam* and subject matter jurisdiction. 12(b)(6)

Sixth Relief Requested.  Complainant moves the Court to allow for future administrative hearing to restore financial health, good will and name in the business and doctoral educational communities.

This deed is made in good faith. I affirm the statements and representations are true, complete, and accurate as to the best of my knowledge. Any statements in error brought to my attention will be corrected. I intend to harm no one. My intention for bringing this Notice of Complaint and Request for Emergency Injunction is to prevent more harm done to my person.

*Charles Weber*                                                    May 2, 2018

Charles Weber
25 Greenbrier Road
Snyder, New York 14226
716-510-3047

# Notice of Complaint and Request for Emergency Injunction

**Hon. Frank P. Geraci, Jr.**
**Chief United States District Judge**
**U.S. Courthouse, 100 State Street**
**Rochester, New York 14614**
**Telephone: (585) 613-4090**
**Fax: (585) 613-4095**

EXHIBIT LIST

| | |
|---|---|
| 1 | Genealogy for Charles Weber |
| 2 | Somerset County Historical Quarterly Vol. 7 1918 |
| 3 | Historic Sites, National and New Jersey Register of Historic Places |
| 4 | Government treatise on 14th Amendment, see p 1566 |
| 5 | Title 8 Aliens and Nationality Sec. 1401-1409 |
| 6 | 18 USC 1621-1623 |
| 7 | Magistrate Judge Scott Report and Recommendation |
| 8 | Government's Response Docket 41 |
| 9 | 42 USC 1981-1997 |
| 10 | Declaration of Facts and Affidavit of Paternity of Joan Mulligan Weber |
| 11 | Weber transcript 1 24 2018 Competency Hearing 335-338 |
| 12 | Cervantes transcript 1 23 2018 Competency hearing 183-187 |
| 13 | Cervantes transcript 1 23 2018 Competency hearing 169- 173, 275-277 |
| 14 | Natural Born Treatise Alexander Porter Morse Albany Law Journal Vol. 66 |
| 15 | American Law Register October 1879 Citizenship by Naturalization Alexander Porter Morse |
| 16 | Grace Commission Report |
| 17 | 28 USC 1652-1654 |
| 18 | Motion for Amended Discovery 1 19 2018 |
| 19 | Motion to Show Cause 10 30 2017 |
| 20 | Supreme Court Decisions Overturned |



PETITIONER'S EXHIBIT

# A Genealogy Report For

# CHARLES WEBER

Created on 27 June 2015
"The Complete Genealogy Reporter"
© 2006-2013 Nigel Bufton Software
under license to MyHeritage.com Family Tree Builder

## 1. PATERNAL ANCESTRY



Nicholas Weber[65]

Charles Nicholas Weber[2⁻]

Mary Weber[66]

Bernard John Weber[10]

Frank Graf[67]

Mary Weber [Graf][28]

Katherine Graf[68]

**Robert Charles Weber[2]**

Mary M. Weber [O'Donnell][11]

*Charles Weber Direct Relations*

Jacob M. Schappert*102* married Margaret Schappert [Beline].

104. Michael Schappert (Charles's great-great-great-uncle) was born on 17 February 1842, in Rehborn, Bad Kreuznach,Rhineland-Palatinate, Germany, to Johann Anton Schappert*119* and Susanna Margaretha Schappert [Reinhard]*120*, as shown in family tree 16. Michael was a Butcher. On 21 November 1854, aged 12, he immigrated (Traveled aboard the ship called "Confederation" to New York City, New York, USA) to Le Havre, France. Michael died on 5 April 1912, aged 70, in Wilkes-Barre, Luzerne, Pennsylvania, USA. Citation: *Source 12 (Name; Birth; Death)*.

105. Amanda Schappert [Smoulter](Charles's great-great-great-aunt by marriage) was born on 22 July 1850, in Wilkes-Barre, Luzerne, Pennsylvania, USA. Amanda died on 7 January 1914, aged 63, in Wilkes-Barre, Luzerne, Pennsylvania, USA.

Michael Schappert*104* married Amanda Schappert [Smoulter].

106. Ludwig Schappert (Charles's great-great-great-uncle) was born on 7 June 1846, in Obermoschel, Donnersbergkreis,
Rhineland-Palatinate, Germany, to Johann Anton Schappert*119* and Susanna Margaretha Schappert [Reinhard]*120*, as shown in family tree 16. Ludwig died before 1854, when younger than 7.

107. George Christopher Schappert (Charles's great-great-great-uncle) was born on 28 October 1848, in Obermoschel,Donnersbergkreis, Rhineland-Palatinate, Germany, to Johann Anton Schappert*119* and Susanna Margaretha Schappert
[Reinhard]*120*, as shown in family tree 16. George died (Typhoid Fever) on 28 November 1906, aged 58, in Wilkes-Barre, Luzerne, Pennsylvania, USA. He was buried (Saint Nicholas Cemetery) in Wilkes-Barre, Luzerne, Pennsylvania, USA.
Citation: *Source 12 (Name; Birth; Death)*.

108. Elizabeth Schappert [Stenger] (Charles's great-great-great-aunt by marriage) was born in October 1844, in Ohio, USA. Elizabeth died in 1924, aged about 79. George Christopher Schappert*107* married Elizabeth Schappert [Stenger].

109. Catherine F. Schmitt (Charles's great-great-great-aunt) was born on 21 November 1836, in Germany, to Peter Joseph Schmitt*121* and Catherina Schmitt [Thoernes]*122*, as shown in family tree 17. Catherine died on 24 February 1921, aged 84, in Wilkes-Barre, Luzerne, Pennsylvania, USA. She was buried (Hollenbach Cemetery) in Wilkes-Barre, Luzerne, Pennsylvania, USA.

110. Nicholas Schmitt (Charles's great-great-great-uncle) was born in December 1839, in Germany, to Peter Joseph Schmitt*121* and Catherina Schmitt [Thoernes]*122*, as shown in family tree 17. Nicholas is no longer living.

**Generation of Great-Great-Great-Grandparents**

111. James Mulligan (Charles's great-great-great-grandfather) was born in 1800, in Ireland. James died on 19 October 1888, aged about 88, in North Brunswick, Middlesex, New Jersey, USA.

112. Ellen Mulligan [Daugherty] (Charles's great-great-great-grandmother) was born about 1807, in Ireland. Ellen died in New Jersey, USA.

James Mulligan*111* married Ellen Mulligan [Daugherty]. They had two children: James F. Mulligan*69* in 1827
Bridget Ellen Morris [Mulligan]*72* in 1828 *This family is shown as family tree 12.*

113. John Van Horne (Charles's great-great-great-grandfather) was born on 16 December 1787, in New Brunswick, Middlesex, New Jersey, USA, to William Van Horn*125* and Margaret Elizabeth Van Horn [Ellis]*126*, as shown within family tree 13. John died on 19 May 1865, aged 77. He was buried (Charles Evans Cemetery) in Reading, Berks, Pennsylvania, USA. The following information is also recorded for John. Military Service (Private- 1st Co., 48th Regiment, Volunteer Artillery. Served under Capt. John Irvin.) in 1812, aged about 24.

114. Eva Van Horne [Finley] (Charles's great-great-great-grandmother) was born in 1787, in New Brunswick, Middlesex, New Jersey, USA. Eva is no longer living. John Van Horne*113* married Eva Van Horne [Finley]. They had six children:
James Van Horn*77* in 1819
Almirah L. Boone [Van Horn]*79* in 1822
Mary Van Horn*81* in 1822
Caroline Mulligan [Van Horn]*70* in 1827
Lydia S. Van Horn*82* in 1828
John Van Horn*83* in 1833
*This family is shown as family tree 13.*
Page 16

*Charles Weber Direct Relations*

115. James Morris (Charles's great-great-great-grandfather) was born about 1810, in Kinvarra, Ireland. James died about 1864,

aged about 54, in Kinvarra, Ireland.

116. Sarah Morris [Fahey] (Charles's great-great-great-grandmother) was born in 1808, in Kinvarra, Ireland. Sarah died in Loughrea, Ireland.

James Morris*115*, aged about 19, married Sarah Morris [Fahey], aged about 21, about 1829 in Galway, Ireland. They had five children:

Michael William Morris*71* in 1830

John Morris*84* in 1832

James Morris*86* in 1834

Mary Margaret Fay [Morris]*87* in 1835

Thomas Morris*89* about 1836

*This family is shown as family tree 14.*

117. Johann Aloysius Goeckel (Charles's great-great-great-grandfather) was born on 13 August 1780, in Germany, to

Johann Adam Goeckel*127* and Anna Maria Goeckel [Breidenbach]*128*, as shown within family tree 15. Johann is no longer

living.

118. Elizabeth Goeckel [Dietz] (Charles's great-great-great-grandmother) was born in Germany to Paul Dietz*129* and Elisabeta Dietz [Brand]*130*, as shown within family tree 10.

Johann Aloysius Goeckel*117*, aged 38, married Elizabeth Goeckel [Dietz] on 16 May 1819. They had one son: John Goeckel*73* in 1828

*This family is shown as family tree 15.*

119. Johann Anton Schappert (Charles's great-great-great-grandfather) was born on 20 September 1801, in Rehborn, Bad Kreuznach, Rhineland-Palatinate, Germany, to Laurent Schappert*131* and Elisabeth Schappert [Fischer]*132*, as shown in family tree 18. On 21 November 1854, aged 53, he immigrated (Left on the ship "Confederation" for New York, USA) to Le Havre, France. In 1870, aged about 68, he resided in Hanover, Luzerne, Pennsylvania, United States. Johann died on 27 February 1873, aged 71, in Wilkes-Barre, Luzerne, Pennsylvania, USA. Johann was buried (St. Nicholas Cemetery) in Wilkes-Barre, Luzerne, Pennsylvania, USA.

Citation: *Source 2, page Year: 1870; Census Place: Hanover, Luzerne, Pennsylvania; Roll: M593_1365; Page: 515B; Image:*

*303; Family History Library Film: 552864 (Name; Birth; Residence in 1870).*

120. Susanna Margareta Schappert [Reinhard] (Charles's great-great-great-grandmother) was born on 20 September 1802, in Rehborn, Bad Kreuznach, Rhineland-Palatinate, Germany. On 21 November 1854, aged 52, she immigrated to New York, New York, USA. Susanna died on 6 April 1883, aged 80, in Wilkes-Barre, Luzerne, Pennsylvania, USA. She was buried (St. Nicholas Cemetery) on 7 April 1883 in Wilkes-Barre, Luzerne, Pennsylvania, USA.

Johann Anton Schappert*119* married Susanna Margaretha Schappert [Reinhard]. They had eleven children:

Heinrich Anton Schappert*90* in 1825

Johann Schappert*92* in 1826

Catherina Reber [Schappert]*94* in 1828

Joseph Schappert*96* in 1832

Elizabetha Schwab [Schappert]*98* in 1833

Margaret Scheidel [Schappert]*100* in 1837

Jacob M. Schappert*102* in 1839

Peter Schappert*75* in 1840

Michael Schappert*104* in 1842

Ludwig Schappert*106* in 1846

George Christopher Schappert*107* in 1848

*This family is shown as family tree 16.*

121. Peter Joseph Schmitt (Charles's great-great-great-grandfather) was born on 3 September 1812. On 21 August 1845, aged 32, he immigrated (Arrived in America) to New York, New York, New York, USA. Peter died in 1872, aged about 59, in Wilkes-Barre, Luzerne, Pennsylvania, USA.

122. Catherina Schmitt [Thoernes] (Charles's great-great-great-grandmother) was born on 17 October 1805, in Landkern, Cochem-Zell, Rhineland-Palatinate, Germany, to Nicholai Thoernes*133* and Anna Sophia Thoernes

[Mohr]*134*, as shown within family tree 17. She was baptised (St. Servatius Catholic Church) on 17 October 1805, in Landkern, Cochem-Zell, Rhineland-Palatinate, Germany. On 21 August 1845, aged 39, she immigrated (Arrived in America aboard the ship "Louis Phillipe") to New York, New York, New York, USA. Catherina died on 24 September 1896, aged 90, in Wilkes-Barre, Luzerne, Pennsylvania, USA.

Peter Joseph Schmitt*121* married Catherina Schmitt [Thoernes]. They had three children:

Catherine F. Schmitt*109* in 1836

Nicholas Schmitt*110* in 1839

Sophia Schappert [Schmitt]*76* in 1843

*This family is shown as family tree 17.*

Page 17

*Charles Weber Direct Relations*

123. Laurent Schappert (Charles's great-great-great-great-uncle) was born on 24 October 1805, in Heiligenmoschel, Kaiserslautern, Rhineland-Palatinate, Germany, to Laurent Schappert*131* and Elisabeth Schappert [Fischer]*132*, as shown in family tree 18. He was christened on 24 October 1805, in Heiligenmoschel, Kaiserslautern, Rhineland-Palatinate, Germany. On 14 July 1860, aged 54, he immigrated (Arrived in New York with his wife) to New York, USA. Laurent died on 26 October 1871, aged 66, in New York, USA.

124. Marie Annee Schappert (Charles's great-great-great-great-aunt) was born in 1810, in Rehborn, Bad Kreuznach, Rhineland-Palatinate, Germany, to Laurent Schappert*131* and Elisabeth Schappert [Fischer]*132*, as shown in family tree 18. Marie

died on 16 March 1810, as an infant, in Rehborn, Bad Kreuznach, Rhineland-Palatinate, Germany.

**Generation of Four-Times-Great-Grandparents**

125. William Van Horn (Charles's four-times-great-grandfather) was born in 1749, in Elizabeth, Union, New Jersey, USA, to Philip Van Horne*135* and Elizabeth Van Horne [Ricketts]*136*, as shown within family tree 13. William died in July 1827, aged about 78, in New Brunswick, Middlesex, New Jersey, USA. He was buried (Christ Church Episcopal Churchyard) on 2 July 1827 in New Brunswick, Middlesex, New Jersey, USA.

The following information is also recorded for William. Military Service (Revolutionary War).

Citations:

• *Source 16, page Page 5 - Revolutionary War Service Records. Note 1 applies.*

• *Source 15, page Page 2 - Revolutionary War Pensions. Note 2 applies. (Military Service (Revolutionary War)).*

• *Source 15, page Page 1 - Revolutionary War Pensions. Note 3 applies. (Military Service (Revolutionary War)).*

• *Source 15, page Page 3 - Revolutionary War Pensions. Note 4 applies. (Military Service (Revolutionary War)).*

• *Source 15, page Page 4 - Revolutionary War Pensions. Note 5 applies. (Military Service (Revolutionary War)).*

• *Source 15, page Page 5 - Revolutionary War Pensions. Note 6 applies. (Military Service (Revolutionary War)).*

• *Source 15, page Page 6 - Revolutionary War Pensions. Note 7 applies. (Military Service (Revolutionary War)).*

• *Source 15, page Page 7 - Revolutionary War Pensions. Note 8 applies. (Military Service (Revolutionary War)).*

• *Source 15, page Page 8 - Revolutionary War Pensions. Note 9 applies. (Military Service (Revolutionary War)).*

• *Source 15, page Page 9 - Revolutionary War Pensions. Note 10 applies. (Military Service (Revolutionary War)).*

• *Source 15, page Page 10 - Revolutionary War Pensions. Note 11 applies. (Military Service (Revolutionary War)).*

• *Source 15, page Page 11 - Revolutionary War Pensions. Note 12 applies. (Military Service (Revolutionary War)).*

• *Source 15, page Page 12 - Revolutionary War Pensions. Note 13 applies. (Military Service (Revolutionary War)).*

• *Source 15, page Page 13 - Revolutionary War Pensions. Note 14 applies. (Military Service (Revolutionary War)).*

• *Source 15, page Page 14 - Revolutionary War Pensions. Note 15 applies. (Military Service (Revolutionary War)).*

• *Source 15, page Page 15 - Revolutionary War Pensions. Note 16 applies. (Military Service (Revolutionary War)).*

• *Source 16, page Page 1 - Revolutionary War Service Records. Note 17 applies. (Military Service (Revolutionary War)).*

• *Source 16, page Page 2 - Revolutionary War Service Records. Note 18 applies. (Military Service (Revolutionary War)).*

• *Source 16, page Page 4 - Revolutionary War Service Records. Note 19 applies. (Military Service (Revolutionary War)).*

126. Margaret Elizabeth Van Horn [Ellis] (Charles's four-times-great-grandmother) was born in 1753. Margaret is no longer living. William Van Horn*125*, aged about 31, married Margaret Elizabeth Van Horn [Ellis], aged about 27, on 17 August 1780 in New Jersey, USA. They had one son: John Van Horne*113* in 1787

*This family is shown within family tree 13.*

127. Johann Adam Goeckel (Charles's four-times-great-grandfather) was born on 25 October 1747, in Faulbach, Miltenberg,

Bavaria, Germany, to Nikolaus Goeckel*137* and Elizabeta Goeckel [Pfenning]*138*, as shown within family tree 15. Johann is no longer living.

128. Anna Maria Goeckel [Breidenbach] (Charles's four-times-great-grandmother) was born in 1750, in Faulbach, Miltenberg, Bavaria, Germany. Anna is no longer living.

Johann Adam Goeckel*127*, aged 26, married Anna Maria Goeckel [Breidenbach], aged about 23, on 8 February 1774 in

Faulbach, Miltenberg, Bavaria, Germany. They had one son:

Johann Aloysius Goeckel*117* in 1780

*This family is shown within family tree 15.*

129. Paul Dietz (Charles's four-times-great-grandfather).

130. Elisabeta Dietz [Brand] (Charles's four-times-great-grandmother).

Paul Dietz*129* married Elisabeta Dietz [Brand]. They had one daughter: Elizabeth Goeckel [Dietz]*118*

*This family is shown within family tree 10.*

Page 18

*Charles Weber Direct Relations*

131. Laurent Schappert (Charles's four-times-great-grandfather) was born about 1775, in Rehborn, Bad Kreuznach, Rhineland-Palatinate, Germany. Laurent is no longer living.

132. Elisabeth Schappert [Fischer] (Charles's four-times-great-grandmother).

Laurent Schappert*131* married Elisabeth Schappert [Fischer]. They had three children:

Johann Anton Schappert*119* in 1801

Laurent Schappert*123* in 1805

Marie Annee Schappert*124* in 1810

*This family is shown as family tree 18.*

133. Nicholai Thoernes (Charles's four-times-great-grandfather) was born on 5 February 1774, in Uersfeld, Vulkaneifel, Rhineland-Palatinate, Germany, to Christian Thoernes*139* and Anna Maria Thoernes*140*. Nicholai died about 1834, aged about

60, in Germany.

134. Anna Sophia Thoernes [Mohr] (Charles's four-times-great-grandmother).

Nicholai Thoernes*133* married Anna Sophia Thoernes [Mohr]. They had one daughter:

Catherina Schmitt [Thoernes]*122* in 1805

*This family is shown within family tree 17.*

**Generation of Five-Times-Great-Grandparents**

135. Philip Van Horne (Charles's five-times-great-grandfather) was born on 29 April 1719, in New York, New York, USA. Before 1755, when younger than 35, he was a Mercantile Business in New York, New York, USA. On 1 January 1770, aged 50, he was a Judge of the Court of Common Pleas in Somerset County, New Jersey, USA. Philip died in May 1793, aged 74, in Maryland, USA.

136. Elizabeth Van Horne [Ricketts] (Charles's five-times-great-grandmother) was born in 1723. Elizabeth died in 1799,

aged about 76.

Philip Van Horne*135* married Elizabeth Van Horne [Ricketts]. They had one son:

William Van Horn*125* in 1749

*This family is shown within family tree 13.*

137. Nikolaus Goeckel (Charles's five-times-great-grandfather) was born on 6 December 1719, in Faulbach, Miltenberg, Bavaria, Germany. Nikolaus died on 9 August 1786, aged 66, in Faulbach, Miltenberg, Bavaria, Germany.

138. Elizabeta Goeckel [Pfenning] (Charles's five-times-great-grandmother) was born about 1724, in Faulbach, Miltenberg, Bavaria, Germany. Elizabeta died on 24 December 1750, aged about 26, in Faulbach, Miltenberg, Bavaria,Germany.

Nikolaus Goeckel*137*, aged 24, married Elizabeta Goeckel [Pfenning], aged about 19, on 21 January 1744 in Faulbach,

Miltenberg, Bavaria, Germany. They had one son:

Johann Adam Goeckel*127* in 1747

*This family is shown within family tree 15.*

139. Christian Thoernes (Charles's five-times-great-grandfather).

140. Anna Maria Thoernes (Charles's five-times-great-grandmother).

Christian Thoernes*139* married Anna Maria Thoernes. They had one son:

Nicholai Thoernes*133* in 1774
*This family is shown within family tree 17.*
141. Anna Maria Unknown (Charles's five-times-great-grandmother).
Anna gave birth to one son:
Nicholai Thoernes*133* in 1774
*This family is shown as family tree 19.*



PETITIONER'S EXHIBIT 2

English
Français
Deutsche
Italiano
Español
Português

www.forgottenbooks.com

**Mythology** Photography **Fiction**
Fishing Christianity **Art** Cooking
Essays Buddhism Freemasonry
Medicine **Biology** Music **Ancient**
**Egypt** Evolution Carpentry Physics
Dance Geology **Mathematics** Fitness
Shakespeare **Folklore** Yoga Marketing
**Confidence** Immortality Biographies
Poetry **Psychology** Witchcraft
Electronics Chemistry History **Law**
Accounting **Philosophy** Anthropology
Alchemy Drama Quantum Mechanics
Atheism Sexual Health **Ancient History**
**Entrepreneurship** Languages Sport
Paleontology Needlework Islam
**Metaphysics** Investment Archaeology
Parenting Statistics Criminology
**Motivational**

# Somerset County Historical Quarterly

## Vol. VII.—1918

EDITOR:
A. VAN DOREN HONEYMAN
PLAINFIELD, NEW JERSEY

PUBLICATION COMMITTEE:

A. Van Doren Honeyman     Hon. James J. Bergen
Alexander G. Anderson     John F. Reger
Joshua Doughty, Jr.     Mrs. William W. Smalley

SOMERVILLE, NEW JERSEY
SOMERSET COUNTY HISTORICAL SOCIETY
PUBLISHERS

ville 1751; d. there 1837; m. Sarah Ten Eyck (dau. of Col. Matthew Ten Eyck). He studied medicine and served as a surgeon practically during the whole of the Revolution, being a surgeon of the Second Regiment of Artillery (Col. Lamb's Artillery). He was not discharged from the service until the end of the War. It is said he was subsequently granted, as a pension, 600 acres of land in Virginia and 2,600 acres in the State of New York. His residence was what has recently been known as the Lozier farm in East Somerville.

Dr. Garret had three sons, Cornelius, Matthias and Garret, and two daughters, Jane and Mary Magdalene. Matthias m. Eliza Herbert. Garret graduated from Queen's College, October, 1815, became a physician and removed to Texas. Cornelius m. Judith Ten Eyck, and had six children: Dr. Peter T., who m. Eliza Ten Eyck; Mary Ann, who m. John Van Derveer; Sarah, who m. Albert Canmann; Ellen, second wife of same; Abigail, who m. Henry P. Hoagland; and Jane, who m. James Bergen, formerly sheriff of Somerset. These families have been well known in Somerville. Dr. Peter T. had a number of children, including Mary A., who m. the late Surrogate William H. Long, father of Dr. William H. Long.

## THE SOMERSET VAN HORNES—COL. PHILIP'S LINE

It has long been an interesting question as to who Col. Philip Van Horne, of Middlebrook and Revolutionary memory, was; where he came from and who were his parents. An important man in his day, as were other Somerset Van Hornes, the subject long ago attracted our attention, and has now been solved.

The Van Hornes (Van Horns, as now generally spelled) of New Jersey and elsewhere in this country descend from three different Van Hoorns, all of whom came from Holland, but without their relationship to each other, if any, being known. They were not brothers. One was Christian Barentsen, who arrived before 1653, and resided in New Amsterdam, but d. in 1658 at Wilmington, Del. One was Joris Jansen, who arrived in 1658. He was a builder and architect in New York City. The earliest to come, however, was Jan Cornelissen, who was in New Amsterdam by 1645. He was the ancestor of Col. Philip Van Horne, the line being as follows:

I. JAN CORNELISSEN VAN HOORN. His sons were: 1. Cornelis Jansen (see below). 2. Abraham, b. Aug. 8, 1647. 3. Abraham (2nd), b. Oct. 24, 1649.

II. CORNELIS JANSEN VAN HOORN, above named, b. Aug. 3, 1642; d. 1692; m. Anna Maria Jans. He lived in New York City, and had sons: 1. Johannes (see below). 2. Gerrit, bapt. Nov. 17, 1671; m. 1693, Altje

Provoost. 3. Abraham, bapt. Jan. 20, 1675; d. 1741; m. Sept. 6, Maria Provoost (see QUARTERLY, Vol. II, p. 79).

III. JOHANNES VAN HORNE (as he signed his name), bapt. J 1663; d. 1735; m. 1693, Catharine (dau. of Jan Dircksen Meyer, haps Andries Jansen Meyer). He is probably the same who own on Oct. 9, 1711, sold 450 acres of land near Readington to Adriae (see QUARTERLY, Vol. II, p. 117). Johannes was a merchant in Nev City, but early became a large landowner in New Jersey, his pu here being as early as 1700. His will, probated in 1735, has her been given in full in the QUARTERLY (Vol. IV, p. 245). By re thereto it will be seen that he bequeathed to his son Cornelius 1,60 of land at Roycefield, Somerset Co.; to his son Abraham 600 a Rocky Hill; to his son James, 1,330 acres adjoining, along the M river, and his house in New York City; and to his son Andrew 1 of 6,800 acres, located between Blawenburg and Rocky Hill, purch William Dockwra in 1707. He also owned land in Hunterdon which was divided among his children. Johannes was an Alder New York City, and Member of the New York Colonial Assembly time. His sons were: 1. Cornelius (see below). 2. Andrew, b. 1 about 1763; resided in Piscataway twsp., Middlesex co. 3. Abra 1708; d. 1756; m. Catherine Rutgers. He also was a prominent Ne merchant. 4. James, b. 1712; d. 1761; m., Dec. 16, 1742, Margar ard (dau. of Samuel Bayard and Margaret Van Cortlandt). Jan a resident of Rocky Hill. His will, dated Oct. 29, 1760, probate 20, 1761 (Trenton Wills, Book H), gave all of his estate to his son and James, although he also had a son Samuel. The son James w specially named in the will: "James to be given the best educat Province of Pennsylvania affords, either at the Academy or Mr. English school; then to study physic or law, and complete his st Scotland." John married the daughter of Col. Nathaniel Heard, of bridge, and remained a resident of Rocky Hill during the Rev dying, however, childless, Feb. 4, 1820. (See QUARTERLY, Vol. II Vol. I, p. 87; Vol. IV, p. 245).

IV. CORNELIUS VAN HORNE (above), b. 1666; d. about 17 July 13, 1718, Elizabeth French (dau. of Philip and Jane French, Brunswick). This Cornelius was the father of Col. Philip Van Ho was born and brought up in New York City, becoming there a mer means, but he must have had at least a Summer residence at Midd before 1726, as then Gov. Burnet of New Jersey recommended hi seat in the Legislative Council, and the English King appointed hi took his seat Aug. 25, 1727. In 1734 he witnessed a baptism at t

Case 1:18-cv-06333 Document 11 Filed 07/02/20 Page 20 of 152

re 1837; m. Sarah Ten Eyck (dau. of Col. Matthew Ten
led medicine and served as a surgeon practically during
Revolution, being a surgeon of the Second Regiment of
...'s Artillery). He was not discharged from the ser-
the War. It is said he was subsequently granted, as a
land in Virginia and 2,600 acres in the State of New
...le was what has recently been known as the Lozier
...ville.

...three sons, Cornelius, Matthias and Garret, and two
Mary Magdalene. Matthias m. Eliza Herbert. Gar-
...n Queen's College, October, 1815, became a physician
...ras. Cornelius m. Judith Ten Eyck, and had six chil-
...ho m. Eliza Ten Eyck; Mary Ann, who m. John Van
...m. Albert Cammann; Ellen, second wife of same;
...ry P. Hoagland; and Jane, who m. James Bergen,
Somerset. These families have been well known in
...ter T. had a number of children, including Mary A.,
Surrogate William H. Long, father of Dr. William H.

SOMERSET VAN HORNES—COL. PHILIP'S LINE

...had an interesting question as to who Col. Philip Van
...ook and Revolutionary memory, was; where he came
...re his parents. An important man in his day, as were
...d Hornes, the subject long ago attracted our attention,
...lved.

...oris (Van Horns, as now generally spelled) of New
...- in this country descend from three different Van
...came from Holland, but without their relationship to
...veing known. They were not brothers. One was
...who arrived before 1653, and resided in New Am-
...58 at Wilmington, Del. One was Joris Jansen, who
...e was a builder and architect in New York City. The
...wever, was Jan Cornelissen, who was in New Amster-
...as the ancestor of Col. Philip Van Horne, the line be-

...RELISSEN VAN HOORN. His sons were: 1. Cornelis Jan-
2. Abraham, b. Aug. 8, 1647. 3. Abraham (2nd), b.

■ JANSEN VAN HOORN, above named, b. Aug. 3, 1642; d.
...larin Jans. He lived in New York City, and had sons: 1.
...elow). 2. Gerrit, bapt. Nov. 17, 1671; m., 1693, Altje

Provoost. 3. Abraham, bapt. Jan. 20, 1675; d. 1741; m., Sept. 6, 1700,
Maria Provoost (see QUARTERLY, Vol. II, p. 79).

III. JOHANNES VAN HORNE (as he signed his name), bapt. Jan. 17,
1663; d. 1735; m., 1693, Catharine (dau. of Jan Dircksen Meyer, or per-
haps Andries Jansen Meyer). He is probably the same who owned and,
on Oct. 9, 1711, sold 450 acres of land near Readington to Adriaen Lane
(see QUARTERLY, Vol. II, p. 117). Johannes was a merchant in New York
City, but early became a large landowner in New Jersey, his purchases
here being as early as 1700. His will, probated in 1735, has heretofore
been given in full in the QUARTERLY (Vol. IV, p. 245). By reference
thereto it will be seen that he bequeathed to his son Cornelius 1,600 acres
of land at Roycefield, Somerset Co.; to his son .Abraham 600 acres at
Rocky Hill; to his son James, 1,300 acres adjoining, along the Millstone
river, and his house in New York City; and to his son Andrew lands in
Piscataway, Middlesex Co. Some of the land thus bequeathed was part
of 6,800 acres, located between Blawenburg and Rocky Hill, purchased of
William Dockwra in 1707. He also owned land in Hunterdon county,
which was divided among his children. Johannes was an Alderman of
New York City, and Member of the New York Colonial Assembly at one
time. His sons were: 1. Cornelius (see below). 2. Andrew, b. 1706; d.
about 1763; resided in Piscataway twp., Middlesex co. 3. Abraham, b.
1708; d. 1756; m. Catherine Rutgers. He also was a prominent New York
merchant. 4. James, b. 1712; d. 1761; m., Dec. 16, 1742, Margaret Bay-
ard (dau. of Samuel Bayard and Margaret Van Cortland). James was
a resident of Rocky Hill. His will, dated Oct. 29, 1760, probated April
20, 1761 (Trenton Wills, Book H), gave all of his estate to his sons John
and James, although he also had a son Samuel. The son James was thus
specially named in the will: "James to be given the best education the
Province of Pennsylvania affords, either at the Academy or Mr. Dove's
English school; then to study physic or law, and complete his studies in
Scotland." John married the daughter of Col. Nathaniel Heard, of Wood-
bridge, and remained a resident of Rocky Hill during the Revolution,
dying, however, childless, Feb. 4, 1820. (See QUARTERLY, Vol. II, p. 24;
Vol. I, p. 87; Vol. IV, p. 245).

IV. CORNELIUS VAN HORNE (above), b. 1696; d. about 1768; m.,
July 13, 1718, Elizabeth French (dau. of Philip and Jane French, of New
Brunswick). This Cornelius was the father of Col. Philip Van Horne. He
was born and brought up in New York City, becoming there a merchant of
means, but he must have had at least a Summer residence at Middlebrook
before 1726, as then Gov. Burnet of New Jersey recommended him to a
sent in the Legislative Council, and the English King appointed him. He
took his seat Aug. 25, 1727. In 1734 he witnessed a baptism at the First

Reformed church of Raritan (Somerville), (see QUARTERLY, Vol. II, p. 217). In 1735 he was reappointed to the Council, and kept his seat until 1740, when, as his business engagements (doubtless in New York) had prevented his attending its sessions, he asked to be dismissed. (See "N. J. Archives," Vol. XI, p. 83, footnote, and references there cited).

Cornelius' will of Feb. 19, 1768, probated May 23, 1770 (Trenton Wills, Book K, p. 381), states that he was of Somerset County, Eastern District, and names his wife, Elizabeth, and sons, Philip and John, and also their children. To Philip he devises the one-half of the plantation on which Cornelius lived (551 acres of land out of 1102 acres), also a grist mill; also one-half of the residue of his estate after the death of his (the testator's) wife. To John he gives the other one-half of the planta- tion, naming it as the "Western side" and also one-half of the residue after the death of his (the testator's) wife. A portion of this land, said to be "about 1,000 acres," and "laid out into four lots of 250 acres each," was advertised for sale in 1774. ("N. J. Archives," Vol. XXIV, p. 332). The testator names the children of Philip as Cornelius, William, Philip, Mary, Elizabeth, Cornelis and "Violetta," which serves perfectly to identi- fy this Philip. He names the children of John as Hannah, Elizabeth and Catherine. The land above devised appears to have been the same pur- chased by him Aug. 28, 1724, from John Chambers, of New York City (Trenton Deeds, Book 33, p. —). A John Van Horne was a Justice of the Peace of Somerset, 1767 and 1768.

That Cornelius Van Horne died about 1768, although his will was not probated until May, 1770, is evident from a notice in the "New York Ga- zette and Weekly Mercury" of Mar. 20, 1769 ("N. J. Archives," Vol. XXVI, p. 401), which said: "Tuesday last was married at Elizabeth- Town, in New Jersey. . . . And on Thursday following Mr. James Rivington, of this city (New York), bookseller, was married to the widow Elizabeth Van Horne, relict of Mr. Cornelius Van Horne."

V. COL. PHILIP VAN HORNE, b., probably, about 1720; m. Elizabeth (dau. of William Ricketts and Mary Walton, of Jamaica). The dates of his birth and death, and even the place of his death, have not yet been discovered, but he probably died before 1786, and perhaps in New York City. Like his father he was brought up as a New York merchant, but seems to have settled at Middlebrook at least as early as 1754. On Dec. 3, 1755, he is referred to as "Col. Van Horn, of Somerset Co.," by Gov. Belcher, who then gave orders that he proceed with forty men to Sussex county, "to be employed in the immediate defense of the frontiers of the Province in the counties of Morris and Sussex" against the reported ap- proach of the French and Indian army. ("N. J. Archives," Vol. VIII, First Series, Second Part, p. 182.) This is the first time we have seen his

name mentioned in connection with New Jersey military affai[rs]. May 12, 1759, he was appointed Judge of the Somerset County C[...] position he probably held until the Revolution, as he was certai[n] ing as Judge in 1773 ("N. J. Archives," Vol. XXIX, p. 65), and i[s] certain he was in Somerset after the War, and, we think, as late as [...]

Col. Van Horne had nine children: 1. Cornelius. 2. Willi[am]. Philip. (These three probably born in New York City). 4. Mar[gar]- etts, who was b. Nov. 3, 1734, and m., Sept. 12, 1778, Col. Stephe[n] lan, the brave Irish commander of the First Pennsylvania Light Dr[agoons]. 5. John, b. June 4, 1750. 6. Elizabeth, b. Aug. 2, 1761. 7. Cor[...] June 11, 1764; m., Feb. 12, 1782, Thomas L. Lansdale. 8. Vio[...] 1766. 9. Maria, who m. Samuel Fox.

Further interesting facts about Col. Philip will be found in t[he arti]- cle by Justice James J. Bergen in the 1912 QUARTERLY (Vol. I, [...] Some of the foregoing dates have been obtained from a typewritte[n...] of the Van Horne line prepared by Mr. C. S. Williams, of Ne[w York] City, in 1911, while other facts have been due to personal researc[h].

❧   ❧   ❧   ❧

## HISTORICAL NOTES AND COMMENTS

BY THE EDITOR

### The Frelinghuysen Name and Records of it

It has always been an interesting fact, but one which has al[ways been] the source of trouble to many genealogists, that our early Dutch an[cestors] varied their names, and even the spelling of their names, to a deg[ree] we of this day can scarcely understand. No matter how educat[ed they] were, surnames and spelling appeared to have been of minor accou[nt. We] could multiply instances of complete alterations in surnames witho[ut end] but just now are calling attention to the fact that consistent spe[lling of] either surnames or Christian names seem to have been an unkno[wn art]. A mere examination of any of the old baptismal records, such as v[ve have] been publishing, proves the truth of our statement. We have lat[ely had] occasion to notice how the head of the Frelinghuysen family va[ried the] spelling of his surname. If it be correctly stated in the careful r[ecords] of the Classis of the Amsterdam, Holland, wherein his call to S[omerset] County is noted and approved, the correct family name was "Friel[inghuy]- sen." The record there says:

"1718, June 5th. Rev. Matthias Winterwyck, minister at , together with the Messrs. Banker and van der Meulen, appeared [before] the Classis and exhibited an instrument from the congregation a[t Rari]- tan, in the province of New Jersey, by which they are authorized [to call] a minister for those churches. They declared that they had cho[sen]

named church of Raritan (Somerville), (see QUARTERLY, Vol. II, p.

In 1735 he was reappointed to the Council, and kept his seat until when, as his business engagements (doubtless in New York) had ted his attending its sessions, he asked to be dismissed. (See "N. J. ...ves," Vol. XI, p. 83, footnote, and references there cited).

Cornelius' will of Feb. 19, 1768, probated May 23, 1770 (Trenton Book K, p. 381), states that he was of Somerset County, Eastern ... and names his wife, Elizabeth, and sons, Philip and John, and ... children. To Philip he devises the one-half of the plantation ... Cornelius lived (551 acres of land out of 1102 acres); also a ... one-half of the residue of his estate after the death of his ... also names the children of Philip as Cornelius, William, Philip, ...zabeth, Cornelis and "Violetta," which serves perfectly to identi-... Philip. He names the children of John as Hannah, Elizabeth and ...rille. The land above devised appears to have been the same pur-... him Aug. 28, 1724, from John Chambers, of New York City ... Deeds, Book 33, p. —). A John Van Horne was a Justice of the ... Somerset, 1767 and 1768.

Cornelius Van Horne died about 1768, although his will was not ... until May, 1770, is evident from a notice in the "New York Ga-...cunti Weekly Mercury" of Mar. 20, 1769 ("N. J. Archives," Vol. ..., 401), which said: "Tuesday last was married at Elizabeth-... New Jersey; . . . . And on Thursday following Mr. James ... of this city (New York), bookseller, was married to the widow ... Van Horne, relict of Mr. Cornelius Van Horne."

... PHILIP VAN HORNE, b. probably about 1720; m. Elizabeth ... William Ricketts and Mary Walton, of (Jamaica). The dates of ... and death, and even the place of his death, have not yet been ... but he probably died before 1786, and perhaps in New York ... his father he was brought up as a New York merchant, but ... have settled at Middlebrook at least as early as 1754. On Dec. ... is referred to as "Col. Van Horn, of Somerset Co.," by Gov. ... who then gave orders that he proceed with forty men to Sussex ... "to be employed in the immediate defense of the frontiers of the ... ce in the counties of Morris and Sussex" against the reported ap- ... of the French and Indian army. ("N. J. Archives," Vol. VIII, ... Series, Second Part, p. 182). This is the first time we have seen his

---

name mentioned in connection with New Jersey military affairs. On May 12, 1759, he was appointed Judge of the Somerset County Courts, a position he probably held until the Revolution, as he was certainly acting as Judge in 1773 ("N. J. Archives," Vol. XXIX, p. 65), and it is also certain he was in Somerset after the War, and, we think, as late as 1782.

Col. Van Horne had nine children: 1. Cornelius. 2. William. 3. Philip. (These three probably born in New York City). 4. Mary Ricketts, who was b. Nov. 3, 1754, and m., Sept. 12, 1778, Col. Stephen Moylan, the brave Irish commander of the First Pennsylvania Light Dragoons. 5. John, b. June 4, 1759. 6. Elizabeth, b. Aug. 2, 1761. 7. Cornelia, b. June 11, 1764; m., Feb. 12, 1782, Thomas L. Lansdale. 8. Violette, b. 1766. 9. Maria, who m. Samuel Fox.

Further interesting facts about Col. Philip will be found in the article by Justice James J. Bergen in the 1912 QUARTERLY (Vol. I, p. 81). Some of the foregoing dates have been obtained from a typewritten sketch of the Van Horne line prepared by Mr. C. S. Williams, of New York City, in 1911, while other facts have been due to personal researches.

❧ ❧ ❧ ❧

## HISTORICAL NOTES AND COMMENTS

### BY THE EDITOR

❧ ❧ ❧ ❧

### The Frelinghuysen Name and Records of it

It has always been an interesting fact, but one which has also been the source of trouble to many genealogists, that our early Dutch ancestors varied their names, and even the spelling of their names, to a degree that we of this day can scarcely understand. No matter how educated they were, surnames and spelling appeared to have been of minor account. We could multiply instances of complete alterations in surnames without end, but just now are calling attention to the fact that consistent spelling of either surnames or Christian names seem to have been an unknown art. A mere examination of any of the old baptismal records, such as we have been publishing, proves the truth of our statement. We have lately had occasion to notice how the head of the Frelinghuysen family varied the spelling of his surname. If it be correctly stated in the careful minutes of the Classis of the Amsterdam, Holland, wherein his call to Somerset County is noted and approved, the correct family name was "Frielinghuy-sen." The record there says:

"1718, June 9th. Rev. Matthias Winterwyck, minister at Alphen, together with the Meura Bunker and van der Meulen, appeared before the Classis and exhibited an instrument from the congregation at Raritan, in the province of New Jersey, by which they are authorized to call a minister for those churches. They declared that they had chosen for

PETITIONER'S EXHIBIT 3

# Historic Sites & Districts in Somerset County, New Jersey





## Listed on the National & New Jersey Registers of Historic Places

Somerset County
Cultural & Heritage
Commission 2015

#25





Court

long



The remains of one of the redoubts can still be seen here, although it has worn down and eroded over the past nearly two-and-a-half centuries. It is New Jersey's only surviving Revolutionary War redoubt. Two historic signs at the site describe its history.[9]



## VAN HORNE HOUSE
### The Headquarters of General Lord Stirling during the 1779 Middlebrook Encampment



Van Horne House
941 East Main St.
Map / Directions to the Van Horne House
Map / Directions to all Bridgewater Revolutionary War Sites

The Van Horne House is operated by the Heritage Trail Association. Visit their website for information about tours and upcoming events: www.heritagetrail.org/van_horne_house.htm.

This house was built circa 1755 by Phillip Van Horne. Phillip entertained both American and British officers at this house during the Revolutionary War. [10]

#### Battle of Bound Brook
April 13, 1777

British forces under General Cornwallis made an attack at this site during the Battle of Bound Brook. American General Benjamin Lincoln was staying at the Van Horne House, and he was caught by surprise by the attack. He managed to escape capture by fleeing the house, apparently before he had time to fully dress in his uniform. Some of the men guarding the house were killed, and their three cannons were captured by the British.[11]

#### Second Middlebrook Encampment
November 1778 - June 1779

General Lord Stirling used this house as his headquarters during the Second Middlebrook Encampment. Lord Stirling, whose birth name was William Alexander, was born in New York City in 1726. He later moved to Basking Ridge, NJ. Stirling began his Revolutionary War service as a colonel in the Somerset County Militia. He was later appointed Brigadier General and then Major General in the Continental Army. Lord Stirling was a close friend of George Washington, and one of his most trusted Generals.

## VAN VEGHTEN HOUSE
### The Headquarters of General Nathanael Greene during the 1779 Middlebrook Encampment



Van Veghten House
9 Van Veghten Rd.
Map / Directions to the Van Veghten House
Map / Directions to all Bridgewater Revolutionary War Sites

The Van Veghten House is operated by the Somerset County Historical Society. Visit their website for information about tours and upcoming events: www.schsnj.com

This house was built at this site overlooking the Raritan River circa 1725 by Derrick Van Veghten, a wealthy farmer and prominent local citizen. During the Second Middlebrook Encampment, the house was used as the headquarters for Quartermaster General Nathanael Greene. Van Veghten's property encompassed a thousand acres, running from the Raritan River to the Watchung Mountains; some of the troops camped on his surrounding property. [12]

Greene wrote in a letter of an enjoyable evening spent while headquartered here: "We had a little dance at my quarters a few Evenings past. His Excellency [General Washington] and Mrs. Greene danced upwards of three hours without once siting [sic] down. Upon the whole we had a pretty little frisk." [13]





The Van Horne House was built in 1754 by Phillip Van Horne, a man who was known to entertain both American and British guests, which earned his estate the nickname "Convivial Hall." During the period known as the Forage Wars, the house was the headquarters of the American Generals Benjamin Lincoln and William Alexander (Lord Stirling) until the April 1777 Battle of Bound Brook, during which Benjamin Lincoln only narrowly avoided being taken prisoner. After the battle the house became the headquarters of a British outpost. The house is now the headquarters for the Heritage Trail Association.

← Old Stone Bridge – Central Arch – Bound Brook, NJ
- Share this Storyline Photo:
- Twitter
- Facebook
- Technorati
- Reddit
- Delicious
- Pinterest

First Middlebrook Encampment – Martinsville, NJ →

**2015 SOMERSET COUNTY
BOARD OF CHOSEN FREEHOLDERS**
Mark Caliguire, Director
Patricia L. Walsh, Deputy Director
Peter S. Palmer
Patrick Scaglione
Brian D. Levine

**SOMERSET COUNTY
CULTURAL & HERITAGE COMMISSION**
Robert Bouwman, President
Thomas Buckingham, Vice President
Ann Osterdale Rosenblum, Secretary
Phyllis Fittipaldi, Treasurer
Donald N. Esposito
Mark Else
Kathy Faulks
Phyllis Konen
H. Kels Swan

Patricia L. Walsh, Freeholder Liaison

Patricia McGarry, Manager
Thomas R. D'Amico, Historic Sites Coordinator
Kaitlin Bundy, Program Coordinator
Catherine Bunting, Administrative Assistant

The County would like to acknowledge the contributions to this publication
by Dennis Bertland, Constance M. Greiff, Ernest Bower, Ursula Brecknell,
William Schleicher and Susan Winter.

The sketches in this document were prepared by Jean Nielson & Arden Redpath
Layout by Greg Backman
Map produced by Andrew Phillips

Introductory Text adapted from materials provided by the
New Jersey Historic Preservation Office

*Somerset County Is An Equal Opportunity Employer*

# TABLE OF CONTENTS

Introduction ............................................................................................. 4

Bedminster Township ............................................................................ 6

Bernards Township ................................................................................ 10

Bernardsville Borough ........................................................................... 16

Bound Brook Borough ............................................................................ 19

Branchburg Township ............................................................................ 21

Bridgewater Township ........................................................................... 23

Far Hills Borough ................................................................................... 26

Franklin Township .................................................................................. 27

*Map of Historic Sites & Districts* ........................................................ 30

Green Brook Township ........................................................................... 34

Hillsborough Township .......................................................................... 35

Millstone Borough .................................................................................. 41

Montgomery Township ........................................................................... 42

North Plainfield Borough ....................................................................... 46

Peapack and Gladstone Borough ........................................................... 48

Raritan Borough ..................................................................................... 49

Rocky Hill Borough ................................................................................ 50

Somerville Borough ................................................................................ 51

South Bound Brook Borough .................................................................. 55

Warren Township .................................................................................... 56

Watchung Borough ................................................................................. 59

## INTRODUCTION

The National Register of Historic Places is the official list of the nation's cultural resources worthy of preservation. A National Register was first established in 1935 by the Historic Sites Act, which directed the Secretary of the Interior to define those properties of national importance as National Historic Landmarks. The National Historic Preservation Act of 1966 expanded the nature of the National Register to include not only properties of national significance, but also districts, sites, structures, buildings and objects of state and local importance. To implement the 1966 Act, the Governor of each state was asked to designate a State Historic Preservation Officer (SHPO) to work in partnership with the U.S. Department of the Interior's National Register Office. For New Jersey, the SHPO is the Commissioner of the Department of Environmental Protection.

The New Jersey Register of Historic Places is the official list of New Jersey's cultural resources. Created by the New Jersey Register of Historic Places Act of 1970, the State Register is closely modeled after the National Register Program. Both Registers have the same criteria for eligibility, nomination form, and review process. Nearly every municipality in New Jersey has properties significant in architecture, history, archaeology, engineering and/or culture that are eligible for the New Jersey and National Registers.

The New Jersey and National Registers provide a degree of review and protection from public encroachment. Section 106 of the National Historic Preservation Act of 1966, as amended, provides for review of any federally licensed, financed or assisted undertaking for properties listed on or eligible for the National Register. The New Jersey Register law requires review of any state, county or municipal undertaking involving properties listed on the New Jersey Register. These reviews are designated to prevent destruction or damage of historic resources by public agencies.

Inclusion in the National Register enables the owner of an income producing property to take advantage of certain federal tax benefits.

## BRIDGEWATER TOWNSHIP

## HISTORIC SITES

**24)  MIDDLEBROOK ENCAMPMENT, MOUNTAIN AVENUE**
NR 7-5-75   SR 5-8-75

This area was the scene of two encampments of major portions of Washington's Continental Army during the early summer of 1777, and during the winter of 1778-1779.  In May of 1777 Washington moved his entire army into Somerset County.  The largest portion of his forces (approximately 5,000 troops) was stationed just north of Bound Brook (Middlebrook). The presence of the American Army at Middlebrook foiled the British plans for taking Philadelphia in the spring of 1777.  This delay also prevented the British from reinforcing Burgoyne's Army moving south from Canada and contributed to his defeat and capture at Saratoga, New York, in October 1777, one of the major turning points of the war.

In December of 1778 the portion of the American Army under direct command of General Washington returned to Middlebrook.  Almost 10,000 soldiers were encamped at Middlebrook and other areas of the county (know as the Middlebrook Cantonment). Unlike the previous year at Valley Forge, the winter was remarkably mild and supplies were for the most part plentiful.  The encampment was significant for several reasons, among which were the establishment of the first military training academy for artillery officers (Pluckemin), the first training program for army surgeons and the formation of the Continental Army's first light-infantry corps under General Friedrich von Steuben.  When the 13-star flag was officially adopted by Congress in 1777, the first place it was flown over Continental troops was at Middlebrook.  The Washington Campground Association and Somerset County own portions of the encampment.

**25)   VAN HORNE HOUSE,** 941 MAIN STREET
NR 3-8-02   SR 12-20-01

The present Van Horne House probably dates back to the late 18th century and was extensively remodeled in the middle decades of the 19th and 20th centuries. The 1930s and 1940s remodeling was in the Colonial Revival style and is especially significant. This site, known as "Phil's Hill", was named after Phillip Van Horne, a Bridgewater merchant. It was the site of numerous important events during the Revolutionary War including a portion of the fighting during the Battle of Bound Brook, when British troops captured three American cannons on the front lawn. It was used at various times by Generals Lincoln, Stirling, Lee and Cornwallis. The house is owned by Somerset County and operated by the Heritage Trail Association. For further information go to www.heritagetrail.org.



Van Veghten House

**26)   VAN VEGHTEN HOUSE,** 9 VAN VEGHTEN ROAD
NR 10-10-79   SR 7-21-79

Built in the early 1700s, this brick house served as headquarters for Quartermaster General Nathaniel Green during the winter of 1778-1779. During the Middlebrook Cantonment (Second Middlebrook Encampment), Derrick Van Veghten quartered an entire division of American troops near the house. It was known, at that time, as one of the finest farmsteads in the area. It was originally a one-and-one- half-story dwelling that was widened and enlarged to two-and-one-half stories, probably prior to the Revolution. Derrick Van Veghten was the County Commissioner of Highways, a member of the Colonial Assembly and a member of the Grand Jury of the Court of Oyer and Terminer for Somerset County. It was updated to the Greek Revival style in the late 1830s by Richard Van Veghten. The Somerset County Historical Society now operates the site. Hours: Tuesday 12:00 p.m.-3:00 p.m., Saturday 12:00 p.m. to 4:00 p.m. December through March closed. For further information go to www.schsnj.org.

PETITIONER'S EXHIBIT 4



# FOURTEENTH AMENDMENT

————

## RIGHTS GUARANTEED
## PRIVILEGES AND IMMUNITIES OF CITIZENSHIP,
## DUE PROCESS AND EQUAL PROTECTION

————

## CONTENTS

| | Page |
|---|---|
| Section 1. Rights Guaranteed | 1565 |
| Citizens of the United States | 1565 |
| Privileges and Immunities | 1568 |
| Due Process of Law | 1572 |
| The Development of Substantive Due Process | 1572 |
| "Persons" Defined | 1578 |
| Police Power Defined and Limited | 1579 |
| "Liberty" | 1581 |
| Liberty of Contract | 1581 |
| Regulatory Labor Laws Generally | 1581 |
| Laws Regulating Hours of Labor | 1586 |
| Laws Regulating Labor in Mines | 1586 |
| Laws Prohibiting Employment of Children in Hazardous Occupations | 1587 |
| Laws Regulating Payment of Wages | 1587 |
| Minimum Wage Laws | 1587 |
| Workers' Compensation Laws | 1588 |
| Collective Bargaining | 1591 |
| Regulation of Business Enterprises: Rates, Charges, and Conditions of Service | 1594 |
| "Business Affected With a Public Interest" | 1594 |
| *Nebbia v. New York* | 1596 |
| Judicial Review of Publicly Determined Rates and Charges | 1597 |
| Development | 1597 |
| Limitations on Judicial Review | 1600 |
| The *Ben Avon* Case | 1602 |
| History of the Valuation Question | 1603 |
| Regulation of Public Utilities (Other Than Rates) | 1607 |
| In General | 1607 |
| Compulsory Expenditures: Grade Crossings, and the Like | 1608 |
| Compellable Services | 1610 |
| Safety Regulations Applicable to Railroads | 1612 |
| Statutory Liabilities and Penalties Applicable to Railroads | 1613 |
| Regulation of Corporations, Business, Professions, and Trades | 1614 |
| Corporations | 1614 |
| Business in General | 1615 |
| Laws Prohibiting Trusts, Discrimination, Restraint of Trade | 1615 |
| Laws Preventing Fraud in Sale of Goods and Securities | 1616 |
| Banking, Wage Assignments and Garnishment | 1618 |
| Insurance | 1619 |
| Miscellaneous Businesses and Professions | 1622 |
| Protection of State Resources | 1624 |

1559

## 1560     AMENDMENT 14—RIGHTS GUARANTEED

Section 1. Rights Guaranteed—Continued
  Due Process of Law—Continued
| | |
|---|---|
| Oil and Gas | 1624 |
| Protection of Property and Agricultural Crops | 1625 |
| Water | 1626 |
| Fish and Game | 1627 |
| Ownership of Real Property: Limitations, Rights | 1628 |
| Zoning and Similar Actions | 1628 |
| Estates, Succession, Abandoned Property | 1630 |
| Health, Safety, and Morals | 1632 |
| Safety Regulations | 1632 |
| Sanitation | 1633 |
| Food, Drugs, Milk | 1633 |
| Intoxicating Liquor | 1634 |
| Regulation of Motor Vehicles and Carriers | 1634 |
| Protecting Morality | 1636 |
| Vested Rights, Remedial Rights, Political Candidacy | 1636 |
| Control of Local Units of Government | 1637 |
| Taxing Power | 1637 |
| Generally | 1637 |
| Public Purpose | 1638 |
| Other Considerations Affecting Validity: Excessive Burden; Ratio of Amount Of Benefit Received | 1638 |
| Estate, Gift and Inheritance Taxes | 1639 |
| Income Taxes | 1640 |
| Franchise Taxes | 1640 |
| Severance Taxes | 1640 |
| Real Property Taxes | 1641 |
| Jurisdiction to Tax | 1642 |
| Sales/Use Taxes | 1643 |
| Land | 1643 |
| Tangible Personalty | 1643 |
| Intangible Personalty | 1646 |
| Transfer (Inheritance, Estate, Gift) Taxes | 1650 |
| Corporate Privilege Taxes | 1654 |
| Individual Income Taxes | 1655 |
| Corporate Income Taxes: Foreign Corporations | 1656 |
| Insurance Company Taxes | 1657 |
| Procedure in Taxation | 1659 |
| Generally | 1659 |
| Notice and Hearing in Relation to Taxes | 1659 |
| Notice and Hearing in Relation to Assessments | 1660 |
| Collection of Taxes | 1662 |
| Sufficiency and Manner of Giving Notice | 1664 |
| Sufficiency of Remedy | 1665 |
| Laches | 1665 |
| Eminent Domain | 1666 |
| Substantive Due Process and Noneconomic Liberty | 1666 |
| Abortion | 1669 |
| Privacy: Its Constitutional Dimensions | 1679 |
| Family Relationships | 1688 |
| Liberty Interests of Retarded and Mentally Ill: Commitment and Treatment | 1690 |

AMENDMENT 14—RIGHTS GUARANTEED          1561

Section 1. Rights Guaranteed—Continued
    Due Process of Law—Continued
        "Right to Die" ......................................................................................... 1692
Procedural Due Process: Civil ...................................................................................... 1693
    Some General Criteria ........................................................................................ 1693
        Ancient Use and Uniformity ......................................................................... 1693
        Equality ........................................................................................................ 1694
        Due Process, Judicial Process, and Separation of Powers ........................ 1694
    Power of the States to Regulate Procedure ...................................................... 1695
        Generally ...................................................................................................... 1695
        Commencement of Actions .......................................................................... 1696
        Pleas in Abatement ...................................................................................... 1696
        Defenses ........................................................................................................ 1697
        Amendments and Continuances .................................................................. 1697
        Costs, Damages, and Penalties .................................................................... 1698
        Statutes of Limitation .................................................................................. 1699
        Evidence and Presumptions ......................................................................... 1701
        Jury Trials .................................................................................................... 1704
        Appeals ......................................................................................................... 1704
    Jurisdiction ........................................................................................................ 1705
        Generally ...................................................................................................... 1705
        In Personam Proceedings Against Individuals ........................................... 1707
        Suability of Foreign Corporations .............................................................. 1710
        Actions in Rem: Proceedings Against Land ............................................... 1716
        Actions in Rem: Attachment Proceedings .................................................. 1718
        Actions in Rem: Estates, Trusts, Corporations .......................................... 1720
        Notice: Service of Process ............................................................................ 1722
    The Procedure Which Is Due Process ................................................................ 1723
        The Interests Protected: Entitlements and Positivist Recognition ............ 1723
        Proceedings in Which Procedural Due Process Must Be Observed ........... 1732
        When Is Process Due .................................................................................... 1735
        The Requirements of Due Process ............................................................... 1740
Procedural Due Process: Criminal .............................................................................. 1745
    Generally ............................................................................................................ 1745
    The Elements of Due Process ............................................................................ 1747
        Clarity in Criminal Statutes: The Void-for-Vagueness Doctrine ............... 1747
        Other Aspects of Statutory Notice .............................................................. 1749
        Entrapment ................................................................................................... 1750
        Criminal Identification Process ................................................................... 1752
        Initiation of the Prosecution ....................................................................... 1753
        Fair Trial ...................................................................................................... 1753
        Guilty Pleas .................................................................................................. 1757
        Prosecutorial Misconduct ............................................................................ 1758
        Proof, Burden of Proof, and Presumptions ................................................. 1761
        Sentencing .................................................................................................... 1765
        The Problem of the Incompetent or Insane Defendant or Convict ............ 1769
        Corrective Process: Appeals and Other Remedies ...................................... 1770
        Rights of Prisoners ....................................................................................... 1772
        Probation and Parole .................................................................................... 1776
        The Problem of the Juvenile Offender ......................................................... 1780
        The Problem of Civil Commitment .............................................................. 1783
Equal Protection of the Laws ..................................................................................... 1786
    Scope and Application ........................................................................................ 1786

1562      AMENDMENT 14—RIGHTS GUARANTEED

Equal Protection of the Laws—Continued
   Scope and Application—Continued
      State Action ............................................................................................................ 1786
      "Persons" ................................................................................................................. 1802
      "Within Its Jurisdiction" ...................................................................................... 1803
   Equal Protection: Judging Classifications by Law .......................................... 1804
      Traditional Standard: Restrained Review ........................................................ 1805
      The New Standards: Active Review ................................................................... 1809
   Testing Facially Neutral Classifications Which Impact on Minorities .......................... 1815
Traditional Equal Protection: Economic Regulation and Related Exercises of the Police
Powers ............................................................................................................................. 1821
   Taxation ........................................................................................................................ 1821
      Classification for Purpose of Taxation .............................................................. 1821
      Foreign Corporations and Nonresidents .......................................................... 1824
      Income Taxes ......................................................................................................... 1825
      Inheritance Taxes ................................................................................................. 1826
      Motor Vehicle Taxes ............................................................................................ 1826
      Property Taxes ...................................................................................................... 1827
      Special Assessment .............................................................................................. 1828
   Police Power Regulation ........................................................................................... 1829
      Classification .......................................................................................................... 1829
   Other Business and Employment Relations ......................................................... 1834
      Labor Relations ..................................................................................................... 1834
      Monopolies and Unfair Trade Practices ........................................................... 1835
      Administrative Discretion ................................................................................... 1835
      Social Welfare ........................................................................................................ 1836
      Punishment of Crime .......................................................................................... 1838
Equal Protection and Race .................................................................................................. 1839
   Overview ...................................................................................................................... 1839
   Education ...................................................................................................................... 1840
      Development and Application of "Separate But Equal" .............................. 1840
      Brown v. Board of Education .............................................................................. 1842
      Brown's Aftermath .............................................................................................. 1843
      Implementation of School Desegregation ........................................................ 1845
      Northern Schools: Inter- and Intradistrict Desegregation ............................ 1847
      Efforts to Curb Busing and Other Desegregation Remedies ....................... 1852
      Termination of Court Supervision .................................................................... 1853
   Juries ............................................................................................................................ 1854
   Capital Punishment ................................................................................................... 1857
   Housing ......................................................................................................................... 1858
   Other Areas of Discrimination ................................................................................ 1859
      Transportation ...................................................................................................... 1859
      Public Facilities .................................................................................................... 1859
      Marriage ................................................................................................................. 1860
      Judicial System .................................................................................................... 1860
      Public Designation ............................................................................................... 1861
      Public Accommodations ...................................................................................... 1861
      Elections ................................................................................................................. 1861
   Permissible Remedial Utilization of Racial Classifications ............................. 1861
The New Equal Protection ................................................................................................... 1869
   Classifications Meriting Close Scrutiny ................................................................ 1869
      Alienage and Nationality .................................................................................... 1869
      Sex ........................................................................................................................... 1875

The New Equal Protection—Continued
  Classifications Meriting Close Scrutiny—Continued
      Illegitimacy ................................................................................................................... 1886
    Fundamental Interests: The Political Process .................................................... 1892
      Voter Qualifications ............................................................................................... 1893
      Access to the Ballot ............................................................................................... 1897
      Apportionment and Districting .......................................................................... 1902
      Weighing of Votes .................................................................................................. 1911
    The Right to Travel .................................................................................................. 1911
      Durational Residency Requirements ................................................................. 1911
    Marriage and Familial Relations .......................................................................... 1914
    Poverty and Fundamental Interests: The Intersection of Due Process and Equal Protection ..................................................................................................................... 1916
      Generally .................................................................................................................. 1916
      Criminal Procedure .............................................................................................. 1918
      The Criminal Sentence ........................................................................................ 1920
      Voting ....................................................................................................................... 1921
      Access to Courts .................................................................................................... 1922
      Educational Opportunity ..................................................................................... 1923
      Abortion ................................................................................................................... 1925
Section 2. Apportionment of Representation ........................................................... 1926
Sections 3 and 4. Disqualification and Public Debt ............................................... 1928
Section 5. Enforcement ................................................................................................ 1928
  Generally ...................................................................................................................... 1928
  State Action ................................................................................................................. 1929
  Congressional Definition of Fourteenth Amendment Rights .......................... 1933

### RIGHTS GUARANTEED

### PRIVILEGES AND IMMUNITIES OF CITIZENSHIP, DUE PROCESS AND EQUAL PROTECTION

———

### FOURTEENTH AMENDMENT

SECTION 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

### CITIZENS OF THE UNITED STATES

In the *Dred Scott Case*,[1] Chief Justice Taney for the Court ruled that United States citizenship was enjoyed by two classes of individuals: (1) white persons born in the United States as descendents of "persons, who were at the time of the adoption of the Constitution recognized as citizens in the several States and [who] became also citizens of this new political body," the United States of America, and (2) those who, having been "born outside the dominions of the United States," had migrated thereto and been naturalized therein. The States were competent, he continued, to confer state citizenship upon anyone in their midst, but they could not make the recipient of such status a citizen of the United States. The "Negro," or "African race," according to the Chief Justice, was ineligible to attain United States citizenship, either from a State or by virtue of birth in the United States, even as a free man descended from a Negro residing as a free man in one of the States at the date of ratification of the Constitution.[2] Congress, first in § 1 of the Civil Rights Act of 1866 [3] and then in the first sentence

---

[1] Scott v. Sandford, 60 U.S. (19 How.) 393, 404–06, 417–18, 419–20 (1857).

[2] The controversy, political as well as constitutional, which this case stirred and still stirs, is exemplified and analyzed in the material collected in S. KUTLER, THE DRED SCOTT DECISION: LAW OR POLITICS? (1967).

[3] "That all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States; and such citizens, of every race and color, without regard to any previous

of § 1 of the Fourteenth Amendment, [4] set aside the *Dred Scott* holding in a sentence "declaratory of existing rights, and affirmative of existing law. . . ." [5]

While clearly establishing a national rule on national citizenship and settling a controversy of long standing with regard to the derivation of national citizenship, the Fourteenth Amendment did not obliterate the distinction between national and state citizenship, but rather preserved it. [6] The Court has accorded the first sentence of § 1 a construction in accordance with the congressional intentions, holding that a child born in the United States of Chinese parents who themselves were ineligible to be naturalized is nevertheless a citizen of the United States entitled to all the rights and privileges of citizenship. [7] Congress' intent in including the qualifying phrase "and subject to the jurisdiction thereof," was apparently to exclude from the reach of the language children born of diplomatic representatives of a foreign state and children born of alien enemies in hostile occupation, both recognized exceptions to the common-law rule of acquired citizenship by birth, [8] as well as children of members of Indian tribes subject to tribal laws. [9] The lower courts have generally held that the citizenship of the parents determines the citizenship of children born on vessels in United States territorial waters or on the high seas. [10]

In *Afroyim v. Rusk*, [11] a divided Court extended the force of this first sentence beyond prior holdings, ruling that it withdrew

---

condition of slavery or involuntary servitude . . . shall have the same right[s]. . . ." Ch. 31, 14 Stat. 27.

[4] The proposed amendment as it passed the House contained no such provision, and it was decided in the Senate to include language like that finally adopted. CONG. GLOBE, 39th Cong., 1st Sess. 2560, 2768–69, 2869 (1866). The sponsor of the language said: "This amendment which I have offered is simply declaratory of what I regard as the law of the land already, that every person born within the limits of the United States, and subject to their jurisdiction, is . . . a citizen of the United States." Id. at 2890. The legislative history is discussed at some length in Afroyim v. Rusk, 387 U.S. 253, 282–86 (1967) (Justice Harlan dissenting).

[5] United States v. Wong Kim Ark, 169 U.S. 649, 688 (1898).

[6] Slaughter-House Cases, 83 U.S. (16 Wall.) 36, 74 (1873).

[7] United States v. Wong Kim Ark, 169 U.S. 649 (1898).

[8] Id. at 682.

[9] Id. at 680–82; Elk v. Wilkins, 112 U.S. 94, 99 (1884).

[10] United States v. Gordon, 25 Fed. Cas. 1364 (C.C.S.D.N.Y. 1861) (No. 15,231); In re Look Tin Sing, 21 F. 905 (C.C.Cal. 1884); Lam Mow v. Nagle, 24 F.2d 316 (9th Cir. 1928).

[11] 387 U.S. 253 (1967). Though the Court upheld the involuntary expatriation of a woman citizen of the United States during her marriage to a foreign citizen in Mackenzie v. Hare, 239 U.S. 299 (1915), the subject first received extended judicial treatment in Perez v. Brownell, 356 U.S. 44 (1958), in which by a five-to-four decision the Court upheld a statute denaturalizing a native-born citizen for having voted in a foreign election. For the Court, Justice Frankfurter reasoned that Congress' power to regulate foreign affairs carried with it the authority to sever the relationship of this country with one of its citizens to avoid national implication in



(A) all consular officers responsible for the issuance of visas;

(B) all Federal inspection agents at all United States border inspection points; and

(C) all law enforcement and intelligence officers as determined by regulation to be responsible for investigation or identification of aliens admitted to the United States pursuant to a visa.

**(4) Report**

Not later than one year after October 26, 2001, and every 2 years thereafter, the Attorney General and the Secretary of State shall jointly, in consultation with the Secretary of the Treasury, report to Congress describing the development, implementation, efficacy, and privacy implications of the technology standard and electronic database system described in this section.

**(5) Funding**

There is authorized to be appropriated to the Secretary of State, the Attorney General, and the Director of the National Institute of Standards and Technology such sums as may be necessary to carry out the provisions of this section.

(Pub. L. 107–56, title IV, § 403(c), Oct. 26, 2001, 115 Stat. 344; Pub. L. 107–173, title II, §§ 201(c)(5), 202(a)(4)(B), May 14, 2002, 116 Stat. 548, 549.)

CODIFICATION

Section was enacted as part of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 or USA PATRIOT Act, and not as part of the Immigration and Nationality Act which comprises this chapter.

AMENDMENTS

2002—Par. (1). Pub. L. 107–173, §§ 201(c)(5)(A), 202(a)(4)(B)(i), substituted "15 months" for "2 years" and inserted ", including appropriate biometric identifier standards." after "technology standard".
Par. (2). Pub. L. 107–173, § 202(a)(4)(B)(ii), substituted "interoperable" for "Integrated" in heading and "interoperable" for "integrated" in text.
Par. (4). Pub. L. 107–173, § 201(c)(5)(B), substituted "one year" for "18 months".

REPORT ON THE INTEGRATED AUTOMATED FINGERPRINT IDENTIFICATION SYSTEM FOR PORTS OF ENTRY AND OVERSEAS CONSULAR POSTS

Pub. L. 107–56, title IV, § 405, Oct. 26, 2001, 115 Stat. 345, provided that:
"(a) IN GENERAL.—The Attorney General, in consultation with the appropriate heads of other Federal agencies, including the Secretary of State, Secretary of the Treasury, and the Secretary of Transportation, shall report to Congress on the feasibility of enhancing the Integrated Automated Fingerprint Identification System (IAFIS) of the Federal Bureau of Investigation and other identification systems in order to better identify a person who holds a foreign passport or a visa and may be wanted in connection with a criminal investigation in the United States or abroad, before the issuance of a visa to that person or the entry or exit from the United States by that person.
"(b) AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated not less than $2,000,000 to carry out this section."

**§ 1380. Maintenance of statistics by the Department of Homeland Security**

**(a) In general**

The Department of Homeland Security shall maintain statistics regarding petitions filed, approved, extended, and amended with respect to nonimmigrants described in section 1101(a)(15)(L) of this title, including the number of such nonimmigrants who are classified on the basis of specialized knowledge and the number of nonimmigrants who are classified on the basis of specialized knowledge in order to work primarily at offsite locations.

**(b) Applicability**

Subsection (a) of this section shall apply to petitions filed on or after the effective date of this subtitle.

(Pub. L. 108–447, div. J, title IV, § 414, Dec. 8, 2004, 118 Stat. 3352.)

REFERENCES IN TEXT

This subtitle, referred to in subsec. (b), means subtitle A (§§ 411–417) of title IV of div. J of Pub. L. 108–447. For the effective date of subtitle A, see section 417 of Pub. L. 108–447, set out as an Effective Date of 2004 Amendment note under section 1184 of this title.

CODIFICATION

Section was enacted as part of the L–1 Visa (Intracompany Transferee) Reform Act of 2004, and also as part of the L–1 Visa and H–1B Visa Reform Act and the Consolidated Appropriations Act, 2005, and not as part of the Immigration and Nationality Act which comprises this chapter.

EFFECTIVE DATE

Section effective 180 days after Dec. 8, 2004, see section 417 of Pub. L. 108–447, set out as an Effective Date of 2004 Amendment note under section 1184 of this title.

**§ 1381. Secretary of Labor report**

Not later than January 31 of each year, the Secretary of Labor shall report to the Committees on the Judiciary of the Senate and the House of Representatives on the investigations undertaken based on—

(1) the authorities described in clauses (i) and (ii) of section 1182(n)(2)(G) of this title; and

(2) the expenditures by the Secretary of Labor described in section 1356(v)(2)(D) of this title.

(Pub. L. 108–447, div. J, title IV, § 424(c), Dec. 8, 2004, 118 Stat. 3356.)

CODIFICATION

Section was enacted as part of the H–1B Visa Reform Act of 2004, and also as part of the L–1 Visa and H–1B Visa Reform Act and the Consolidated Appropriations Act, 2005, and not as part of the Immigration and Nationality Act which comprises this chapter.

EFFECTIVE DATE

Section effective 90 days after Dec. 8, 2004, see section 430 of Pub. L. 108–447, set out as an Effective Date of 2004 Amendment note under section 1182 of this title.

### SUBCHAPTER III—NATIONALITY AND NATURALIZATION

PART I—NATIONALITY AT BIRTH AND COLLECTIVE NATURALIZATION

**§ 1401. Nationals and citizens of United States at birth**

The following shall be nationals and citizens of the United States at birth:

(a) a person born in the United States, and subject to the jurisdiction thereof;

(b) a person born in the United States to a member of an Indian, Eskimo, Aleutian, or other aboriginal tribe: *Provided,* That the granting of citizenship under this subsection shall not in any manner impair or otherwise affect the right of such person to tribal or other property;

(c) a person born outside of the United States and its outlying possessions of parents both of whom are citizens of the United States and one of whom has had a residence in the United States or one of its outlying possessions, prior to the birth of such person;

(d) a person born outside of the United States and its outlying possessions of parents one of whom is a citizen of the United States who has been physically present in the United States or one of its outlying possessions for a continuous period of one year prior to the birth of such person, and the other of whom is a national, but not a citizen of the United States;

(e) a person born in an outlying possession of the United States of parents one of whom is a citizen of the United States who has been physically present in the United States or one of its outlying possessions for a continuous period of one year at any time prior to the birth of such person;

(f) a person of unknown parentage found in the United States while under the age of five years, until shown, prior to his attaining the age of twenty-one years, not to have been born in the United States;

(g) a person born outside the geographical limits of the United States and its outlying possessions of parents one of whom is an alien, and the other a citizen of the United States who, prior to the birth of such person, was physically present in the United States or its outlying possessions for a period or periods totaling not less than five years, at least two of which were after attaining the age of fourteen years: *Provided,* That any periods of honorable service in the Armed Forces of the United States, or periods of employment with the United States Government or with an international organization as that term is defined in section 288 of title 22 by such citizen parent, or any periods during which such citizen parent is physically present abroad as the dependent unmarried son or daughter and a member of the household of a person (A) honorably serving with the Armed Forces of the United States, or (B) employed by the United States Government or an international organization as defined in section 288 of title 22, may be included in order to satisfy the physical-presence requirement of this paragraph. This proviso shall be applicable to persons born on or after December 24, 1952, to the same extent as if it had become effective in its present form on that date; and

(h) a person born before noon (Eastern Standard Time) May 24, 1934, outside the limits and jurisdiction of the United States of an alien father and a mother who is a citizen of the United States who, prior to the birth of such person, had resided in the United States.

(June 27, 1952, ch. 477, title III, ch. 1, § 301, 66 Stat. 235; Pub. L. 89–770, Nov. 6, 1966, 80 Stat. 1322; Pub. L. 92–584, §§ 1, 3, Oct. 27, 1972, 86 Stat. 1289; Pub. L. 95–432, §§ 1, 3, Oct. 10, 1978, 92 Stat. 1046; Pub. L. 99–653, § 12, Nov. 14, 1986, 100 Stat. 3657; Pub. L. 103–416, title I, § 101(a), Oct. 25, 1994, 108 Stat. 4306.)

### AMENDMENTS

1994—Subsec. (h). Pub. L. 103–416 added subsec. (h).

1986—Subsec. (g). Pub. L. 99–653 substituted "five years, at least two" for "ten years, at least five".

1978—Subsec. (a). Pub. L. 95–432, § 3, struck out "(a)" before "The following" and redesignated pars. (1) to (7) as (a) to (g), respectively.

Subsec. (b). Pub. L. 95–432, § 1, struck out subsec. (b) which provided that any person who was a national or citizen of the United States under subsec. (a)(7) lose his nationality or citizenship unless he be continuously physically present in the United States for a period of not less than two years between the ages of 14 and 28 or that the alien parent be naturalized while the child was under 18 years of age and the child began permanent residence in the United States while under 18 years of age and that absence from the United States of less than 60 days not break the continuity of presence.

Subsec. (c). Pub. L. 95–432, § 1, struck out subsec. (c) which provided that former subsec. (b) apply to persons born abroad subsequent to May 24, 1934, except that this not be construed to alter the citizenship of any person born abroad subsequent to May 24, 1934 who, prior to the effective date of this chapter, had taken up residence in the United States before attaining 16 years of age, and thereafter, whether before or after the effective date of this chapter, complied with the residence requirements of section 201(g) and (h) of the Nationality Act of 1940.

Subsec. (d). Pub. L. 95–432, § 1, struck out subsec. (d) which provided that nothing in former subsec. (b) be construed to alter the citizenship of any person who came into the United States prior to Oct. 27, 1972, and who, whether before or after Oct. 27, 1972, immediately following such coming complied with the physical presence requirements for retention of citizenship specified in former subsec. (b), prior to amendment of former subsec. (b) by Pub. L. 92–584.

1972—Subsec. (b). Pub. L. 92–584, § 1, substituted provisions that nationals and citizens of the United States under subsec. (a)(7), lose such status unless they are present continuously in the United States for two years between the ages of fourteen and twenty eight years, or the alien parent is naturalized while the child is under the age of eighteen years and the child begins to reside permanently in the United States while under the age of eighteen years, and that absence from the United States of less than sixty days will not break the continuity of presence, for provisions that such status would be lost unless the nationals and citizens come to the United States prior to attaining twenty three years and be present continuously in the United States for five years, and that such presence should be between the age of fourteen and twenty eight years.

Subsec. (d). Pub. L. 92–584, § 3, added subsec. (d).

1966—Subsec. (a)(7). Pub. L. 89–770 authorized periods of employment with the United States Government or with an international organization by the citizen parent, or any periods during which the citizen parent is physically present abroad as the dependent unmarried son or daughter and a member of the household of a person (A) honorably serving with the Armed Forces of the United States, or (B) employed by the United States Government or an international organization, to be included in order to satisfy the physical presence requirement, and permitted the proviso to be applicable to persons born on or after December 24, 1952.

### EFFECTIVE DATE OF 1986 AMENDMENT

Section 23(d) of Pub. L. 99–653, as added by Pub. L. 100–525, § 8(r), Oct. 24, 1988, 102 Stat. 2619, provided that:

"The amendment made by section 12 [amending this section] shall apply to persons born on or after November 14, 1986."

EFFECTIVE DATE OF 1978 AMENDMENT

Section 1 of Pub. L. 95–432 provided that the amendment made by that section is effective Oct. 10, 1978.

EFFECTIVE DATE

Chapter effective 180 days after June 27, 1952, see section 407 of act June 27, 1952, set out as a note under section 1101 of this title.

WAIVER OF RETENTION REQUIREMENTS

Section 101(b) of Pub. L. 103–416 provided that: "Any provision of law (including section 301(b) of the Immigration and Nationality Act [8 U.S.C. 1401(b)] (as in effect before October 10, 1978), and the provisos of section 201(g) of the Nationality Act of 1940 [former 8 U.S.C. 601(g)]) that provided for a person's loss of citizenship or nationality if the person failed to come to, or reside or be physically present in, the United States shall not apply in the case of a person claiming United States citizenship based on such person's descent from an individual described in section 301(h) of the Immigration and Nationality Act (as added by subsection (a))."

RETROACTIVE APPLICATION OF 1994 AMENDMENT

Section 101(c) of Pub. L. 103–416 provided that:
"(1) Except as provided in paragraph (2), the immigration and nationality laws of the United States shall be applied (to persons born before, on, or after the date of the enactment of this Act [Oct. 25, 1994]) as though the amendment made by subsection (a) [amending this section], and subsection (b) [enacting provisions set out above], had been in effect as of the date of their birth, except that the retroactive application of the amendment and that subsection shall not affect the validity of citizenship of anyone who has obtained citizenship under section 1993 of the Revised Statutes [former R.S. 6] (as in effect before the enactment of the Act of May 24, 1934 (48 Stat. 797)).

"(2) The retroactive application of the amendment made by subsection (a), and subsection (b), shall not confer citizenship on, or affect the validity of any denaturalization, deportation, or exclusion action against, any person who is or was excludable from the United States under section 212(a)(3)(E) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(E)) (or predecessor provision) or who was excluded from, or who would not have been eligible for admission to, the United States under the Displaced Persons Act of 1948 [former 50 U.S.C. App. 1951 et seq.] or under section 14 of the Refugee Relief Act of 1953 [former 50 U.S.C. App. 1971l]."

APPLICABILITY OF TRANSMISSION REQUIREMENTS

Section 101(d) of Pub. L. 103–416, as amended by Pub. L. 104–208, div. C, title VI, §671(b)(1), Sept. 30, 1996, 110 Stat. 3009–721, provided that: "This section [amending this section and enacting provisions set out above], the amendments made by this section, and any retroactive application of such amendments shall not effect the application of any provision of law relating to residence or physical presence in the United States for purposes of transmitting United States citizenship to any person whose claim is based on the amendment made by subsection (a) [amending this section] or through whom such a claim is derived."

ADMISSION OF ALASKA AS STATE

Alaska Statehood provisions as not conferring, terminating, or restoring United States nationality, see section 21 of Pub. L. 85–508, July 7, 1958, 72 Stat. 339, set out as a note preceding former section 21 of Title 48, Territories and Insular Possessions.

## § 1401a. Birth abroad before 1952 to service parent

Section 1401(g) of this title shall be considered to have been and to be applicable to a child born outside of the United States and its outlying possessions after January 12, 1941, and before December 24, 1952, of parents one of whom is a citizen of the United States who has served in the Armed Forces of the United States after December 31, 1946, and before December 24, 1952, and whose case does not come within the provisions of section 201(g) or (i) of the Nationality Act of 1940.

(Mar. 16, 1956, ch. 85, 70 Stat. 50; Pub. L. 97–116, §18(u)(2), Dec. 29, 1981, 95 Stat. 1621.)

REFERENCES IN TEXT

Section 201(g) and (i) of the Nationality Act of 1940, referred to in text, which were repealed by act June 27, 1952, ch. 477, title IV, §403(a)(42), 66 Stat. 280, eff. Dec. 24, 1952, provided as follows:
"The following shall be nationals and citizens of the United States at birth:

\*      \*      \*      \*      \*

"(g) A person born outside the United States and its outlying possessions of parents one of whom is a citizen of the United States who, prior to the birth of such person, has had ten years' residence in the United States or one of its outlying possessions, at least five of which were after attaining the age of sixteen years, the other being an alien: *Provided*, That, in order to retain such citizenship, the child must reside in the United States or its outlying possessions for a period or periods totaling five years between the ages of thirteen and twenty-one years: *Provided further*, That, if the child has not taken up a residence in the United States or its outlying possessions by the time he reaches the age of sixteen years, or if he resides abroad for such a time that it becomes impossible for him to complete the five years' residence in the United States or its outlying possessions before reaching the age of twenty-one years, his American citizenship shall thereupon cease.
"The preceding provisos shall not apply to a child born abroad whose American parent is at the time of the child's birth residing abroad solely or principally in the employment of the Government of the United States or a bona fide American, educational, scientific, philanthropic, religious, commercial, or financial organization, having its principal office or place of business in the United States, or an international agency of an official character in which the United States participates, for which he receives a substantial compensation:

\*      \*      \*      \*      \*

"(i) A person born outside the United States and its outlying possessions of parents one of whom is a citizen of the United States who has served or shall serve honorably in the armed forces of the United States after December 7, 1941, and before the date of the termination of hostilities in the present war as proclaimed by the President or determined by a joint resolution by the Congress and who, prior to the birth of such person, has had ten years' residence in the United States or one of its outlying possessions, at least five of which were after attaining the age of twelve years, the other being an alien: *Provided*, That in order to retain such citizenship, the child must reside in the United States or its outlying possessions for a period or periods totaling five years between the ages of thirteen and twenty-one years: *Provided further*, That, if the child has not taken up a residence in the United States or its outlying possessions by the time he reaches the age of sixteen years, or if he resides abroad for such a time that it be-

comes impossible for him to complete the five years' residence in the United States or its outlying possessions before reaching the age of twenty-one years, his American citizenship shall thereupon cease.''

### CODIFICATION

Section was not enacted as part of the Immigration and Nationality Act which comprises this chapter.

### AMENDMENTS

1981—Pub. L. 97–116 substituted ''Section 1401(g)'' for ''Section 1401(a)(7)''.

### EFFECTIVE DATE OF 1981 AMENDMENT

Amendment by Pub. L. 97–116 effective Dec. 29, 1981, see section 21(a) of Pub. L. 97–116, set out as a note under section 1101 of this title.

### § 1401b. Repealed. Pub. L. 92–584, § 2, Oct. 27, 1972, 86 Stat. 1289

Section, Pub. L. 85–316, § 16, Sept. 11, 1957, 71 Stat. 644, provided that absence from the United States of less than twelve months would not break the continuity of presence in the administration of section 1401(b) of this title. See section 1401(b) of this title.

### § 1402. Persons born in Puerto Rico on or after April 11, 1899

All persons born in Puerto Rico on or after April 11, 1899, and prior to January 13, 1941, subject to the jurisdiction of the United States, residing on January 13, 1941, in Puerto Rico or other territory over which the United States exercises rights of sovereignty and not citizens of the United States under any other Act, are declared to be citizens of the United States as of January 13, 1941. All persons born in Puerto Rico on or after January 13, 1941, and subject to the jurisdiction of the United States, are citizens of the United States at birth.

(June 27, 1952, ch. 477, title III, ch. 1, § 302, 66 Stat. 236.)

### § 1403. Persons born in the Canal Zone or Republic of Panama on or after February 26, 1904

(a) Any person born in the Canal Zone on or after February 26, 1904, and whether before or after the effective date of this chapter, whose father or mother or both at the time of the birth of such person was or is a citizen of the United States, is declared to be a citizen of the United States.

(b) Any person born in the Republic of Panama on or after February 26, 1904, and whether before or after the effective date of this chapter, whose father or mother or both at the time of the birth of such person was or is a citizen of the United States employed by the Government of the United States or by the Panama Railroad Company, or its successor in title, is declared to be a citizen of the United States.

(June 27, 1952, ch. 477, title III, ch. 1, § 303, 66 Stat. 236.)

### REFERENCES IN TEXT

For definition of Canal Zone, referred to in text, see section 3602(b) of Title 22, Foreign Relations and Intercourse.

The effective date of this chapter, referred to in text, is the 180th day immediately following June 27, 1952. See section 407 of act June 27, 1952, set out as an Effective Date note under section 1101 of this title.

### CHANGE OF NAME

Panama Railroad Company redesignated Panama Canal Company by act Sept. 26, 1950, ch. 1049, § 2(a)(2), 64 Stat. 1038. References to Panama Canal Company in laws of the United States are deemed to refer to Panama Canal Commission pursuant to section 3602(b)(5) of Title 22, Foreign Relations and Intercourse.

### § 1404. Persons born in Alaska on or after March 30, 1867

A person born in Alaska on or after March 30, 1867, except a noncitizen Indian, is a citizen of the United States at birth. A noncitizen Indian born in Alaska on or after March 30, 1867, and prior to June 2, 1924, is declared to be a citizen of the United States as of June 2, 1924. An Indian born in Alaska on or after June 2, 1924, is a citizen of the United States at birth.

(June 27, 1952, ch. 477, title III, ch. 1, § 304, 66 Stat. 237.)

### ADMISSION OF ALASKA AS STATE

Alaska Statehood provisions as not repealing, amending, or modifying the provisions of this section, see section 24 of Pub. L. 85–508, July 7, 1958, 72 Stat. 339, set out as a note preceding former section 21 of Title 48, Territories and Insular Possessions.

### § 1405. Persons born in Hawaii

A person born in Hawaii on or after August 12, 1898, and before April 30, 1900, is declared to be a citizen of the United States as of April 30, 1900. A person born in Hawaii on or after April 30, 1900, is a citizen of the United States at birth. A person who was a citizen of the Republic of Hawaii on August 12, 1898, is declared to be a citizen of the United States as of April 30, 1900.

(June 27, 1952, ch. 477, title III, ch. 1, § 305, 66 Stat. 237.)

### ADMISSION OF HAWAII AS STATE

Hawaii Statehood provisions as not repealing, amending, or modifying the provisions of this section, see section 20 of Pub. L. 86–3, Mar. 18, 1959, 73 Stat. 13, set out as a note at the beginning of chapter 3 of Title 48, Territories and Insular Possessions.

### § 1406. Persons living in and born in the Virgin Islands

(a) The following persons and their children born subsequent to January 17, 1917, and prior to February 25, 1927, are declared to be citizens of the United States as of February 25, 1927:

(1) All former Danish citizens who, on January 17, 1917, resided in the Virgin Islands of the United States, and were residing in those islands or in the United States or Puerto Rico on February 25, 1927, and who did not make the declaration required to preserve their Danish citizenship by article 6 of the treaty entered into on August 4, 1916, between the United States and Denmark, or who, having made such a declaration have heretofore renounced or may hereafter renounce it by a declaration before a court of record;

(2) All natives of the Virgin Islands of the United States who, on January 17, 1917, resided in those islands, and were residing in those islands or in the United States or Puerto Rico on February 25, 1927, and who were not on February 25, 1927, citizens or subjects of any foreign country;

(3) All natives of the Virgin Islands of the United States who, on January 17, 1917, resided in the United States, and were residing in those islands on February 25, 1927, and who were not on February 25, 1927, citizens or subjects of any foreign country; and

(4) All natives of the Virgin Islands of the United States who, on June 28, 1932, were residing in continental United States, the Virgin Islands of the United States, Puerto Rico, the Canal Zone, or any other insular possession or territory of the United States, and who, on June 28, 1932, were not citizens or subjects of any foreign country, regardless of their place of residence on January 17, 1917.

(b) All persons born in the Virgin Islands of the United States on or after January 17, 1917, and prior to February 25, 1927, and subject to the jurisdiction of the United States are declared to be citizens of the United States as of February 25, 1927; and all persons born in those islands on or after February 25, 1927, and subject to the jurisdiction of the United States, are declared to be citizens of the United States at birth.

(June 27, 1952, ch. 477, title III, ch. 1, §306, 66 Stat. 237.)

## § 1407. Persons living in and born in Guam

(a) The following persons, and their children born after April 11, 1899, are declared to be citizens of the United States as of August 1, 1950, if they were residing on August 1, 1950, on the island of Guam or other territory over which the United States exercises rights of sovereignty:

(1) All inhabitants of the island of Guam on April 11, 1899, including those temporarily absent from the island on that date, who were Spanish subjects, who after that date continued to reside in Guam or other territory over which the United States exercises sovereignty, and who have taken no affirmative steps to preserve or acquire foreign nationality; and

(2) All persons born in the island of Guam who resided in Guam on April 11, 1899, including those temporarily absent from the island on that date, who after that date continued to reside in Guam or other territory over which the United States exercises sovereignty, and who have taken no affirmative steps to preserve or acquire foreign nationality.

(b) All persons born in the island of Guam on or after April 11, 1899 (whether before or after August 1, 1950) subject to the jurisdiction of the United States, are declared to be citizens of the United States: *Provided*, That in the case of any person born before August 1, 1950, he has taken no affirmative steps to preserve or acquire foreign nationality.

(c) Any person hereinbefore described who is a citizen or national of a country other than the United States and desires to retain his present political status shall have made, prior to August 1, 1952, a declaration under oath of such desire, said declaration to be in form and executed in the manner prescribed by regulations. From and after the making of such a declaration any such person shall be held not to be a national of the United States by virtue of this chapter.

(June 27, 1952, ch. 477, title III, ch. 1, §307, 66 Stat. 237.)

### REFERENCES IN TEXT

This chapter, referred to in subsec. (c), was in the original, "this Act", meaning act June 27, 1952, ch. 477, 66 Stat. 163, known as the Immigration and Nationality Act, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 1101 of this title and Tables.

## § 1408. Nationals but not citizens of the United States at birth

Unless otherwise provided in section 1401 of this title, the following shall be nationals, but not citizens, of the United States at birth:

(1) A person born in an outlying possession of the United States on or after the date of formal acquisition of such possession;

(2) A person born outside the United States and its outlying possessions of parents both of whom are nationals, but not citizens, of the United States, and have had a residence in the United States, or one of its outlying possessions prior to the birth of such person;

(3) A person of unknown parentage found in an outlying possession of the United States while under the age of five years, until shown, prior to his attaining the age of twenty-one years, not to have been born in such outlying possession; and

(4) A person born outside the United States and its outlying possessions of parents one of whom is an alien, and the other a national, but not a citizen, of the United States who, prior to the birth of such person, was physically present in the United States or its outlying possessions for a period or periods totaling not less than seven years in any continuous period of ten years—

(A) during which the national parent was not outside the United States or its outlying possessions for a continuous period of more than one year, and

(B) at least five years of which were after attaining the age of fourteen years.

The proviso of section 1401(g) of this title shall apply to the national parent under this paragraph in the same manner as it applies to the citizen parent under that section.

(June 27, 1952, ch. 477, title III, ch. 1, §308, 66 Stat. 238; Pub. L. 99–396, §15(a), Aug. 27, 1986, 100 Stat. 842; Pub. L. 100–525, §3(2), Oct. 24, 1988, 102 Stat. 2614.)

### AMENDMENTS

1988—Par. (4). Pub. L. 100–525 amended Pub. L. 99–396. See 1986 Amendment note below.

1986—Par. (4). Pub. L. 99–396, as amended by Pub. L. 100–525, added par. (4).

### EFFECTIVE DATE OF 1988 AMENDMENT

Section 3 of Pub. L. 100–525 provided that the amendment made by that section is effective as if included in the enactment of Pub. L. 99–396.

### EFFECTIVE DATE OF 1986 AMENDMENT

Section 15(b) of Pub. L. 99–396 provided that: "The amendment made by subsection (a) [amending this section] shall apply to persons born before, on, or after the date of the enactment of this Act [Aug. 27, 1986]. In the case of a person born before the date of the enactment of this Act—

"(1) the status of a national of the United States shall not be considered to be conferred upon the per-

TITLE 8—ALIENS AND NATIONALITY

son until the date the person establishes to the satisfaction of the Secretary of State that the person meets the requirements of section 308(4) of the Immigration and Nationality Act [par. (4) of this section], and

"(2) the person shall not be eligible to vote in any general election in American Samoa earlier than January 1, 1987."

## § 1409. Children born out of wedlock

(a) The provisions of paragraphs (c), (d), (e), and (g) of section 1401 of this title, and of paragraph (2) of section 1408 of this title, shall apply as of the date of birth to a person born out of wedlock if—

(1) a blood relationship between the person and the father is established by clear and convincing evidence,

(2) the father had the nationality of the United States at the time of the person's birth,

(3) the father (unless deceased) has agreed in writing to provide financial support for the person until the person reaches the age of 18 years, and

(4) while the person is under the age of 18 years—

(A) the person is legitimated under the law of the person's residence or domicile,

(B) the father acknowledges paternity of the person in writing under oath, or

(C) the paternity of the person is established by adjudication of a competent court.

(b) Except as otherwise provided in section 405 of this Act, the provisions of section 1401(g) of this title shall apply to a child born out of wedlock on or after January 13, 1941, and before December 24, 1952, as of the date of birth, if the paternity of such child is established at any time while such child is under the age of twenty-one years by legitimation.

(c) Notwithstanding the provision of subsection (a) of this section, a person born, after December 23, 1952, outside the United States and out of wedlock shall be held to have acquired at birth the nationality status of his mother, if the mother had the nationality of the United States at the time of such person's birth, and if the mother had previously been physically present in the United States or one of its outlying possessions for a continuous period of one year.

(June 27, 1952, ch. 477, title III, ch. 1, § 309, 66 Stat. 238; Pub. L. 97–116, § 18(l), Dec. 29, 1981, 95 Stat. 1620; Pub. L. 99–653, § 13, Nov. 14, 1986, 100 Stat. 3657; Pub. L. 100–525, §§ 8(k), 9(r), Oct. 24, 1988, 102 Stat. 2617, 2621.)

### References in Text

Section 405 of this Act, referred to in subsec. (b), is section 405 of act June 27, 1952, ch. 477, title IV, 66 Stat. 280, which is set out as a Savings Clause note under section 1101 of this title.

### Amendments

1988—Subsec. (a). Pub. L. 100–525, § 8(k), amended Pub. L. 99–653. See 1986 Amendment note below.

Subsec. (b). Pub. L. 100–525, § 9(r)(1), substituted "before December 24, 1952" for "prior to the effective date of this chapter" and "at any time" for "before or after the effective date of this chapter and".

Subsec. (c). Pub. L. 100–525, § 9(r)(2), substituted "after December 23, 1952" for "on or after the effective date of this chapter".

1986—Subsec. (a). Pub. L. 99–653, as amended by Pub. L. 100–525, § 8(k), amended subsec. (a) generally. Prior to amendment, subsec. (a) read as follows: "The provisions of paragraphs (c), (d), (e), and (g) of section 1401 of this title, and of paragraph (2) of section 1408, of this title shall apply as of the date of birth to a child born out of wedlock on or after the effective date of this chapter, if the paternity of such child is established while such child is under the age of twenty-one years by legitimation."

1981—Subsec. (a). Pub. L. 97–116, § 18(l)(1), substituted "(c), (d), (e), and (g) of section 1401" for "(3) to (5) and (7) of section 1401(a)".

Subsec. (b). Pub. L. 97–116, § 18(l)(2), substituted "section 1401(g)" for "section 1401(a)(7)".

### Effective Date of 1988 Amendment

Amendment by section 8(k) of Pub. L. 100–525 effective as if included in the enactment of the Immigration and Nationality Act Amendments of 1986, Pub. L. 99–653, see section 309(b)(15) of Pub. L. 102–232, set out as an Effective and Termination Dates of 1988 Amendments note under section 1101 of this title.

### Effective Date of 1986 Amendment

Section 23(e) of Pub. L. 99–653, as added by Pub. L. 100–525, § 8(r), Oct. 24, 1988, 102 Stat. 2619, provided that:

"(1) Except as provided in paragraph (2)(B), the new section 309(a) [8 U.S.C. 1409(a)] (as defined in paragraph (4)(A)) shall apply to persons who have not attained 18 years of age as of the date of the enactment of this Act [Nov. 14, 1986].

"(2) The old section 309(a) shall apply—

"(A) to any individual who has attained 18 years of age as of the date of the enactment of this Act, and

"(B) any individual with respect to whom paternity was established by legitimation before such date.

"(3) An individual who is at least 15 years of age, but under 18 years of age, as of the date of the enactment of this Act, may elect to have the old section 309(a) apply to the individual instead of the new section 309(a).

"(4) In this subsection:

"(A) The term 'new section 309(a)' means section 309(a) of the Immigration and Nationality Act [8 U.S.C. 1409(a)], as amended by section 13 of this Act [section 13 of Pub. L. 99–653] and as in effect after the date of the enactment of this Act.

"(B) The term 'old section 309(a)' means section 309(a) of the Immigration and Nationality Act, as in effect before the date of the enactment of this Act."

### Effective Date of 1981 Amendment

Amendment by Pub. L. 97–116 effective Dec. 29, 1981, see section 21(a) of Pub. L. 97–116, set out as a note under section 1101 of this title.

### Part II—Nationality Through Naturalization

## § 1421. Naturalization authority

### (a) Authority in Attorney General

The sole authority to naturalize persons as citizens of the United States is conferred upon the Attorney General.

### (b) Court authority to administer oaths

#### (1) Jurisdiction

Subject to section 1448(c) of this title—

##### (A) General jurisdiction

Except as provided in subparagraph (B), each applicant for naturalization may choose to have the oath of allegiance under section 1448(a) of this title administered by the Attorney General or by an eligible court



(b) LIMITATION ON PROSECUTIONS OF OFFENSES PROSECUTED IN OTHER COUNTRIES.—No prosecution may be commenced against a person under this section if a foreign government, in accordance with jurisdiction recognized by the United States, has prosecuted or is prosecuting such person for the conduct constituting such offense, except upon the approval of the Attorney General or the Deputy Attorney General (or a person acting in either such capacity), which function of approval may not be delegated.

(Added Pub. L. 110–457, title II, §223(a), Dec. 23, 2008, 122 Stat. 5071.)

## CHAPTER 79—PERJURY

Sec.
1621. Perjury generally.
1622. Subornation of perjury.
1623. False declarations before grand jury or court.

### AMENDMENTS

1970—Pub. L. 91–452, title IV, §401(b), Oct. 15, 1970, 84 Stat. 933, added item 1623.

## § 1621. Perjury generally

Whoever—

(1) having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true; or

(2) in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true;

is guilty of perjury and shall, except as otherwise expressly provided by law, be fined under this title or imprisoned not more than five years, or both. This section is applicable whether the statement or subscription is made within or without the United States.

(June 25, 1948, ch. 645, 62 Stat. 773; Pub. L. 88–619, §1, Oct. 3, 1964, 78 Stat. 995; Pub. L. 94–550, §2, Oct. 18, 1976, 90 Stat. 2534; Pub. L. 103–322, title XXXIII, §330016(1)(I), Sept. 13, 1994, 108 Stat. 2147.)

### HISTORICAL AND REVISION NOTES

Based on title 18, U.S.C., 1940 ed., §§231, 629 (Mar. 4, 1909, ch. 321, §125, 35 Stat. 1111; June 15, 1917, ch. 30, title XI, §19, 40 Stat. 230).

Words "except as otherwise expressly provided by law" were inserted to avoid conflict with perjury provisions in other titles where the punishment and application vary.

More than 25 additional provisions are in the code. For construction and application of several such sections, see *Behrle v. United States* (App. D.C. 1938, 100 F. 2d 714), *United States v. Hammer* (D.C.N.Y., 1924, 299 F. 1011, affirmed, 6 F. 2d 786), *Rosenthal v. United States* (1918, 248 F. 684, 160 C.C.A. 584), cf. *Epstein v. United States* (1912, 196 F. 354, 116 C.C.A. 174, certiorari denied 32 S. Ct. 527, 223 U.S. 731, 56 L. ed. 634).

Mandatory punishment provisions were rephrased in the alternative.

Minor verbal changes were made.

### AMENDMENTS

1994—Pub. L. 103–322 substituted "fined under this title" for "fined not more than $2,000" in concluding provisions.

1976—Pub. L. 94–550 divided existing provisions into a single introductory word "Whoever", par. (1), and closing provisions following par. (2), and added par. (2).

1964—Pub. L. 88–619 inserted at end "This section is applicable whether the statement or subscription is made within or without the United States."

## § 1622. Subornation of perjury

Whoever procures another to commit any perjury is guilty of subornation of perjury, and shall be fined under this title or imprisoned not more than five years, or both.

(June 25, 1948, ch. 645, 62 Stat. 774; Pub. L. 103–322, title XXXIII, §330016(1)(I), Sept. 13, 1994, 108 Stat. 2147.)

### HISTORICAL AND REVISION NOTES

Based on title 18, U.S.C., 1940 ed., §232 (Mar. 4, 1909, ch. 321, §126, 35 Stat. 1111).

The punishment prescribed in section 1621 of this title was substituted for the reference thereto.

Minor change was made in phraseology.

### AMENDMENTS

1994—Pub. L. 103–322 substituted "fined under this title" for "fined not more than $2,000".

## § 1623. False declarations before grand jury or court

(a) Whoever under oath (or in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined under this title or imprisoned not more than five years, or both.

(b) This section is applicable whether the conduct occurred within or without the United States.

(c) An indictment or information for violation of this section alleging that, in any proceedings before or ancillary to any court or grand jury of the United States, the defendant under oath has knowingly made two or more declarations, which are inconsistent to the degree that one of them is necessarily false, need not specify which declaration is false if—

(1) each declaration was material to the point in question, and

(2) each declaration was made within the period of the statute of limitations for the offense charged under this section.

In any prosecution under this section, the falsity of a declaration set forth in the indictment or information shall be established sufficient for conviction by proof that the defendant while under oath made irreconcilably contradictory declarations material to the point in question in any proceeding before or ancillary to any court or grand jury. It shall be a defense to an indict-



PETITIONER'S
EXHIBIT
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                                                        **Hon. Hugh B. Scott**

                                                        **15CR10A**

                        v.
                                                        **Report
                                                        &
                                                        Recommendation**

CHARLES WEBER,

                        Defendant.

        This matter has been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(C)

(Text Order dated Jan. 15, 2015). The instant matter before the Court is a series of motions by

defendant proceeding pro se (Docket Nos. 19, 22) seeking to dismiss the Indictment. The earlier

motion (Docket No. 19) was not signed, see W.D.N.Y. Loc. Crim. R. 49(a) (papers are to be

filed pursuant to this Court's electronic case filing regulations), (e)(6) (paper filed documents to

contain original signature); cf. Fed. R. Crim. P. 57(b) (local rules of District govern in absence of

Federal Rule of Criminal Procedure), 49(d) (filing of criminal motion in manner provided for

civil action), and thus should be **terminated**. Defendant's new moving papers (Docket No. 22)

appear identical save the signature omissions. This Court shall focus on defendant's latter

motion (Docket No. 22).

        Related to these motions is an earlier motion for discovery (Docket No. 18), seeking

(among other discovery sought) documents "where Congress has legislatively mentions 'The

People' in its statutory construction and any and all documents where the Internal Revenue Service ("IRS") "has acted in accordance with the Fair Debt Collections Act [sic][1]. Pub. L. 95-109; 91 Stat. 874" (id. ¶¶ 5, 7). So much of this discovery motion that is implicated by his motion to dismiss will be considered in this Report; the discovery aspects will be treated in a separate Order.

Pursuant to the scheduling Order for this case (Docket No. 13), defense motions were due by May 15, 2015, the Government's response by June 1, 2015, with argument scheduled for June 17, 2015. During a conference on May 29, 2015, the Government sought, and was given, a two-week extension to respond (Docket No. 24). The Government then filed its response (Docket No. 26) and the motions were argued on July 15, 2015 (Docket No. 36, minute entry; see Docket Nos. 28, 30, 32, 33[2]).

## BACKGROUND

Defendant is charged in a two-count Indictment (Docket No. 1) for making and subscribing to false returns, in violation of I.R.C. § 7206. Count 1 alleges that defendant, a resident of Snyder, New York, made and subscribed a U.S. Nonresident Alien Income Tax Return (Form 1040NR) for calendar year 2006, which was verified by a declaration. There, defendant allegedly claimed his taxable income for 2006 was only $745.33 in dividends, but failed to disclose that he was operating a dental practice during that year from which he derived

---

[1] The actual name of the statute defendant may be trying to cite is the Fair Debt Collection Practices Act, codified at 15 U.S.C. §§ 1692, et seq. ("FDCPA").

[2] Defendant did submit medical proof for his July 1, 2015, appointment (Docket No. 37, filed under seal) that cause the adjournment of argument of his motion to July 15, 2015, see Docket Nos. 32, 34.

2

gross receipts and sales and received income. The Indictment charges that "the defendant then
and there well knew, the defendant was a citizen of the United States; the defendant had received
taxable income in addition to dividends; the defendant had been present in the United States
during calendar year 2006; and the defendant was required by law and regulation to disclose the
operation of the business activity, the gross receipts and sales he derived therefrom, and the
income from business activity." (Id.) Count 2 alleges similar activity for calendar year 2007, for
which defendant reported only dividends of $812 (id.).

*Defendant's Motion to Dismiss*

Defendant challenges facially (almost line-by-line) and constitutionally this Indictment
(see generally Docket No. 22). In his separate memorandum of law (as opposed to the
memorandum incorporated in his motion to dismiss document), defendant describes in
exhaustive detail the structure of federal income tax laws and his understanding of their
constitutional foundations (Docket No. 22, Def. Memo.).

His motion argues several grounds for dismissal of this Indictment (id., Def. Motion to
Dismiss). First, he argues that the "UNITED STATES OF AMERICA" is not listed as the
"plaintiff" in the Indictment (despite the fact that it is captioned "United States of America v.
Charles Weber") and disputes whether any allegation was made in any document that he was a
citizen of the United States (id. ¶¶ 11-12, 6). According to defendant, the Internal Revenue
Service is a "foreign entity not found in the Statutes at Large as created by an Act of Congress"
(id. ¶ 15a, citing Chrysler Corp. v. Brown, 441 U.S. 281, 297 n. 24 (1979)[3]). Among the

---

[3]This, among the other citations by plaintiff, takes cases out of context. This Court
believes this is the case defendant is referring to, since his citation is only to the footnote, Docket
No. 22, ¶ 15a. Rather than provide a point-by-point refutation of the erroneous citations, this

3

objections to the Indictment, defendant argues that there was no record of the Grand Jury presentment; lack of jurisdiction for this Court and against defendant; due process violations; facial defects in counts of the Indictment. He charges that there is no evidence of defendant being (or not being) a "United States" citizen, with defendant citizenship distinct from his declared status as a "New Yorker". Defendant denies the applicability of the Fourteenth and Sixteenth Amendments (Docket No. 22, Def. Motion ¶¶ 67, 71-72, 91) to justify imposition of federal income taxation upon him. He argues facts are not in evidence as alleged in the Indictment.

Defendant also submitted a declaration from Joan Mulligan Weber, his wife, regarding defendant's ancestry and descendants (id., Joan Weber Decl.; see id., Def. Motion 20) apparently to confirm his birth in New York for his status as a "New Yorker". Within his Motion, defendant also submits his "Declaration of Political Status and Allegiance" wherein he declares that his was born "on the land of Queens, 'New York' ", one of the States of the American Union, and not this STATE OF NEW YORK, a Federally legislated state, described in Title 28 United States Code Section 112[4], and commonly known as 'NY.'" (Docket No. 22, Def. Motion Memo. at 4). Defendant then declares that "I only recognize the jurisdiction of New York and any of the States of the American Union, whose land I happen to be living upon or sojourning through," but denying that he is "now a United States of America Citizen and have never been a United States of America Citizen," and thus is not subject to the jurisdiction of the

---

Court notes that (while pro se) defendant has a gross misapprehension of the law.

[4]This section of the Judiciary Code defines the federal judicial districts created in the State of New York, 28 U.S.C. § 112; see generally 28 U.S.C. §§ 81-131, including the Western District of New York, § 112(d).

4

United States of America (id. at pages 4-5). Defendant, however, claims that he is a beneficiary

of the 1789 United States Constitution, with its Preamble, but not its Amendments (id. at page 5),

presumably excluding (for example) rights under the First, Fourth, Fifth, Sixth, Eighth, and

Fourteenth Amendments, despite later arguing that the Government violated his Fourth, Fifth,

and Sixth Amendment rights (id. ¶ 85). He signed this declaration as a "New Yorker,

Beneficiary" (id. Motion at page 5). Defendant also challenges the identity used by the

Government in this case (id. Motion ¶ 5 (defendant "does not consent to any attempt to create a

colorable persona under colorable law by the name of capitalized term CHARLES WEBER,"

from the caption for this action)). He also challenges the legal existence of the "UNITED

STATES OF AMERICA" (id., Def. Motion ¶¶ 8-12). This citation led to a detention issue

whether defendant in fact identified himself for purpose of pretrial release (Docket No. 24).

   Defendant next argues that this Court lacks jurisdiction to hear this case because the

enabling statute, 18 U.S.C. § 3231, is based upon a repealed statute that was not enacted (Docket

No. 22, Def. Motion at pages 46-47) and cannot lawfully conduct a hearing absent a lawful

enactment of Congress (id. at 47).

   The Government argues that defendant sets forth only frivolous arguments for dismissal

of the Indictment (Docket No. 26, Gov't Response at 2-3). First, defendant is a citizen of the

United States, despite his contrary protests, because (as defendant admits) he was born in New

York (id. at 3-5). The United States has standing to bring this criminal case (id. at 5-6). The

Government next contends that this Court has jurisdiction over the prosecution under the tax

laws enacted pursuant to United States Constitution, Article I, Section 8, clause 1, as an offense

against the laws of the United States, 18 U.S.C. § 3231 (id. at 6). Next, the Government defends

5

this Indictment as being constitutionally sufficient (id. at 7). This Indictment meets the two
requirements for sufficiency, that it contains the elements of the offense charged and fairly
informed defendant of the charges against him and that the pleading enabled him either "to plead
an acquittal or conviction in bar of future prosecutions for the same offense," United States v.
Resendiz-Ponce, 549 U.S. 102, 108 (2007) (id.), to trigger double jeopardy. The Government
contends that the Internal Revenue Service is an agency of the United States and not a "foreign
entity" as claimed by defendant (id. at 7-8). Defendant is identified in the Indictment, either in
all capital letters or in initial capital letters, thus properly named despite defendant's contrary
argument (id. at 8-9). The Government contends that defendant's argument of judicial
misconduct and receipt of "undisclosed cash awards" are spurious (id. at 9).

        During oral argument, defendant asserts that he is not a United States citizen because his
birth certificate contained his mother's maiden name and there was no affidavit from her
confirming his birth in this country, hence rendering him an alien and thus not required to pay
income taxes to the United States. The Government countered that any person in this country,
citizen or alien, is required to pay income taxes, see United States v. Drachenberg, 623 F.3d 122,
125 (2d Cir. 2010) (per curiam) (filing requirement applies to individuals regardless of their
citizenship).

## DISCUSSION

I.      Timeliness of Defense Motion to Dismiss

        Defendant, proceeding pro se, filed his motion to dismiss ten days late (compare Docket
No. 13, minute entry setting motion deadline of May 15, 2015, with Docket No. 22, defense
motion filed May 25, 2015). The Government objects to consideration of this untimely motion

6

(Docket No. 26, Gov't Response at 2). Even though defendant is representing himself, the ten-day delay in moving to dismiss prejudices the Government and is unexplained. The motion should be **denied** on this ground alone. But for a complete record (and the fact that defendant's otherwise timely discovery motion (Docket No. 18) asserts the same theories as advanced in the untimely motion to dismiss), this Court next considers the merits of the motion.

II.      Sufficiency of the Indictment

This Court has considered all of defendant's arguments and finds that the Indictment here sufficiently informs defendant of the charges alleged and establishes the predicate information for double jeopardy if he were charged with these offenses later in a separate case. His contentions to the contrary are specious. His motion to dismiss should be **denied**.

III.     Tax Protestor Arguments

It is tempting to meet each defendant's arguments in turn. As this Court read his 62-page motion and 28-page memorandum, erroneous contentions leap from the pages, begging to be refuted[5]. The Government's response (Docket No. 26) attempts to refute them. But defendant's contentions are numerous and clearly without merit that such detailed consideration is not required.

First, as to the format of defendant's papers, he presents his arguments in varying fonts as if cut and paste from various sources and appearing to be arguments repeated by other tax protester defendants. Defendant was unable to cite an instance where these arguments prevailed. He cites cases superseded by constitutional amendments (e.g., Dred Scott v. Sandford, 60 U.S.

---

[5] Such as defendant's "motion for equitable relief" in this criminal case, seeking damages for each day of the Government's alleged wrongdoing in collecting taxes from him, Docket No. 22, Def. Motion ¶ 89.

7

(19 How.) 393 (1857), Docket No. 22, Def. Motion ¶ 131) that he conveniently deems not to be binding. Defendant focuses on the 1783 Treaty of Paris that ended the American Revolution and confirmed American independence (e.g., id. ¶ 125), but that treaty (as he asserts in his papers (Docket No. 22, Def. Motion at page 49)) was made by the United States and not the thirteen states collectively, see U.S. Art. of Confederation art. IX (exclusive power of "United States in Congress assembled" to make treaties).

Defendant is a citizen of the United States, U.S. Const. Amend. XIV, § 1, cl. 1 ("all persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."); 8 U.S.C. § 1401(a) (national and citizen of United States at birth of a person born in the United States). This is not a mere naturalization provision and defendant cannot opt out (cf. Docket No. 22, Def. Motion at page 19) when it is convenient for him to avoid the obligations of citizenship. Defendant admits in his papers that he was born in New York (see id., Def. Aff. at page 4; Decl. of Joan Mulligan Weber), hence also making him a citizen of the United States.

In summary, defendant's arguments are well-worn arguments made unsuccessfully by tax protestors challenging the fundamental premises of federal income taxation as applied to them. This Court has jurisdiction to hear this action, United States v. Cote, No. 3:12CR264, 2013 U.S. Dist. LEXIS 54137, at *4-5 (D. Conn. Apr. 16, 2013). There, the court held that

> The district courts of the United States "have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States." 18 U.S.C. § 3231. The United States Constitution gives Congress "the power to lay and collect taxes, duties, imposts and excises," U.S. Const. art. I, § 8, cl. 1, including "taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration," U.S. Const. amend. XVI. The Constitution further gives Congress the power "to make all laws which shall be necessary and proper for carrying into

8

execution" its powers, U.S. Const. art. I, § 8, cl. 18, including the power to
criminalize tax evasion and obstruction of the Government's efforts to recover
erroneously-issued tax refunds. In this case, the Government alleges in the
Indictment that the object of the defendant's actions was to evade or defeat
federal taxes, in violation of 18 U.S.C. §287 and 26 U.S.C. §7212(a). Congress
has authority to enact the statute relevant to this case. Thus, this Court has
jurisdiction over this criminal case.

Id. This court then cited numerous cases in which the filing requirement for income taxes were

upheld despite defendants' arguments that federal income taxation somehow did not apply to

them, id. at \*5-7 (citing e.g., Drachenberg, supra, 623 F.3d at 125 (filing requirement applies

regardless of purported citizenship status); United States v. Plemons, 956 F.2d 273 (7th Cir.

1992) (summary affirmance, rejecting argument defendant was not a citizen of the United States

or of Indiana for tax purposes); United States v. Sloan, 939 F.2d 499, 499-501 (7th Cir. 1991);

Bey v. IRS, No. 1:CV:02-1413, 2003 U.S. Dist. LEXIS 4760, at \*3-6 (M.D. Pa. Feb. 25, 2003)

(tax protester claims have been squarely rejected by many courts). Defendant here is like the

defendant in Sloan and similar tax protestors, which the Sloan court characterized as "like moths

to a flame, some people find themselves irresistibly drawn to the tax protestor movement's

illusory claim that there is no legal requirement to pay federal income tax. And like the moths,

these people sometimes get burned." Sloan, supra, 939 F.2d at 499-500.

Finally, as found by Judge Richard Posner in trying United States v. Hakeem El Bey,

No. 14CR447, Docket No. 46, Order of Feb. 20, 2015, at 3, involving another tax protester

proceeding pro se, "A defendant who has the cognitive ability to represent himself in a legal

proceeding but refuses to confine his defense to testimony and other evidence, and to argument,

that are permissible in a legal proceeding—refuses in effect to cooperate with the court and obey

the law governing the proceeding—forfeits his right to defend himself."

This Court is not recommending forfeiting this defendant's right to self-representation at this time. But defendant's present motion to dismiss this Indictment (Docket No. 22) should be **denied**, either on timeliness grounds or on its lack of merit on its substance.

## CONCLUSION

Based upon the above, it is recommended that defendant's motion to dismiss the Indictment (Docket No. 22) be **denied**; his earlier motion (Docket No. 19) for similar relief should be **denied** because the motion was unsigned and replaced by the latter motion.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b) (effective December 1, 2009) and W.D.N.Y. Local Civil Rule 72.3(a).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME OR TO REQUEST AN EXTENSION OF SUCH TIME WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT DISTRICT COURT'S ORDER ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.** Thomas v. Arn, 474 U.S. 140 (1985); F.D.I.C. v. Hillcrest Associates, 66 F.3d 566 (2d Cir. 1995); Wesolak v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988).

10



IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                15-CR-0010A(HBS)

CHARLES WEBER,

        Defendant.

## GOVERNMENT'S RESPONSE TO DEFENDANT'S OBJECTIONS TO REPORT AND RECOMMENDATION RECOMMENDING DENIAL OF MOTION TO DISMISS INDICTMENT

      The United States of America, by and through its attorneys, William J. Hochul, Jr.,

United States Attorney for the Western District of New York, and MaryEllen Kresse,

Assistant United States Attorney, of counsel, hereby submits its Response to Defendant's

Objections to Magistrate Judge Hugh B. Scott's July 20, 2015 Report and Recommendation

recommending denial of defendant's motion dismiss the Indictment.

### PROCEDURAL HISTORY

      The defendant is charged by Indictment with two counts of Making and Subscribing a

False Return in violation of Title 26, United States Code, Section 7206(1).   He has elected to

represent himself.   On May 26, 2015, the defendant filed a Motion to Dismiss the

Indictment. (Docket No. 22).[1]   The government response to defendant's motion was filed on

June 12, 2015. (Docket No. 26).   Following oral argument on July 15, 2015, Magistrate

---

[1] The defendant originally filed his motion to dismiss on May 25, 2015, Docket No. 19, but that motion was not signed.

Judge Scott issued a Report and Recommendation in which he recommended that defendant's motion to dismiss be denied. (Docket No. 38).  The defendant filed Objections to the Report and Recommendation on August 4, 2015. (Docket No. 40).  Because the defendant has set forth no valid argument that the Magistrate Judge erred in recommending denial of his motion to dismiss, his objections should be denied and the Report and Recommendation adopted by this Court.

## DISCUSSION

### I.    Standard of Review

Pursuant to Section 636(b)(1)(B) of Title 28 of the United States Code, this Court must make a de novo determination of those portions of the Report and Recommendation to which objection is made.    As set forth in Magistrate Judge Scott's Report and Recommendation, "the District Court on de novo review will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance." Docket No. 38, at 11 (citing Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988)).  Magistrate Judge Scott's Report and Recommendation also advised the objecting party that "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." Id. (citing W.D.N.Y Local Civil Rule 72.3(a)(3)).

2

## II.    The Defendant's Objections

A review of defendant's "Objections" reveals that the majority of his 19-page submission addresses rulemaking under the Administrative Procedures Act ("APA"), and whether the Internal Revenue Service complied with the APA in promulgating the statutory and regulatory provisions of Title 26 of the United States Code.    See Defendant's Objections, Docket No. 40, at 1-12; 19.  This argument was not raised before Magistrate Judge Scott. As such, it should not be considered by this Court.


Even if the Court considers this argument, defendant's blind recitation of various principals of administrative law is not relevant and does not establish that the False Return charges of the Indictment should be dismissed.    As Magistrate Judge Scott found: "defendant's arguments are well-worn arguments made unsuccessfully by tax protestors challenging the fundamental premises of federal income taxation as applied to them." Report and Recommendation, Docket No. 38, at 8.


Besides the APA argument, the defendant, in his "Objections", continues to assert that the case against him must be dismissed because he "does not consent to a non Article III administrative tribunal." Defendant's Objections, Docket No. 40, at 13. The defendant claims that as "a direct descendant of one of the People as their Posterity" he is not a citizen of the United States for purposes of the Fourteenth Amendment, and that Magistrate Judge Scott erred when he found otherwise.  Id. at 13-14.  The defendant's arguments on this issue continue to be without merit.  As Magistrate Judge Scott properly found, the defendant is a

3

citizen of the United States and subject to the jurisdiction of the United States.  Report and Recommendation, Docket No. 38, at 8.  The right of the United States to require citizens (and non-citizens) to pay income taxes, and its authority to enforce the tax laws, including to criminally prosecute those who fail to comply with such laws, is well-established and judicially recognized.

To the extent the defendant takes issue with the length of the oral argument before Magistrate Judge Scott, Docket No. 40, at 15, the government notes that oral argument is not a right; defendant's due process rights are not implicated by a Court's exercise of its discretion to circumscribe the length, scope or nature of any oral argument it chooses to allow.

## CONCLUSION

For the reasons set forth above, the government respectfully requests that the Court adopt Magistrate Judge Scott's Report and Recommendation and deny defendant's motion to dismiss the Indictment in all respects.

**DATED**:    Buffalo, New York, August 24, 2015.

BY:    /s/   MARYELLEN KRESSE
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
(716) 843-5888
MaryEllen.Kresse@usdoj.gov

TO:    Charles Weber

4

The District Court on de novo review will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance.  See Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to W.D.N.Y. Local Civil Rule 72.3(a)(3), "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3) may result in the District Court's refusal to consider the objection.**

SO ORDERED.

_/s/ Hugh B. Scott_

Hon. Hugh B. Scott
United States Magistrate Judge

Dated: Buffalo, New York
July 20, 2015

11



TITLE 42—THE PUBLIC HEALTH AND WELFARE



PETITIONER'S EXHIBIT 9

| Sec. | |
|---|---|
| 2000h–3. | Construction of provisions not to affect authority of Attorney General, etc., to institute or intervene in actions or proceedings. |
| 2000h–4. | Construction of provisions not to exclude operation of State laws and not to invalidate consistent State laws. |
| 2000h–5. | Authorization of appropriations. |
| 2000h–6. | Separability. |

CHAPTER REFERRED TO IN OTHER SECTIONS

This chapter is referred to in section 11111 of this title.

SUBCHAPTER I—GENERALLY

### § 1981. Equal rights under the law

#### (a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

#### (b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

#### (c) Protection against impairment

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

(R.S. § 1977; Pub. L. 102–166, title I, § 101, Nov. 21, 1991, 105 Stat. 1071.)

CODIFICATION

R.S. § 1977 derived from act May 31, 1870, ch. 114, § 16, 16 Stat. 144.

Section was formerly classified to section 41 of Title 8, Aliens and Nationality.

AMENDMENTS

1991—Pub. L. 102–166 designated existing provisions as subsec. (a) and added subsecs. (b) and (c).

EFFECTIVE DATE OF 1991 AMENDMENT

Section 402 of Pub. L. 102–166 provided that:

"(a) IN GENERAL.—Except as otherwise specifically provided, this Act [see Short Title of 1991 Amendment note below] and the amendments made by this Act shall take effect upon enactment [Nov. 21, 1991].

"(b) CERTAIN DISPARATE IMPACT CASES.—Notwithstanding any other provision of this Act, nothing in this Act shall apply to any disparate impact case for which a complaint was filed before March 1, 1975, and for which an initial decision was rendered after October 30, 1983."

SHORT TITLE OF 1991 AMENDMENT

Section 1 of Pub. L. 102–166 provided that: "This Act [enacting section 1981a of this title and sections 60l and 1201 to 1224 of Title 2, The Congress, amending this section and sections 1988, 2000e, 2000e–1, 2000e–2, 2000e–4, 2000e–5, 2000e–16, 12111, 12112, and 12209 of this title, and

section 626 of Title 29, Labor, and enacting provisions set out as notes under this section and sections 2000e and 2000e–4 of this title, and section 1a–5 of Title 16, Conservation] may be cited as the 'Civil Rights Act of 1991'."

SHORT TITLE OF 1976 AMENDMENT

Pub. L. 94–559, which amended section 1988 of this title, is known as "The Civil Rights Attorney's Fees Awards Act of 1976", see note set out under section 1988 of this title.

SEVERABILITY

Section 401 of Pub. L. 102–166 provided that: "If any provision of this Act [see Short Title of 1991 Amendment note above], or an amendment made by this Act, or the application of such provision to any person or circumstances is held to be invalid, the remainder of this Act and the amendments made by this Act, and the application of such provision to other persons and circumstances, shall not be affected."

CONGRESSIONAL FINDINGS

Section 2 of Pub. L. 102–166 provided that: "The Congress finds that—

"(1) additional remedies under Federal law are needed to deter unlawful harassment and intentional discrimination in the workplace;

"(2) the decision of the Supreme Court in Wards Cove Packing Co. v. Atonio, 490 U.S. 642 (1989) has weakened the scope and effectiveness of Federal civil rights protections; and

"(3) legislation is necessary to provide additional protections against unlawful discrimination in employment."

PURPOSES OF 1991 AMENDMENT

Section 3 of Pub. L. 102–166 provided that: "The purposes of this Act [see Short Title of 1991 Amendment note above] are—

"(1) to provide appropriate remedies for intentional discrimination and unlawful harassment in the workplace;

"(2) to codify the concepts of 'business necessity' and 'job related' enunciated by the Supreme Court in Griggs v. Duke Power Co., 401 U.S. 424 (1971), and in the other Supreme Court decisions prior to Wards Cove Packing Co. v. Atonio, 490 U.S. 642 (1989);

"(3) to confirm statutory authority and provide statutory guidelines for the adjudication of disparate impact suits under title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e et seq.); and

"(4) to respond to recent decisions of the Supreme Court by expanding the scope of relevant civil rights statutes in order to provide adequate protection to victims of discrimination."

LEGISLATIVE HISTORY FOR 1991 AMENDMENT

Section 105(b) of Pub. L. 102–166 provided that: "No statements other than the interpretive memorandum appearing at Vol. 137 Congressional Record S 15276 (daily ed. Oct. 25, 1991) shall be considered legislative history of, or relied upon in any way as legislative history in construing or applying, any provision of this Act [see Short Title of 1991 Amendment note above] that relates to Wards Cove—Business necessity/cumulation/alternative business practice."

CONSTRUCTION OF 1991 AMENDMENT

Section 116 of title I of Pub. L. 102–166 provided that: "Nothing in the amendments made by this title [enacting section 1981a of this title and amending this section, sections 1988, 2000e, 2000e–1, 2000e–2, 2000e–4, 2000e–5, 2000e–16, 12111, and 12112 of this title, and section 626 of Title 29, Labor] shall be construed to affect court-ordered remedies, affirmative action, or conciliation agreements, that are in accordance with the law."

ALTERNATIVE MEANS OF DISPUTE RESOLUTION

Section 118 of title I of Pub. L. 102–166 provided that: "Where appropriate and to the extent authorized by

law, the use of alternative means of dispute resolution, including settlement negotiations, conciliation, facilitation, mediation, factfinding, minitrials, and arbitration, is encouraged to resolve disputes arising under the Acts or provisions of Federal law amended by this title [enacting section 1981a of this title and amending this section, sections 1988, 2000e, 2000e–1, 2000e–2, 2000e–4, 2000e–5, 2000e–16, 12111, and 12112 of this title, and section 626 of Title 29, Labor].''

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 1981a, 1988 of this title; title 2 sections 1202, 1311; title 3 section 411.

## § 1981a. Damages in cases of intentional discrimination in employment

### (a) Right of recovery

#### (1) Civil rights

In an action brought by a complaining party under section 706 or 717 of the Civil Rights Act of 1964 [42 U.S.C. 2000e–5, 2000e–16] against a respondent who engaged in unlawful intentional discrimination (not an employment practice that is unlawful because of its disparate impact) prohibited under section 703, 704, or 717 of the Act [42 U.S.C. 2000e–2, 2000e–3, 2000e–16], and provided that the complaining party cannot recover under section 1981 of this title, the complaining party may recover compensatory and punitive damages as allowed in subsection (b) of this section, in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964, from the respondent.

#### (2) Disability

In an action brought by a complaining party under the powers, remedies, and procedures set forth in section 706 or 717 of the Civil Rights Act of 1964 [42 U.S.C. 2000e–5, 2000e–16] (as provided in section 107(a) of the Americans with Disabilities Act of 1990 (42 U.S.C. 12117(a)), and section 794a(a)(1) of title 29, respectively) against a respondent who engaged in unlawful intentional discrimination (not an employment practice that is unlawful because of its disparate impact) under section 791 of title 29 and the regulations implementing section 791 of title 29, or who violated the requirements of section 791 of title 29 or the regulations implementing section 791 of title 29 concerning the provision of a reasonable accommodation, or section 102 of the Americans with Disabilities Act of 1990 (42 U.S.C. 12112), or committed a violation of section 102(b)(5) of the Act, against an individual, the complaining party may recover compensatory and punitive damages as allowed in subsection (b) of this section, in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964, from the respondent.

#### (3) Reasonable accommodation and good faith effort

In cases where a discriminatory practice involves the provision of a reasonable accommodation pursuant to section 102(b)(5) of the Americans with Disabilities Act of 1990 [42 U.S.C. 12112(b)(5)] or regulations implementing section 791 of title 29, damages may not be awarded under this section where the covered entity demonstrates good faith efforts, in consultation with the person with the disability who has informed the covered entity that accommodation is needed, to identify and make a reasonable accommodation that would provide such individual with an equally effective opportunity and would not cause an undue hardship on the operation of the business.

### (b) Compensatory and punitive damages

#### (1) Determination of punitive damages

A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency or political subdivision) if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.

#### (2) Exclusions from compensatory damages

Compensatory damages awarded under this section shall not include backpay, interest on backpay, or any other type of relief authorized under section 706(g) of the Civil Rights Act of 1964 [42 U.S.C. 2000e–5(g)].

#### (3) Limitations

The sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party—

(A) in the case of a respondent who has more than 14 and fewer than 101 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $50,000;

(B) in the case of a respondent who has more than 100 and fewer than 201 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $100,000; and

(C) in the case of a respondent who has more than 200 and fewer than 501 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $200,000; and

(D) in the case of a respondent who has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $300,000.

#### (4) Construction

Nothing in this section shall be construed to limit the scope of, or the relief available under, section 1981 of this title.

### (c) Jury trial

If a complaining party seeks compensatory or punitive damages under this section—

(1) any party may demand a trial by jury; and

(2) the court shall not inform the jury of the limitations described in subsection (b)(3) of this section.

### (d) Definitions

As used in this section:

#### (1) Complaining party

The term ''complaining party'' means—

(A) in the case of a person seeking to bring an action under subsection (a)(1) of this section, the Equal Employment Opportunity Commission, the Attorney General, or a person who may bring an action or proceeding under title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e et seq.); or

(B) in the case of a person seeking to bring an action under subsection (a)(2) of this section, the Equal Employment Opportunity Commission, the Attorney General, a person who may bring an action or proceeding under section 794a(a)(1) of title 29, or a person who may bring an action or proceeding under title I of the Americans with Disabilities Act of 1990 [42 U.S.C. 12111 et seq.].

**(2) Discriminatory practice**

The term "discriminatory practice" means the discrimination described in paragraph (1), or the discrimination or the violation described in paragraph (2), of subsection (a) of this section.

(R.S. § 1977A, as added Pub. L. 102–166, title I, § 102, Nov. 21, 1991, 105 Stat. 1072.)

#### REFERENCES IN TEXT

The Civil Rights Act of 1964, referred to in subsec. (d)(1)(A), is Pub. L. 88–352, July 2, 1964, 78 Stat. 241, as amended. Title VII of the Act is classified generally to subchapter VI (§ 2000e et seq.) of this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 2000a of this title and Tables.

The Americans with Disabilities Act of 1990, referred to in subsec. (d)(1)(B) is Pub. L. 101–336, July 26, 1990, 104 Stat. 327, as amended. Title I of the Act is classified generally to subchapter I (§ 12111 et seq.) of chapter 126 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 12101 of this title and Tables.

#### EFFECTIVE DATE

Section effective Nov. 21, 1991, except as otherwise provided, see section 402 of Pub. L. 102–166, set out as an Effective Date of 1991 Amendment note under section 1981 of this title.

#### SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in section 1988 of this title; title 2 sections 1202, 1311; title 3 section 411.

### § 1982. Property rights of citizens

All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

(R.S. § 1978.)

#### CODIFICATION

R.S. § 1978 derived from act Apr. 9, 1866, ch. 31, § 1, 14 Stat. 27.

Section was formerly classified to section 42 of Title 8, Aliens and Nationality.

#### EX. ORD. NO. 11063. EQUAL OPPORTUNITY IN HOUSING

Ex. Ord. No. 11063, Nov. 20, 1962, 27 F.R. 11527, as amended by Ex. Ord. No. 12259, Dec. 31, 1980, 46 F.R. 1253; Ex. Ord. No. 12892, § 6–604, Jan. 17, 1994, 59 F.R. 2939, provided:

WHEREAS the granting of Federal assistance for the provision, rehabilitation, or operation of housing and related facilities from which Americans are excluded because of their race, color, creed, or national origin is unfair, unjust, and inconsistent with the public policy of the United States as manifested in its Constitution and laws; and

WHEREAS the Congress in the Housing Act of 1949 [see Short Title note set out under section 1441 of this title] has declared that the general welfare and security of the Nation and the health and living standards of its people require the realization as soon as feasible of the goal of a decent home and a suitable living environment for every American family; and

WHEREAS discriminatory policies and practices based upon race, color, creed, or national origin now operate to deny many Americans the benefits of housing financed through Federal assistance and as a consequence prevent such assistance from providing them with an alternative to substandard, unsafe, unsanitary, and overcrowded housing; and

WHEREAS such discriminatory policies and practices result in segregated patterns of housing and necessarily produce other forms of discrimination and segregation which deprive many Americans of equal opportunity in the exercise of their unalienable rights to life, liberty, and the pursuit of happiness; and

WHEREAS the executive branch of the Government, in faithfully executing the laws of the United States which authorize Federal financial assistance, directly or indirectly, for the provision, rehabilitation, and operation of housing and related facilities, is charged with an obligation and duty to assure that those laws are fairly administered and that benefits thereunder are made available to all Americans without regard to their race, color, creed, or national origin:

NOW, THEREFORE, by virtue of the authority vested in me as President of the United States by the Constitution and laws of the United States, it is ordered as follows:

#### PART I—PREVENTION OF DISCRIMINATION

SECTION 101. I hereby direct all departments and agencies in the executive branch of the Federal Government, insofar as their functions relate to the provision, rehabilitation, or operation of housing and related facilities, to take all action necessary and appropriate to prevent discrimination because of race, color, religion (creed), sex, disability, familial status or national origin—

(a) in the sale, leasing, rental, or other disposition of residential property and related facilities (including land to be developed for residential use), or in the use or occupancy thereof, if such property and related facilities are—

(i) owned or operated by the Federal Government, or

(ii) provided in whole or in part with the aid of loans, advances, grants, or contributions hereafter agreed to be made by the Federal Government, or

(iii) provided in whole or in part by loans hereafter insured, guaranteed, or otherwise secured by the credit of the Federal Government, or

(iv) provided by the development or the redevelopment of real property purchased, leased, or otherwise obtained from a State or local public agency receiving Federal financial assistance for slum clearance or urban renewal with respect to such real property under a loan or grant contract hereafter entered into; and

(b) in the lending practices with respect to residential property and related facilities (including land to be developed for residential use) of lending institutions, insofar as such practices relate to loans hereafter insured or guaranteed by the Federal Government.

SEC. 102. I hereby direct the Department of Housing and Urban Development and all other executive departments and agencies to use their good offices and to take other appropriate action permitted by law, including the institution of appropriate litigation, if required, to promote the abandonment of discriminatory practices with respect to residential property and related facilities heretofore provided with Federal financial assistance of the types referred to in Section 101(a)(ii), (iii), and (iv).

PART II—IMPLEMENTATION BY DEPARTMENTS AND AGENCIES

SEC. 201. Each executive department and agency subject to this order is directed to submit to the President's Committee on Equal Opportunity in Housing established pursuant to Part IV of this order (hereinafter sometimes referred to as the Committee), within thirty days from the date of this order, a report outlining all current programs administered by it which are affected by this order.

SEC. 202. Each such department and agency shall be primarily responsible for obtaining compliance with the purposes of this order as the order applies to programs administered by it; and is directed to cooperate with the Committee, to furnish it, in accordance with law, such information and assistance as it may request in the performance of its functions, and to report to it at such intervals as the Committee may require.

SEC. 203. Each such department and agency shall, within thirty days from the date of this order, issue such rules and regulations, adopt such procedures and policies, and make such exemptions and exceptions as may be consistent with law and necessary or appropriate to effectuate the purposes of this order. Each such department and agency shall consult with the Committee in order to achieve such consistency and uniformity as may be feasible.

PART III—ENFORCEMENT

SEC. 301. The Committee, any subcommittee thereof, and any officer or employee designated by any executive department or agency subject to this order may hold such hearings, public or private, as the Committee, department, or agency may deem advisable for compliance, enforcement, or educational purposes.

SEC. 302. If any executive department or agency subject to this order concludes that any person or firm (including but not limited to any individual, partnership, association, trust, or corporation) or any State or local public agency has violated any rule, regulation, or procedure issued or adopted pursuant to this order, or any nondiscrimination provision included in any agreement or contract pursuant to any such rule, regulation, or procedure, it shall endeavor to end and remedy such violation by informal means, including conference, conciliation, and persuasion unless similar efforts made by another Federal department or agency have been unsuccessful. In conformity with rules, regulations, procedures, or policies issued or adopted by it pursuant to Section 203 hereof, a department or agency may take such action as may be appropriate under its governing laws, including, but not limited to, the following:

It may—

(a) cancel or terminate in whole or in part any agreement or contract with such person, firm, or State or local public agency providing for a loan, grant, contribution, or other Federal aid, or for the payment of a commission or fee;

(b) refrain from extending any further aid under any program administered by it and affected by this order until it is satisfied that the affected person, firm, or State or local public agency will comply with the rules, regulations, and procedures issued or adopted pursuant to this order, and any nondiscrimination provisions included in any agreement or contract;

(c) refuse to approve a lending institution or any other lender as a beneficiary under any program administered by it which is affected by this order or revoke such approval if previously given.

SEC. 303. In appropriate cases executive departments and agencies shall refer to the Attorney General violations of any rules, regulations, or procedures issued or adopted pursuant to this order, or violations of any nondiscrimination provisions included in any agreement or contract, for such civil or criminal action as he may deem appropriate. The Attorney General is authorized to furnish legal advice concerning this order to the Committee and to any department or agency requesting such advice.

SEC. 304. Any executive department or agency affected by this order may also invoke the sanctions provided in Section 302 where any person or firm, including a lender, has violated the rules, regulations, or procedures issued or adopted pursuant to this order, or the nondiscrimination provisions included in any agreement or contract, with respect to any program affected by this order administered by any other executive department or agency.

PART IV—ESTABLISHMENT OF THE PRESIDENT'S COMMITTEE ON EQUAL OPPORTUNITY IN HOUSING

[Revoked. Ex. Ord. No. 12259, Dec. 31, 1980, 46 F.R. 1253; Ex. Ord. No. 12892, §6–604, Jan. 17, 1994, 59 F.R. 2939.]

PART V—POWERS AND DUTIES OF THE PRESIDENT'S COMMITTEE ON EQUAL OPPORTUNITY IN HOUSING

SEC. 501. [Revoked. Ex. Ord. No. 12259, Dec. 31, 1980, 46 F.R. 1253; Ex. Ord. No. 12892, §6–604, Jan. 17, 1994, 59 F.R. 2939.]

SEC. 502. (a) The Committee shall take such steps as it deems necessary and appropriate to promote the coordination of the activities of departments and agencies under this order. In so doing, the Committee shall consider the overall objectives of Federal legislation relating to housing and the right of every individual to participate without discrimination because of race, color, religion (creed), sex, disability, familial status or national origin in the ultimate benefits of the Federal programs subject to this order.

(b) The Committee may confer with representatives of any department or agency, State or local public agency, civic, industry, or labor group, or any other group directly or indirectly affected by this order; examine the relevant rules, regulations, procedures, policies, and practices of any department or agency subject to this order and make such recommendations as may be necessary or desirable to achieve the purposes of this order.

(c) The Committee shall encourage educational programs by civic, educational, religious, industry, labor, and other nongovernmental groups to eliminate the basic causes of discrimination in housing and related facilities provided with Federal assistance.

SEC. 503. [Revoked. Ex. Ord. No. 12259, Dec. 31, 1980, 46 F.R. 1253; Ex. Ord. No. 12892, §6–604, Jan. 17, 1994, 59 F.R. 2939.]

PART VI—MISCELLANEOUS

SEC. 601. As used in this order, the term "departments and agencies" includes any wholly-owned or mixed-ownership Government corporation, and the term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, and the territories of the United States.

SEC. 602. This order shall become effective immediately.

[Functions of President's Committee on Equal Opportunity in Housing under Ex. Ord. No. 11063 delegated to Secretary of Housing and Urban Development by Ex. Ord. No. 12892, §6–604(a), Jan. 17, 1994, 59 F.R. 2939, set out as a note under section 3608 of this title.]

CROSS REFERENCES

Third party tort liability to United States for hospital and medical care, see section 2651 et seq. of this title.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 1988, 3608 of this title.

## § 1983. Civil action for deprivation of rights

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen

of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

(R.S. § 1979; Pub. L. 96–170, § 1, Dec. 29, 1979, 93 Stat. 1284; Pub. L. 104–317, title III, § 309(c), Oct. 19, 1996, 110 Stat. 3853.)

### CODIFICATION

R.S. § 1979 derived from act Apr. 20, 1871, ch. 22, § 1, 17 Stat. 13.

Section was formerly classified to section 43 of Title 8, Aliens and Nationality.

### AMENDMENTS

1996—Pub. L. 104–317 inserted before period at end of first sentence '', except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable''.

1979—Pub. L. 96–170 inserted "or the District of Columbia" after "Territory", and provisions relating to Acts of Congress applicable solely to the District of Columbia.

### EFFECTIVE DATE OF 1979 AMENDMENT

Amendment by Pub. L. 96–170 applicable with respect to any deprivation of rights, privileges, or immunities secured by the Constitution and laws occurring after Dec. 29, 1979, see section 3 of Pub. L. 96–170, set out as a note under section 1343 of Title 28, Judiciary and Judicial Procedure.

### SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 1988, 1997e of this title.

## § 1984. Omitted

### CODIFICATION

Section, act Mar. 1, 1875, ch. 114, § 5, 18 Stat. 337, which was formerly classified to section 46 of Title 8, Aliens and Nationality, related to Supreme Court review of cases arising under act Mar. 1, 1875. Sections 1 and 2 of act Mar. 1, 1875 were declared unconstitutional in *U.S. v. Singleton*, 109 U.S. 3, and sections 3 and 4 of such act were repealed by act June 25, 1948, ch. 645, § 21, 62 Stat. 862.

## § 1985. Conspiracy to interfere with civil rights

### (1) Preventing officer from performing duties

If two or more persons in any State or Territory conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof; or to induce by like means any officer of the United States to leave any State, district, or place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties;

### (2) Obstructing justice; intimidating party, witness, or juror

If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;

### (3) Depriving persons of rights or privileges

If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

(R.S. § 1980.)

### CODIFICATION

R.S. § 1980 derived from acts July 31, 1861, ch. 33, 12 Stat. 284; Apr. 20, 1871, ch. 22, § 2, 17 Stat. 13.

Section was formerly classified to section 47 of Title 8, Aliens and Nationality.

### SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 1986, 1988 of this title; title 28 section 1343.

## § 1986. Action for neglect to prevent

Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action; and if the death of any party be caused by any such wrongful act and neglect, the legal representatives of the deceased shall have such action therefor, and may recover not exceeding $5,000 damages therein, for the benefit of the widow of the deceased, if there be one, and if there be no widow, then for the benefit of the next of kin of the deceased. But no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued.

(R.S. § 1981.)

### CODIFICATION

R.S. § 1981 derived from act Apr. 20, 1871, ch. 22, § 6, 17 Stat. 15.

Section was formerly classified to section 48 of Title 8, Aliens and Nationality.

### SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in section 1988 of this title.

## § 1987. Prosecution of violation of certain laws

The United States attorneys, marshals, and deputy marshals, the United States magistrate judges appointed by the district and territorial courts, with power to arrest, imprison, or bail offenders, and every other officer who is especially empowered by the President, are authorized and required, at the expense of the United States, to institute prosecutions against all persons violating any of the provisions of section 1990 of this title or of sections 5506 to 5516 and 5518 to 5532 of the Revised Statutes, and to cause such persons to be arrested, and imprisoned or bailed, for trial before the court of the United States or the territorial court having cognizance of the offense.

(R.S. § 1982; Mar. 3, 1911, ch. 231, § 291, 36 Stat. 1167; June 25, 1948, ch. 646, § 1, 62 Stat. 909; Oct. 17, 1968, Pub. L. 90–578, title IV, § 402(b)(2), 82 Stat. 1118; Dec. 1, 1990, Pub. L. 101–650, title III, § 321, 104 Stat. 5117.)

### REFERENCES IN TEXT

Sections 5506 to 5510, 5516 to 5519 and 5524 to 5535 of the Revised Statutes, referred to in text, were repealed by act Mar. 4, 1909, ch. 321, § 341, 35 Stat. 1153; section 5506, 5511 to 5515, and 5520 to 5523, also referred to in text, were repealed by act Feb. 8, 1894, ch. 25, § 1, 28 Stat. 37. The provisions of sections 5508, 5510, 5516, 5518 and 5524 to 5532 of the Revised Statutes were reenacted by act Mar. 4, 1909, and classified to sections 51, 52, 54 to 59, 246, 428 and 443 to 445 of former Title 18, Criminal Code and Criminal Procedure. Those sections were repealed and reenacted as sections 241, 242, 372, 592, 593,

752, 1071, 1581, 1583 and 1588 of Title 18, Crimes and Criminal Procedure, in the general revision of Title 18 by act June 25, 1948, ch. 645, 62 Stat. 683.

### CODIFICATION

R.S. § 1982 derived from acts Apr. 9, 1866, ch. 31, § 4, 14 Stat. 28; May 31, 1870, Ch. 114, § 9, 16 Stat. 142.

Section was formerly classified to section 49 of Title 8, Aliens and Nationality.

### CHANGE OF NAME

Act June 25, 1948, eff. Sept. 1, 1948, substituted "United States attorneys" for "district attorneys". See section 541 of Title 28, Judiciary and Judicial Procedure, and Historical and Revision Notes thereunder.

"United States magistrate judges" substituted in text for "magistrates" pursuant to section 321 of Pub. L. 101–650, set out as a note under section 631 of Title 28. Previously, "magistrates" substituted for "commissioners" pursuant to Pub. L. 90–578. See chapter 43 (§ 631 et seq.) of Title 28.

Reference to the district courts substituted for reference to the circuit courts on authority of section 291 of act Mar. 3, 1911.

### SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in section 1989 of this title.

## § 1988. Proceedings in vindication of civil rights

### (a) Applicability of statutory and common law

The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of titles 13, 24, and 70 of the Revised Statutes for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause, and, if it is of a criminal nature, in the infliction of punishment on the party found guilty.

### (b) Attorney's fees

In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318 [20 U.S.C. 1681 et seq.], the Religious Freedom Restoration Act of 1993 [42 U.S.C. 2000bb et seq.], title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.], or section 13981 of this title,[1] the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity such officer shall not be held liable for any costs, including attorney's fees, unless such action was clearly in excess of such officer's jurisdiction.

### (c) Expert fees

In awarding an attorney's fee under subsection (b) of this section in any action or proceeding to

[1] So in original.

enforce a provision of section 1981 or 1981a of this title, the court, in its discretion, may include expert fees as part of the attorney's fee.

(R.S. §722; Pub. L. 94–559, §2, Oct. 19, 1976, 90 Stat. 2641; Pub. L. 96–481, title II, §205(c), Oct. 21, 1980, 94 Stat. 2330; Pub. L. 102–166, title I, §§103, 113(a), Nov. 21, 1991, 105 Stat. 1074, 1079; Pub. L. 103–141, §4(a), Nov. 16, 1993, 107 Stat. 1489; Pub. L. 103–322, title IV, §40303, Sept. 13, 1994, 108 Stat. 1942; Pub. L. 104–317, title III, §309(b), Oct. 19, 1996, 110 Stat. 3853.)

REFERENCES IN TEXT

Title 13 of the Revised Statutes, referred to in subsec. (a), was in the original "this Title" meaning title 13 of the Revised Statutes, consisting of R.S. §§530 to 1093. For complete classification of R.S. §§530 to 1093 to the Code, see Tables.

Title 24 of the Revised Statutes, referred to in subsec. (a), was in the original "Title 'CIVIL RIGHTS,'" meaning title 24 of the Revised Statutes, consisting of R.S. §§1977 to 1991, which are classified to sections 1981 to 1983, 1985 to 1987, and 1989 to 1994 of this title. For complete classification of R.S. §§1977 to 1991 to the Code, see Tables.

Title 70 of the Revised Statutes, referred to in subsec. (a), was in the original "Title 'CRIMES,'" meaning title 70 of the Revised Statutes, consisting of R.S. §§5323 to 5550. For complete classification of R.S. §§5323 to 5550, see Tables.

Title IX of Public Law 92–318, referred to in subsec. (b), is title IX of Pub. L. 92–318, June 23, 1972, 86 Stat. 373, as amended, popularly known as the Education Amendments of 1972, which is classified principally to chapter 38 (§1681 et seq.) of Title 20, Education. For complete classification of this Act to the Code, see Tables.

The Religious Freedom Restoration Act of 1993, referred to in subsec. (b), is Pub. L. 103–141, Nov. 16, 1993, 107 Stat. 1488, which is classified principally to chapter 21B (§2000bb et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 2000bb of this title and Tables.

The Civil Rights Act of 1964, referred to in subsec. (b), is Pub. L. 88–352, July 2, 1964, 78 Stat. 241, as amended. Title VI of the Civil Rights Act of 1964 is classified generally to subchapter V (§2000d et seq.) of this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 2000a of this title and Tables.

CODIFICATION

R.S. §722 derived from acts Apr. 9, 1866, ch. 31, §3, 14 Stat. 27; May 31, 1870, ch. 114, §18, 16 Stat. 144.

Section was formerly classified to section 729 of Title 28 prior to the general revision and enactment of Title 28, Judiciary and Judicial Procedure, by act June 25, 1948, ch. 646, §1, 62 Stat. 869.

AMENDMENTS

1996—Subsec. (b). Pub. L. 104–317 inserted before period at end ", except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity such officer shall not be held liable for any costs, including attorney's fees, unless such action was clearly in excess of such officer's jurisdiction".

1994—Subsec. (b). Pub. L. 103–322, which directed the amendment of the last sentence of this section by striking "or" after "92–318," and by inserting ", or section 13981 of this title," after "1964", was executed to subsec. (b) of this section by striking "or" after "Act of 1993," and by inserting ", or section 13981 of this title," after "1964", to reflect the probable intent of Congress and amendments by Pub. L. 102–166 and Pub. L. 103–141. See 1993 and 1991 Amendment notes below.

1993—Subsec. (b). Pub. L. 103–141 inserted "the Religious Freedom Restoration Act of 1993," before "or title VI".

1991—Subsec. (a). Pub. L. 102–166, §113(a)(1), designated first sentence of existing provisions as subsec. (a).

Subsec. (b). Pub. L. 102–166, §§103, 113(a)(1), designated second sentence of existing provisions as subsec. (b) and inserted "1981a," after "1981,".

Subsec. (c). Pub. L. 102–166, §113(a)(2), added subsec. (c).

1980—Pub. L. 96–481 struck out "or in any civil action or proceeding, by or on behalf of the United States of America, to enforce, or charging a violation of, a provision of the United States Internal Revenue Code,".

1976—Pub. L. 94–559 authorized the court, in its discretion, to allow a reasonable attorney's fee as part of the prevailing party's costs.

EFFECTIVE DATE OF 1991 AMENDMENT

Amendment by Pub. L. 102–166 effective Nov. 21, 1991, except as otherwise provided, see section 402 of Pub. L. 102–166, set out as a note under section 1981 of this title.

EFFECTIVE DATE OF 1980 AMENDMENT

Amendment by Pub. L. 96–481 effective Oct. 1, 1981, and applicable to adversary adjudication as defined in section 504(b)(1)(C) of Title 5, Government Organization and Employees, and to civil actions and adversary adjudications described in section 2412 of Title 28, Judiciary and Judicial Procedure, which are pending on, or commenced on or after Oct. 1, 1981, see section 208 of Pub. L. 96–481, set out as an Effective Date note under section 2412 of Title 28.

SHORT TITLE OF 1976 AMENDMENT

Pub. L. 94–559, §1, Oct. 19, 1976, 90 Stat. 2641, provided: "That this Act [amending this section] may be cited as 'The Civil Rights Attorney's Fees Awards Act of 1976'."

FEDERAL RULES OF CIVIL PROCEDURE

Effect of Rule 69 on this section, see note by Advisory Committee under said Rule, Title 28, Appendix, Judiciary and Judicial Procedure.

Execution, see Rule 69.

FEDERAL RULES OF CRIMINAL PROCEDURE

Scope and application, see Rules 1 and 54, Title 18, Appendix, Crimes and Criminal Procedure.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 1981a, 1997e, 3602 of this title.

## § 1989. United States magistrate judges; appointment of persons to execute warrants

The district courts of the United States and the district courts of the Territories, from time to time, shall increase the number of United States magistrate judges, so as to afford a speedy and convenient means for the arrest and examination of persons charged with the crimes referred to in section 1987 of this title; and such magistrate judges are authorized and required to exercise all the powers and duties conferred on them herein with regard to such offenses in like manner as they are authorized by law to exercise with regard to other offenses against the laws of the United States. Said magistrate judges are empowered, within their respective counties, to appoint, in writing, under their hands, one or more suitable persons, from time to time, who shall execute all such warrants or other process as the magistrate judges may issue in the lawful performance of their duties, and the persons so appointed shall have authority to summon and call to their aid the bystanders or posse comitatus of the proper county, or

such portion of the land or naval forces of the United States, or of the militia, as may be necessary to the performance of the duty with which they are charged; and such warrants shall run and be executed anywhere in the State or Territory within which they are issued.

(R.S. §§1983, 1984; Mar. 3, 1911, ch. 231, §291, 36 Stat. 1167; Oct. 17, 1966, Pub. L. 90–578, title IV, §402(b)(2), 82 Stat. 1118; Dec. 1, 1990, Pub. L. 101–650, title III, §321, 104 Stat. 5117.)

CODIFICATION

R.S. §§1983 and 1984 derived from acts Apr. 9, 1866, ch. 31, §§4, 5, 14 Stat. 28; May 31, 1870, ch. 114, §§9, 10, 16 Stat. 142.

Section was formerly classified to section 50 of Title 8, Aliens and Nationality.

CHANGE OF NAME

"United States magistrate judges" and "magistrate judges" substituted in text for "magistrates" wherever appearing pursuant to section 321 of Pub. L. 101–650, set out as a note under section 631 of Title 28, Judiciary and Judicial Procedure. Previously, "magistrates" substituted for "commissioners" pursuant to Pub. L. 90–578. See chapter 43 (§631 et seq.) of Title 28.

"District courts" substituted for "circuit courts" on authority of section 291 of act Mar. 3, 1911.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 1990, 1991 of this title.

§ 1990. Marshal to obey precepts; refusing to receive or execute process

Every marshal and deputy marshal shall obey and execute all warrants or other process, when directed to him, issued under the provisions of section 1989 of this title. Every marshal and deputy marshal who refuses to receive any warrant or other process when tendered to him, issued in pursuance of the provisions of this section, or refuses or neglects to use all proper means diligently to execute the same, shall be liable to a fine in the sum of $1,000, for the benefit of the party aggrieved thereby.

(R.S. §§1985, 5517.)

CODIFICATION

R.S. §1985 derived from acts Apr. 9, 1866, ch. 31, §5, 14 Stat. 28; May 31, 1870, ch. 114, §10, 16 Stat. 142.

R.S. §5517 derived from act May 31, 1870, ch. 114, §10, 16 Stat. 142.

Section was formerly classified to section 51 of Title 8, Aliens and Nationality.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 1987, 1992 of this title.

§ 1991. Fees; persons appointed to execute process

Every person appointed to execute process under section 1989 of this title shall be entitled to a fee of $5 for each party he may arrest and take before any United States magistrate judge, with such other fees as may be deemed reasonable by the magistrate judge for any additional services necessarily performed by him, such as attending at the examination, keeping the prisoner in custody, and providing him with food and lodging during his detention, and until the

final determination of the magistrate judge; such fees to be made up in conformity with the fees usually charged by the officers of the courts of justice within the proper district or county, as near as may be practicable, and paid out of the Treasury of the United States on the certificate of the judge of the district within which the arrest is made, and to be recoverable from the defendant as part of the judgment in case of conviction.

(R.S. §1987; Pub. L. 90–578, title IV, §402(b)(2), Oct. 17, 1968, 82 Stat. 1118; Pub. L. 101–650, title III, §321, Dec. 1, 1990, 104 Stat. 5117.)

CODIFICATION

R.S. §1987 derived from acts Apr. 9, 1866, ch. 31, §7, 14 Stat. 29; May 31, 1870, ch. 114, §12, 16 Stat. 143.

Section was formerly classified to section 53 of Title 8, Aliens and Nationality.

CHANGE OF NAME

"United States magistrate judge" and "magistrate judge" substituted in text for "magistrate" wherever appearing pursuant to section 321 of Pub. L. 101–650, set out as a note under section 631 of Title 28, Judiciary and Judicial Procedure. Previously, "magistrate" substituted for "commissioner" pursuant to Pub. L. 90–578. See chapter 43 (§631 et seq.) of Title 28.

§ 1992. Speedy trial

Whenever the President has reason to believe that offenses have been, or are likely to be committed against the provisions of section 1990 of this title or of section 5506 to 5516 and 5518 to 5532 of the Revised Statutes, within any judicial district, it shall be lawful for him, in his discretion, to direct the judge, marshal, and United States attorney of such district to attend at such place within the district, and for such time as he may designate, for the purpose of the more speedy arrest and trial of persons so charged, and it shall be the duty of every judge or other officer, when any such requisition is received by him to attend at the place and for the time therein designated.

(R.S. §1988; June 25, 1948, ch. 646, §1, 62 Stat. 909.)

REFERENCES IN TEXT

Sections 5506 to 5510, 5516 to 5519 and 5524 to 5535 of the Revised Statutes, referred to in text, were repealed by act Mar. 4, 1909, ch. 321, §341, 35 Stat. 1153; section 5506, 5511 to 5515, and 5520 to 5523, also referred to in text, were repealed by act Feb. 8, 1894, ch. 25, §1, 28 Stat. 37. The provisions of sections 5508, 5510, 5516, 5518 and 5524 to 5532 of the Revised Statutes were reenacted by act Mar. 4, 1909, and classified to sections 51, 52, 54 to 59, 246, 428 and 443 to 445 of former Title 18, Criminal Code and Criminal Procedure. Those sections were repealed and reenacted as sections 241, 242, 372, 592, 593, 752, 1071, 1581, 1583 and 1588 of Title 18, Crimes and Criminal Procedure, in the general revision of Title 18 by act June 25, 1948, ch. 645, 62 Stat. 683.

CODIFICATION

R.S. §1988 derived from act Apr. 9, 1866, ch. 31, §8, 14 Stat. 29.

Section was formerly classified to section 54 of Title 8, Aliens and Nationality.

CHANGE OF NAME

Act June 25, 1948, effective Sept. 1, 1948, substituted "United States attorney" for "district attorney". See section 541 of Title 28, Judiciary and Judicial Procedure, and Historical and Revision Notes thereunder.

**§ 1993. Repealed. Pub. L. 85–315, pt. III, § 122, Sept. 9, 1957, 71 Stat. 637**

Section, R.S. § 1989, authorized President to employ land or naval forces to aid in execution of judicial process issued under sections 1981 to 1983 or 1985 to 1992 of this title, or to prevent violation and enforce due execution of sections 1981 to 1983 and 1985 to 1994 of this title. See section 332 of Title 10, Armed Forces.

### § 1994. Peonage abolished

The holding of any person to service or labor under the system known as peonage is abolished and forever prohibited in any Territory or State of the United States; and all acts, laws, resolutions, orders, regulations, or usages of any Territory or State, which have heretofore established, maintained, or enforced, or by virtue of which any attempt shall hereafter be made to establish, maintain, or enforce, directly or indirectly, the voluntary or involuntary service or labor of any persons as peons, in liquidation of any debt or obligation, or otherwise, are declared null and void.

(R.S. § 1990.)

CODIFICATION

R.S. § 1990 derived from act Mar. 2, 1867, ch. 187, § 1, 14 Stat. 546.

Section was formerly classified to section 56 of Title 8, Aliens and Nationality.

### § 1995. Criminal contempt proceedings; penalties; trial by jury

In all cases of criminal contempt arising under the provisions of this Act, the accused, upon conviction, shall be punished by fine or imprisonment or both: *Provided however,* That in case the accused is a natural person the fine to be paid shall not exceed the sum of $1,000, nor shall imprisonment exceed the term of six months: *Provided further,* That in any such proceeding for criminal contempt, at the discretion of the judge, the accused may be tried with or without a jury: *Provided further, however,* That in the event such proceeding for criminal contempt be tried before a judge without a jury and the sentence of the court upon conviction is a fine in excess of the sum of $300 or imprisonment in excess of forty-five days, the accused in said proceeding, upon demand therefore, shall be entitled to a trial de novo before a jury, which shall conform as near as may be to the practice in other criminal cases.

This section shall not apply to contempts committed in the presence of the court or so near thereto as to interfere directly with the administration of justice nor to the misbehavior, misconduct, or disobedience, of any officer of the court in respect to the writs, orders, or process of the court.

Nor shall anything herein or in any other provision of law be construed to deprive courts of their power, by civil contempt proceedings, without a jury, to secure compliance with or to prevent obstruction of, as distinguished from punishment for violations of, any lawful writ, process, order, rule, decree, or command of the court in accordance with the prevailing usages of law and equity, including the power of detention.

(Pub. L. 85–315, pt. V, § 151, Sept. 9, 1957, 71 Stat. 638.)

REFERENCES IN TEXT

This Act, referred to in text, is Pub. L. 85–315, Sept. 9, 1957, 71 Stat. 634, as amended, known as the Civil Rights Act of 1957, which enacted this section, sections 1975 to 1975e of this title and section 295–1 of former Title 5, Executive Departments and Government Officers and Employees, repealed section 1993 of this title, amended section 1971 of this title and sections 1343 and 1861 of Title 28, Judiciary and Judicial Procedure, and enacted provisions set out as a note under section 1975 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 1975 of this title and Tables.

CROSS REFERENCES

Jury trial of criminal contempts, see section 3691 of Title 18, Crimes and Criminal Procedure.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in section 1973*l* of this title.

### § 1996. Protection and preservation of traditional religions of Native Americans

On and after August 11, 1978, it shall be the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, Eskimo, Aleut, and Native Hawaiians, including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites.

(Pub. L. 95–341, § 1, Aug. 11, 1978, 92 Stat. 469.)

SHORT TITLE OF 1994 AMENDMENT

Pub. L. 103–344, § 1, Oct. 6, 1994, 108 Stat. 3125, provided that: "This Act [enacting section 1996a of this title] may be cited as the 'American Indian Religious Freedom Act Amendments of 1994.'"

SHORT TITLE

Pub. L. 95–341, which enacted this section and a provision set out as a note under this section, is popularly known as the American Indian Religious Freedom Act.

FEDERAL IMPLEMENTATION OF PROTECTIVE AND PRESERVATION FUNCTIONS RELATING TO NATIVE AMERICAN RELIGIOUS CULTURAL RIGHTS AND PRACTICES; PRESIDENTIAL REPORT TO CONGRESS

Section 2 of Pub. L. 95–341 provided that the President direct the various Federal departments, agencies, and other instrumentalities responsible for administering relevant laws to evaluate their policies and procedures in consultation with native traditional religious leaders to determine changes necessary to preserve Native American religious cultural rights and practices and report to the Congress 12 months after Aug. 11, 1978.

EX. ORD. NO. 13007. INDIAN SACRED SITES

Ex. Ord. No. 13007, May 24, 1996, 61 F.R. 26771, provided:

By the authority vested in me as President by the Constitution and the laws of the United States, in furtherance of Federal treaties, and in order to protect and preserve Indian religious practices, it is hereby ordered:

SECTION 1. *Accommodation of Sacred Sites.* (a) In managing Federal lands, each executive branch agency with statutory or administrative responsibility for the man-

agement of Federal lands shall, to the extent prac-
ticable, permitted by law, and not clearly inconsistent
with essential agency functions, (1) accommodate ac-
cess to and ceremonial use of Indian sacred sites by In-
dian religious practitioners and (2) avoid adversely af-
fecting the physical integrity of such sacred sites.
Where appropriate, agencies shall maintain the con-
fidentiality of sacred sites.

(b) For purposes of this order:

(i) ''Federal lands'' means any land or interests in
land owned by the United States, including leasehold
interests held by the United States, except Indian trust
lands;

(ii) ''Indian tribe'' means an Indian or Alaska Native
tribe, band, nation, pueblo, village, or community that
the Secretary of the Interior acknowledges to exist as
an Indian tribe pursuant to Public Law No. 103–454, 108
Stat. 4791 [see 25 U.S.C. 479a, 479a–1], and ''Indian'' re-
fers to a member of such an Indian tribe; and

(iii) ''Sacred site'' means any specific, discrete, nar-
rowly delineated location on Federal land that is iden-
tified by an Indian tribe, or Indian individual deter-
mined to be an appropriately authoritative represen-
tative of an Indian religion, as sacred by virtue of its es-
tablished religious significance to, or ceremonial use
by, an Indian religion; provided that the tribe or appro-
priately authoritative representative of an Indian reli-
gion has informed the agency of the existence of such
a site.

SEC. 2. *Procedures.* (a) Each executive branch agency
with statutory or administrative responsibility for the
management of Federal lands shall, as appropriate,
promptly implement procedures for the purposes of car-
rying out the provisions of section 1 of this order, in-
cluding, where practicable and appropriate, procedures
to ensure reasonable notice is provided of proposed ac-
tions or land management policies that may restrict
future access to or ceremonial use of, or adversely af-
fect the physical integrity of, sacred sites. In all ac-
tions pursuant to this section, agencies shall comply
with the Executive memorandum of April 29, 1994,
''Government-to-Government Relations with Native
American Tribal Governments'' [25 U.S.C. 450 note].

(b) Within 1 year of the effective date of this order,
the head of each executive branch agency with statu-
tory or administrative responsibility for the manage-
ment of Federal lands shall report to the President,
through the Assistant to the President for Domestic
Policy, on the implementation of this order. Such re-
ports shall address, among other things, (i) any changes
necessary to accommodate access to and ceremonial
use of Indian sacred sites; (ii) any changes necessary to
avoid adversely affecting the physical integrity of In-
dian sacred sites; and (iii) procedures implemented or
proposed to facilitate consultation with appropriate In-
dian tribes and religious leaders and the expeditious
resolution of disputes relating to agency action on Fed-
eral lands that may adversely affect access to, ceremo-
nial use of, or the physical integrity of sacred sites.

SEC. 3. Nothing in this order shall be construed to re-
quire a taking of vested property interests. Nor shall
this order be construed to impair enforceable rights to
use of Federal lands that have been granted to third
parties through final agency action. For purposes of
this order, ''agency action'' has the same meaning as in
the Administrative Procedure Act (5 U.S.C. 551(13)).

SEC. 4. This order is intended only to improve the in-
ternal management of the executive branch and is not
intended to, nor does it, create any right, benefit, or
trust responsibility, substantive or procedural, enforce-
able at law or equity by any party against the United
States, its agencies, officers, or any person.

WILLIAM J. CLINTON.

SECTION REFERRED TO IN OTHER SECTIONS

This section is referred to in sections 1996a, 11701 of
this title; title 16 sections 410pp–5, 410pp–6, 410aaa–75,
460uu–47, 460jjj–1, 470ii, 543f; title 20 sections 4424, 7902.

## § 1996a. Traditional Indian religious use of pe-
yote

### (a) Congressional findings and declarations

The Congress finds and declares that—

(1) for many Indian people, the traditional
ceremonial use of the peyote cactus as a reli-
gious sacrament has for centuries been inte-
gral to a way of life, and significant in perpet-
uating Indian tribes and cultures;

(2) since 1965, this ceremonial use of peyote
by Indians has been protected by Federal regu-
lation;

(3) while at least 28 States have enacted laws
which are similar to, or are in conformance
with, the Federal regulation which protects
the ceremonial use of peyote by Indian reli-
gious practitioners, 22 States have not done
so, and this lack of uniformity has created
hardship for Indian people who participate in
such religious ceremonies;

(4) the Supreme Court of the United States,
in the case of Employment Division v. Smith,
494 U.S. 872 (1990), held that the First Amend-
ment does not protect Indian practitioners
who use peyote in Indian religious ceremonies,
and also raised uncertainty whether this reli-
gious practice would be protected under the
compelling State interest standard; and

(5) the lack of adequate and clear legal pro-
tection for the religious use of peyote by Indi-
ans may serve to stigmatize and marginalize
Indian tribes and cultures, and increase the
risk that they will be exposed to discrimina-
tory treatment.

### (b) Use, possession, or transportation of peyote

(1) Notwithstanding any other provision of
law, the use, possession, or transportation of pe-
yote by an Indian for bona fide traditional cere-
monial purposes in connection with the practice
of a traditional Indian religion is lawful, and
shall not be prohibited by the United States or
any State. No Indian shall be penalized or dis-
criminated against on the basis of such use, pos-
session or transportation, including, but not
limited to, denial of otherwise applicable bene-
fits under public assistance programs.

(2) This section does not prohibit such reason-
able regulation and registration by the Drug En-
forcement Administration of those persons who
cultivate, harvest, or distribute peyote as may
be consistent with the purposes of this section
and section 1996 of this title.

(3) This section does not prohibit application
of the provisions of section 481.111(a) of Vernon's
Texas Health and Safety Code Annotated, in ef-
fect on October 6, 1994, insofar as those provi-
sions pertain to the cultivation, harvest, and
distribution of peyote.

(4) Nothing in this section shall prohibit any
Federal department or agency, in carrying out
its statutory responsibilities and functions,
from promulgating regulations establishing rea-
sonable limitations on the use or ingestion of
peyote prior to or during the performance of du-
ties by sworn law enforcement officers or per-
sonnel directly involved in public transportation
or any other safety-sensitive positions where
the performance of such duties may be adversely
affected by such use or ingestion. Such regula-

TITLE 42—THE PUBLIC HEALTH AND WELFARE

tions shall be adopted only after consultation with representatives of traditional Indian religions for which the sacramental use of peyote is integral to their practice. Any regulation promulgated pursuant to this section shall be subject to the balancing test set forth in section 3 of the Religious Freedom Restoration Act (Public Law 103–141; 42 U.S.C. 2000bb–1).

(5) This section shall not be construed as requiring prison authorities to permit, nor shall it be construed to prohibit prison authorities from permitting, access to peyote by Indians while incarcerated within Federal or State prison facilities.

(6) Subject to the provisions of the Religious Freedom Restoration Act (Public Law 103–141; 42 U.S.C. 2000bb–1) [42 U.S.C. 2000bb et seq.], this section shall not be construed to prohibit States from enacting or enforcing reasonable traffic safety laws or regulations.

(7) Subject to the provisions of the Religious Freedom Restoration Act (Public Law 103–141; 42 U.S.C. 2000bb–1), this section does not prohibit the Secretary of Defense from promulgating regulations establishing reasonable limitations on the use, possession, transportation, or distribution of peyote to promote military readiness, safety, or compliance with international law or laws of other countries. Such regulations shall be adopted only after consultation with representatives of traditional Indian religions for which the sacramental use of peyote is integral to their practice.

**(c) Definitions**

For purposes of this section—

(1) the term "Indian" means a member of an Indian tribe;

(2) the term "Indian tribe" means any tribe, band, nation, pueblo, or other organized group or community of Indians, including any Alaska Native village (as defined in, or established pursuant to the Alaska Native Claims Settlement Act (43 U.S.C. 1601 et seq.)), which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians;

(3) the term "Indian religion" means any religion—

(A) which is practiced by Indians, and

(B) the origin and interpretation of which is from within a traditional Indian culture or community; and

(4) the term "State" means any State of the United States, and any political subdivision thereof.

**(d) Protection of rights of Indians and Indian tribes**

Nothing in this section shall be construed as abrogating, diminishing, or otherwise affecting—

(1) the inherent rights of any Indian tribe;

(2) the rights, express or implicit, of any Indian tribe which exist under treaties, Executive orders, and laws of the United States;

(3) the inherent right of Indians to practice their religions; and

(4) the right of Indians to practice their religions under any Federal or State law.

(Pub. L. 95–341, §3, as added Pub. L. 103–344, §2, Oct. 6, 1994, 108 Stat. 3125.)

REFERENCES IN TEXT

The Religious Freedom Restoration Act, referred to in subsec. (b)(6), (7), probably means the Religious Freedom Restoration Act of 1993, Pub. L. 103–141, Nov. 16, 1993, 107 Stat. 1488, which is classified principally to chapter 21B (§ 2000bb et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 2000bb of this title and Tables.

The Alaska Native Claims Settlement Act, referred to in subsec. (c)(2), is Pub. L. 92–203, Dec. 18, 1971, 85 Stat. 688, as amended, which is classified generally to chapter 33 (§ 1601 et seq.) of Title 43, Public Lands. For complete classification of this Act to the Code, see Short Title note set out under section 1601 of Title 43 and Tables.

**§ 1996b. Interethnic adoption**

**(1) Prohibited conduct**

A person or government that is involved in adoption or foster care placements may not—

(A) deny to any individual the opportunity to become an adoptive or a foster parent, on the basis of the race, color, or national origin of the individual, or of the child, involved; or

(B) delay or deny the placement of a child for adoption or into foster care, on the basis of the race, color, or national origin of the adoptive or foster parent, or the child, involved.

**(2) Enforcement**

Noncompliance with paragraph (1) is deemed a violation of title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.].

**(3) No effect on the Indian Child Welfare Act of 1978**

This subsection shall not be construed to affect the application of the Indian Child Welfare Act of 1978 [25 U.S.C. 1901 et seq.].

(Pub. L. 104–188, title I, § 1808(c), Aug. 20, 1996, 110 Stat. 1904.)

REFERENCES IN TEXT

The Civil Rights Act of 1964, referred to in par. (2), is Pub. L. 88–352, July 2, 1964, 78 Stat. 241, as amended. Title VI of the Act is classified generally to subchapter V (§ 2000d et seq.) of this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 2000a of this title and Tables.

The Indian Child Welfare Act of 1978, referred to in par. (3), is Pub. L. 95–608, Nov. 8, 1978, 92 Stat. 3069, as amended, which is classified principally to chapter 21 (§ 1901 et seq.) of Title 25, Indians. For complete classification of this Act to the Code, see Short Title note set out under section 1901 of Title 25 and Tables.

SUBCHAPTER I–A—INSTITUTIONALIZED PERSONS

**§ 1997. Definitions**

As used in this subchapter—

(1) The term "institution" means any facility or institution—

(A) which is owned, operated, or managed by, or provides services on behalf of any State or political subdivision of a State; and

(B) which is—

(i) for persons who are mentally ill, disabled, or retarded, or chronically ill or handicapped;

(ii) a jail, prison, or other correctional facility;



PETITIONER'S
EXHIBIT
10

## Declaration of Facts and Affidavit of Paternity of Joan Mulligan Weber

I, Joan Mulligan Weber, am competent to testify, and further, have firsthand knowledge of the facts related herein, and further, the facts related herein are true, correct and complete.

1.  I am Joan Mulligan Weber. I am a woman and was born in the house of my mother and father, Eugene Mulligan and Marion Louise nee Goeckel Mulligan, 119 Park Place, Kingston, Pennsylvania.

2.  I am their biological daughter and my birthday is February ten, nineteen hundred and twenty nine. My baptism name is Joan Mulligan.

3.  Both mother Marion and father Eugene were born in Pennsylvania and were married while conceiving all five children, making them the biological parents.

4.  I married Robert Charles Weber of Buffalo, New York on June twenty - one, nineteen hundred and fifty-two in Luzerne County, Pennsylvania.

5.  Robert's birthday is June six, nineteen hundred and twenty five, and is the biological son of father Bernard John Weber and mother Mary nee O'Donnell Weber also of Buffalo, New York.

6.  Father Bernard John Weber was born in Buffalo, New York in nineteen hundred, and mother Mary, nee O'Donnell Weber was born in Pennsylvania in nineteen hundred and one.

7.  While married to Robert Weber I gave birth to our son, Charles Weber. Charles was born November twenty-five, nineteen hundred fifty-five in Queens New York.

8.  His confirmation name of John was added toward the later grades. Robert and I are the biological parents, father and mother, and are expressly **_not_** custodial parents.

9.  I, as the biological mother of Charles Weber, never intended to abandon my son or to

create a controversy as to his status as anything but my biological son at the time I was married to Robert Charles Weber for this child born.

10. Regarding the Birth Certificate information, maiden Joan Mulligan was never the mother of Charles Weber. The married Joan Mulligan Weber has always been the biological mother of her son, Charles Weber.

11. I did not know by placing my maiden name as the mother of my child, my son would be legally considered born out of wedlock, or an infant of unknown parentage.

12. The preceding facts are hereby stated to correct any false or inaccurate information that may have been entered on the public record regarding the paternity status. The foregoing statements are true and complete as to the best of my knowledge.

Affiant _Joan Mulligan Weber_

Date _June 11, 2015_

**NOTARY**

State of New York      )
                       ) ss
County of Erie         )

The foregoing instrument is being sworn before me this _11_, day of _June_, 2015

My commission expires _5/21/16_. Witness my hand and official Seal.

_Jeanne Marcella_

Notary Public

SEAL

2/2



PETITIONER'S EXHIBIT 11

1

2
**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

3

4  UNITED STATES OF AMERICA,            )
                                        )  Case No. 1:15-CR-00010
5                                       )                (RJA)(HBS)
                      Plaintiff,        )
6                                       )
    vs.                                 )  January 24th, 2018
7                                       )
    CHARLES WEBER,                      )
8                                       )
                      Defendant.        )
9

10

                **TRANSCRIPT OF COMPETENCY HEARING**
11          **BEFORE THE HONORABLE RICHARD J. ARCARA**
                **SENIOR UNITED STATES DISTRICT JUDGE**
12

13
    APPEARANCES:
14
    For the Plaintiff:    JAMES P. KENNEDY, JR.
15                         ACTING UNITED STATES ATTORNEY
                           BY:  MARYELLEN KRESSE, ESQ.
16                         ASSISTANT UNITED STATES ATTORNEY
                           138 Delaware Avenue
17                         Buffalo, NY 14202

18  For the Defendant:    FEDERAL PUBLIC DEFENDER'S OFFICE
                           BY:  BRIAN COMERFORD, ESQ.
19                         300 Pearl Street, Suite 200
                           Buffalo, NY 14202
20
    Court Reporter:       MEGAN E. PELKA, RPR
21                         Robert H. Jackson Courthouse
                           2 Niagara Square
22                         Buffalo, NY 14202

23

24

25

1   citizen"?

2   A.   Well, I guess the first thing you have to realize is

3   which citizen are they talking about; citizen of the

4   United States or the Fourteenth Amendment or citizen of the

5   sovereign states?  That's never really been put forth in

6   testimony and I'll just read it straight from a court case.

7              MS. KRESSE:   Your Honor --

8              THE WITNESS:   Like the citizens --

9              MS. KRESSE:   Objection.

10             THE COURT:   Sustained.

11             THE WITNESS:   Why?  Excuse me.

12             THE COURT:   Just ask the next question,

13  Mr. Comerford.  I don't give explanations.  I make rulings.

14  BY MR. COMERFORD:

15  Q.   What is your -- without reading from something,

16  Dr. Weber, without reading from something you have prepared,

17  what are your views on being characterized as a sovereign

18  citizen; you personally, not reading from something?

19  A.   Well, I was just going to use that as background, but

20  I'll move on.  The Court cases that I am referring to are

21  Supreme Court cases or court cases that cite court cases,

22  Supreme Court cases.  And this one is citing the

23  *Slaughterhouse* cases, which were approximately in the 1870's.

24  And this case was a Susan B. Anthony case.  And in the Susan

25  B. Anthony case, she was arrested for voting and she promoted

1    the fact that as a citizen of the United States, she had the

2    right to vote.  And the Court said no, the citizen of the

3    United States does not apply to you and your right to vote.

4    Your elected franchise is not in the United States

5    Constitution for you.  It's in your New York State

6    Constitution.  And so, she was denied that right.

7          And they explained that the citizens of the

8    United States have privileges and immunities that are

9    different than the privileges and immunities from the

10   citizens of the several States, their rights are not

11   protected by the Fourteenth Amendment and that is what was

12   held in the *Slaughterhouse* cases.

13         It's been held in other cases since then too, the

14   *United States v. Quickshank*, *Twining v. New Jersey*, *Maxwell*

15   *v. Dow.*  You have *Toshiro vs. Georgia*.  And recently, you

16   have the case of *Demer v. Jones* in 1993.  It's well-known

17   that the two are not equivalent.

18   Q.   Now, in 2015, did you make a discovery demand on the U.S.

19   Attorney?

20   A.   Yes, I did.

21   Q.   What was that about?

22   A.   The demand was to produce a statute where the people were

23   made liable for any income taxes and where the term "the

24   people" were actually introduced.

25   Q.   And what -- was there a hearing on that motion?

1    A.    There was a hearing, yes.

2    Q.    And what happened in that?

3    A.    Well, the -- I brought up the fact that -- well, first,

4    the answer to that from the U.S. Attorney was that there

5    wasn't any that existed, that people are never mentioned in

6    statutes, or something to that effect.  And after had she

7    made the answer, I countered and said no, no, that's not

8    true, because when the states or the territories were making

9    a petition to the people for inclusion into the statehood,

10   that would petition the people and I brought out certain

11   examples of that.

12          So, in other words, what they were doing was the

13   first 13 states that formed the union would accept the

14   petition on territories.  They would have 60,000 or more

15   citizens in that territory and then they would set up their

16   government, their judicial system and their executive system

17   and then they would apply it to the people.  And the people

18   would either approve or disprove of the application.

19          And when they did approve, the enabling acts were

20   brought forth.  And the enabling acts brought those

21   territories into statehood under the Constitutional scheme

22   and that they would be on equal footing with the original 13

23   states.

24          And then at that time, the result of that motion was

25   that it was granted in part and denied in part.  Now, at that

1   time, I don't believe that Judge Scott had my genealogy to

2   prove that I was posterior people and I think that came in a

3   month or so later.  So, when I did receive the answer, he

4   inside it in part and granted it in part.  So, I wrote an

5   objection and then the objection, they answered that from the

6   U.S. Attorney.  She stated that, yes, okay, you are one of

7   the people, but you do owe -- you know, why don't you owe

8   federal income tax?

9          And my answer to that was -- and I don't know if

10  it's ever really been heard today.  I don't think we have

11  heard it.  My answer to that was well, under Subchapter A of

12  Title 26 in the Code of Federal Regulations, the implemented

13  statute on Section 1.1 specifically limits individual income

14  taxes to citizens of the United States or residents -- or

15  citizens and residents of the United States.

16         The people are not there.  It had nothing to do with

17  the citizens of the several States.  Only -- in our

18  situation, only the Fourteenth Amendment citizens, which

19  brings up a problem because in order to be a Fourteenth

20  Amendment citizen, you have to be naturalized.  Congress only

21  has one power to naturalize anybody and that's to naturalize

22  aliens.

23         And the conditions at birth that cause the

24  Fourteenth Amendment to be attached are located in Title 8,

25  Section 1401 through 1409.  And that -- the allegation of me

1   temporal lobes were asymmetrical and his hippocampus was

2   slightly abnormal, but the main thing was there was no

3   evidence of something like a tumor, evidence of vascular

4   ischemic changes that would indicate that he had vascular

5   pathology diseases applicable or that there was some kind of

6   obvious brain deterioration.

7           And specifically, we were looking for any evidence

8   of mercury poisoning of which there are certain MRI findings

9   that are pathognomonic or specific to that if it's present

10  and those were not present.

11  Q.  And did you do any research into the sovereign citizen

12  cases, the sovereign citizen movement, those sorts of things?

13  A.  Yes.  And I'd like to mention there's not a lot out

14  there, but yes, I did do some research and because I have --

15  my colleagues that I did the presentation with were

16  interested.  I did discuss the case anonymously with them and

17  this led to us putting together an educational presentation

18  for the APAL meeting.

19  Q.  And I guess prior to providing you with the reports, did

20  you review some of the literature out there, specifically

21  Government Exhibits 4 and 5, which are the Parker article and

22  then the other article by Pytyck and Chaimowitz?

23  A.  Yes.

24  Q.  Did you do any other research online or anything like

25  that that you can tell us about into sovereign citizens?

1  A.  Well, there's various websites online that talk about

2  sovereign citizens.  So, givemeliberty.org is a website that

3  is often referred to, that sovereign citizens often refer to.

4  There's a number of YouTube videos that show sovereign

5  citizens in court and are certainly very conducive to being

6  educational in that sense.  And again, consulting with

7  colleagues who have had expertise in evaluating.

8  Q.  And did you -- you reviewed those materials --

9  A.  I did.

10  Q.  -- the things that were available online?

11  A.  Well, I did.  And in fact, I was the one that provided

12  those articles to our forensic psychiatry core group for

13  discussion.  The fellow Dr. Heffler prepared, again

14  anonymous, a presentation regarding this case for our

15  department to discuss and as part of these case

16  presentations, we usually provide background literature for

17  people to become familiar with, so those articles were

18  provided by us.

19  Q.  And by "those articles", you mean Government Exhibits 4

20  and 5?

21  A.  Correct.

22  Q.  Now, ultimately, did you reach a diagnosis of Dr. Weber?

23  A.  Yes.

24  Q.  And what -- can you tell us what that diagnosis is in

25  your report?

CERVANTES -- MR. COMERFORD -- 01/23/18

185

1   A.   Right.   In my second report, I diagnosed Dr. Weber with

2   cognitive disorder; unspecified cognitive disorder.   In my

3   first report, I diagnosed delusional disorder, mixed type and

4   I want to explain that -- why these are two different

5   diagnoses in two different reports.   Not all cases are

6   straightforward.   Individuals with mental illness are complex

7   and sometimes, they don't fit into neat categories.

8        When we first evaluated Dr. Weber in 2016, the

9   picture to us seemed to be a mixed picture of different types

10  of delusions; so, not only beliefs about the government and

11  his lineage and about tax-related issues, but also very

12  prominent somatic -- meaning physical complaints -- beliefs

13  and beliefs about treatments that were not reality-based,

14  that were very unusual and specifically unusual for him to

15  believe.

16       After -- as the case went on, because this case went

17  on for quite a while and after discussion with you and as

18  more information emerged as to how he was trying to manage

19  his case, I concluded that there was also some cognitive

20  dysfunction, which is difficult to put into a very specific

21  category at this point.   So, the specific ideology is

22  unclear, but I believe it is present.

23  Q.   And what -- in interviewing Dr. Weber, did he tell you

24  about how he got involved in this whole idea about taxes and

25  sovereign citizen?   Can you talk about that?

1    A.   Yes.  He remembered very clearly where it started.  It

2    was around 2006.  He was driving either to or from a golf

3    tournament and he recalled listening to a radio show where

4    this was being discussed and he recalls thinking that this

5    sounded very bizarre, very off, but he still made a note and

6    a few weeks later, went to do some research on it himself.

7           And he become very engrossed in this, spending

8    anywhere from 25 to 40 hours a week doing research on this.

9    So, he become very interested in researching his lineage and

10   became convinced that the beliefs the sovereign citizens had

11   were, in fact, what is true and what should be true for him.

12   So, he began adopting this over the next several years.

13   Q.   And do you recall where he was working at the time?

14   A.   Dr. Weber was employed in his own private dental practice

15   at the time.

16   Q.   And was he married?

17   A.   He was.

18   Q.   Did he have employees?

19   A.   He did.  He had at least three employees.

20   Q.   And if you know from what he's told you or from other

21   information about the case, was there any indication that he

22   was in, you know, some sort of financial trouble or anything

23   like that at the time?

24   A.   There was no indication that there was any financial

25   trouble or crisis at the time.



PETITIONER'S EXHIBIT
13

```
 1                      UNITED STATES DISTRICT COURT
                        WESTERN DISTRICT OF NEW YORK
 2

 3

 4   UNITED STATES OF AMERICA,        )
                                      ) Case No. 1:15-CR-00010
 5                                    )              (RJA)(HBS)
                     Plaintiff,       )
 6                                    )
     vs.                              ) January 23rd, 2018
 7                                    )
     CHARLES WEBER,                   )
 8                                    )
                     Defendant.       )
 9

10                 TRANSCRIPT OF COMPETENCY HEARING
             BEFORE THE HONORABLE RICHARD J. ARCARA
11              SENIOR UNITED STATES DISTRICT JUDGE

12

13
     APPEARANCES:
14
     For the Plaintiff:    JAMES P. KENNEDY, JR.
15                         ACTING UNITED STATES ATTORNEY
                           BY:  MARYELLEN KRESSE, ESQ.
16                              PATRICIA ASTORGA, ESQ.
                           ASSISTANT UNITED STATES ATTORNEYS
17                         138 Delaware Avenue
                           Buffalo, NY 14202
18
     For the Defendant:    FEDERAL PUBLIC DEFENDER'S OFFICE
19                         BY:  BRIAN COMERFORD, ESQ.
                           300 Pearl Street, Suite 200
20                         Buffalo, New York 14202

21   Court Reporter:       MEGAN E. PELKA, RPR
                           Robert H. Jackson Courthouse
22                         2 Niagara Square
                           Buffalo, NY 14202
23

24

25
```

 1   competency as well.  That includes issues with plea

 2   bargaining and issues about providing information that he

 3   proposes his attorney use and wouldn't really go into detail

 4   as to what it was, but eluded to the fact that if his

 5   attorney refused to use the information that he wanted to use

 6   that he would ask the attorney to go off the case.

 7   Q.  But, again, that goes to issue number two, which is

 8   whether or not he is competent to represent himself, correct?

 9   A.  Well, it goes to assisting in your defense, but if you

10   are not competent generally, I think the -- you know, then

11   competency pro se is a higher bar, so, if he's not competent

12   to work with an attorney, then he is not competent to

13   represent himself, either.

14   Q.  Well, is that necessarily the case?  Well, if you are not

15   competent to stand trial, then you're not competent to stand

16   trial?

17   A.  Correct.

18   Q.  And in fact, if somebody is found not competent to stand

19   trial, they end up going into a hospital, essentially

20   incarcerated in a mental facility for a period of up to four

21   months, correct?

22   A.  Correct.

23   Q.  And is Mr. Weber somebody who would be benefitted from

24   some sort of treatment, whether it's medicinal or otherwise,

25   that would somehow -- I can't think of the right word, not

1   Q.   Right.  And it's a pretty low threshold in terms of what

2   has to be demonstrated, correct?

3   A.   Yes.

4   Q.   So, it is whether the defendant has a rational as well as

5   factual understanding of the proceedings against him?

6   A.   Correct.

7   Q.   And whether the defendant has sufficient presentability

8   to consult with an attorney with a reasonable degree of

9   rational understanding.  That's the second component,

10  correct?

11  A.   Correct.

12  Q.   And you talked a little bit about the ability to consult

13  with an attorney, but clearly even in your observations here

14  over the course of the last two days of this hearing, that

15  Mr. Weber has been able to consult with his attorney and work

16  with his attorney, Mr. Comerford, relative to and in

17  conjunction with this hearing?

18  A.   Well, I don't know.  I think you'd have to ask

19  Mr. Comerford that.  I don't know what all has been said or

20  what all Dr. Weber wishes Mr. Comerford to bring forth.

21  My -- in my conversations with Mr. Comerford, Mr. Comerford

22  was not optimistic that anything that Dr. Weber wanted to

23  present was going to be particularly helpful in his defense.

24  Q.   Well, that may be because his legal beliefs are not

25  beliefs that anybody else except sovereign citizens adhere

```
 1            THE CLERK:  All rise.  The United States District

 2    Court is now in session.  Criminal action 2015-10A.  United

 3    States v. Charles Weber.  Criminal competency continuation.

 4    Counsel, please state your name and the party you represent

 5    for the record.

 6            MS. KRESSE:  Good morning, Your Honor.  MaryEllen

 7    Kresse and Patricia Astorga for the United States.

 8            THE COURT:  Good morning.

 9            MR. COMERFORD:  Good morning, Your Honor.  Brian

10    Comerford for Charles Weber.  He's present this morning.

11            THE COURT:  All right.  Good morning.

12            MR. COMERFORD:  We're prepared to continue with the

13    hearing, Judge.

14            THE COURT:  Okay.  Let's go.

15            MR. COMERFORD:  And we call Dr. Ana Natasha

16    Cervantes.

17    (The witness was sworn at 10:00 a.m.)

18            THE CLERK:  If you could please state your name and

19    spell your first and last name for the record and make sure

20    you speak into the microphone.

21            THE WITNESS:  It's Ana Natasha Cervantes,

22    C-E-R-V-A-N-T-E-S.

23

24

25
```

171

1  clients, be it attorneys, different agencies, companies,

2  insurance companies as well.  So, I do a variety of criminal

3  and civil work.

4  Q.  And did you do -- in criminal work, it's primarily cases

5  where either -- I guess can you tell us who typically hires

6  you to do criminal work?

7  A.  I have done work for various agencies.  The majority of

8  my work locally is either private attorneys or assigned

9  counsel, but I have done some work in Monroe County for the

10  Monroe County Public Defender's Office, a couple of cases

11  that involved the U.S. Attorney's Office here locally as well

12  and for the Federal Public Defender's Office.

13  Q.  And have you been retained by the U.S. Attorney's Office

14  in the past to work on cases?

15  A.  Yes.  Some of those have been joint cases that have been

16  agreed upon by both parties and court ordered.

17  Q.  In terms of your educational background, could you give

18  us just a briefly summary of that?

19  A.  Sure.  I completed by bachelor's in psychology from

20  Loyola University in 1997.  I then went on to medical school

21  at Case Western Reserve University from 1997 to 2001.  From

22  2001 to 2002, I completed an internship in internal medicine

23  at Metro Health Medical School, also thorough University

24  Hospital in Cleveland.  And then, I completed a general

25  psychiatry residency at John Hopkins Hospital in Baltimore,

CERVANTES -- MR. COMERFORD -- 01/23/18                        173

1   calling something psychiatric.

2   Q.   Thank you.

3         MR. COMERFORD:   Judge, I am handing up to the witness

4   a copy of Defendant's Exhibit 1.

5         THE COURT:   Okay.

6   BY MR. COMERFORD:

7   Q.   Dr. Cervantes, do you recognize that document?

8   A.   Yes.

9   Q.   Can you tell us what it is?

10  A.   This is a copy of my CV.

11  Q.   And did you provide that to me in our preparation for

12  this case?

13  A.   Yes, I did.

14  Q.   And is a -- I guess it's accurate and up-to-date, to the

15  best of your knowledge?

16  A.   Yes, it is.

17  Q.   And does it detail your professional and educational

18  background?

19  A.   Yes, it does.

20        MR. COMERFORD:   Judge, we would move into evidence

21  Defendant's Exhibit 1.

22        MS. KRESSE:   No objection.

23        THE COURT:   All right.   It will be received.

24  (Defendant's Exhibit 1 was received in evidence.)

25


PETITIONER'S
EXHIBIT
14

# NATURAL-BORN CITIZEN OF THE UNITED STATES: ELIGIBILITY FOR THE OFFICE OF PRESIDENT

*By ALEXANDER PORTER MORSE (ALBANY LAW JOURNAL VOL. 66 (1904-1905))*

As a wide-spread interest attaches to the discussion of the meaning and scope of the constitutional provision in respect to eligibility for the office of president of the United States, I submit some views in this relation which may be opportune.

The question is often asked: Are children of citizens of the United States born at sea or in foreign territory, other than the offspring of American ambassadors or ministers plenipotentiary, natural-born citizens of the United States, within the purview of the constitutional provision? After some consideration of the history of the times, of the relation of the provision to the subject-matter and of the acts of congress relating to citizenship, it seems clear to the undersigned that such persons are natural-born, that is, citizens by origin; and that, if otherwise qualified, they are eligible to the office of president. In respect to the citizenship of children of American parentage, wherever born, the principle of jus sanguinis seems to be the American principle; that is to say, the law of hereditary, rather than territorial allegiance, is recognized, which is modern, as distinguished from the ancient, and at one time, common-law principle of jus soli. If the provision was as sometimes inaccurately cited, namely, that the president must be "a native-born citizen," there might be no question as to its meaning. But the framers generally used precise language; and the etymology actually employed makes the meaning definite. Its correspondent in English law, "*natural-born subject*," appears in constitutional history and parliamentary enactments; and there it includes all children born out of the king's allegiance whose fathers were natural-born subjects; and the children of such children (i. e., children whose grandfathers by the father's side were natural-born subjects), though their mothers were aliens, are now deemed to be natural born subjects themselves to all intents and purposes, unless their said ancestors were attainted or banished beyond sea for high treason, or were at the birth of such children in the service of a prince at enmity with Great Britain. At the time of the adoption of the Constitution, immigration was anticipated and provisions for naturalization would immediately

1

follow the establishment of the government. Those resident in the United States at the time the Constitution was adopted were made citizens. Thereafter the

president must be taken from the natural-born citizens. If it was intended that anybody who was a citizen by birth should be eligible, it would only have been necessary to say, "no person, except a native-born citizen"; but the framers thought it wise, in view of the probable influx of European immigration, to provide that the president should at least be the child of citizens owing allegiance to the United States at the time of his birth. It may be observed in passing that the current phrase "native-born citizen" is well understood; but it is pleonasm and should be discarded; and the correct designation, "native citizen" should be substituted in all constitutional and statutory enactments, in judicial decisions and in legal discussions where accuracy and precise language are essential to intelligent discussion.

The earliest act of congress to establish a uniform rule of naturalization (March 26, 1790) contained the following clause: "And the children of citizens of the United States that may be born at sea or out of the United States, shall be considered as natural-born citizens." The draft of this act has been credited to Mr. Jefferson, although his authorship has been questioned; and his reputed relationship to it may be ascribed to the fact that he was the author of the original naturalization acts in the Constitution of Virginia, and was an ardent supporter of a wise system of naturalization laws before and after he became President. But whoever drew the act followed closely the various parliamentary statutes of Great Britain; and its language in this relation indicates that the first congress entertained and declared the opinion that children of American parentage, wherever born, were within the constitutional designation, "natural-born citizens." The act is declaratory; but the reason that such children are natural born remains; that is, their American citizenship is natural—the result of parentage—and is not artificial or acquired by compliance with legislative requirements. The second act of naturalization (January 29, 1795), which was reported and probably drawn by Mr. Madison, chairman of a select House committee, enacted "*That the children of persons duly naturalized dwelling within the United States, and being under the age of twenty-one years at the time of such naturalization, and the children of citizens of the United States born out of the limits and jurisdiction of the United States shall be considered as citizens of the United States*." As carried forward in the Revised Statutes, the

2

provision reads: "*All children heretofore born or hereafter born out of the limits and jurisdiction of the United States, whose fathers were or may be at the time of their birth citizens thereof are declared to be citizens of the United States; but the rights of citizenship shall not descend to children whose fathers never resided in the United States*." This provision, as its terms express, is declaratory; it is not the statute that constitutes children of American parentage citizens; it is the fact of American descent, the jus sanguinis, that makes them citizens at the moment of birth—a fact which, for sufficient and convenient reasons, the legislative power of the State recognizes and announces to the world.

If there was ambiguity, the rights and privileges of children of American parents dependent upon constitutional guarantee would demand recognition; and constitutional guaranties in favor of such persons might not be restricted or denied by congress.

To return to the constitutional requirement in respect to eligibility for the office of president, let us inquire what was the obvious purpose and intent of the limitation? Plainly, it was inserted in order to exclude "aliens" by birth and blood from that high office, upon considerations which naturally had much weight at the time of the adoption of the Constitution. It was scarcely intended to bar the children of American parentage, whether born at sea or in foreign territory. Where it was said in the old books that an alien is one born out of the king's or State's dominions or allegiance, this must be of the limits understood with some restrictions. A forced or restricted construction of the constitutional phrase under consideration would be out of harmony with 'modern conceptions of political status, and might produce startling results. It remains to be decided whether a child of domiciled Chinese parents, born in the United States, is eligible, if otherwise qualified, to the office of president and to all the privileges of the Constitution. And it would be a strange conclusion, in another aspect, if the child of American parents, born in China, should be denied correspondent rights and privileges in the United States.

A natural-born citizen has been defined as one whose citizenship is established by the jurisdiction which the United States already has over the parents of the child, not what is thereafter acquired by choice of residence in this country.

3

Our conclusion is that the child of citizens of the United States, wherever born, is "a natural-born citizen of the United States," within the constitutional requirement; and, as such, if possessed of the other qualifications, would be eligible for the office of president of the United States.

*WASHINGTON, D.C., March, 19o4*


PETITIONER'S EXHIBIT
75

THE

# AMERICAN LAW REGISTER.

## OCTOBER 1879.

### CITIZENSHIP BY NATURALIZATION.

#### I.

NATURALIZATION being an act by which a change of political *status* is effected, under regulation of municipal or national authority, is a proceeding within the exclusive cognisance of the municipal or national tribunal, to whose administration it is committed by the supreme authority; and as the validity of the act depends upon construction of municipal or national law, all questions, whether of fact or of law, growing out of the act, are referable to the municipal or national court or tribunal. It is never a question of international concern, and is not determinable by reference to external, international or public law.

It may be, however, and not infrequently is, the subject of treaty stipulation between powers who are not satisfied with the existent state or condition of the law or practice, either in respect of the terms or the mode by which a change of nationality is effected.

The national character, which results from origin, continues till legally changed; and the *onus* of proving such change, usually rests upon the party alleging it. Naturalization, it has been said,[1] is the rule of modern states.

Whether wisely or not, each nation, in the absence of treaty stipulation, reserves to itself the right to dictate the terms and to prescribe the formalities upon which the certificates or letters of

---

[1] Argument on Naturalization, by the advocate of the United States, before the American-Spanish Commission (under agreement, February 12th 1871). Washington, D. C.

naturalization will be issued, as well as the individuals to whom they may be issued; and it exercises this right without reference to the country of origin of the individual applicant, or any other country. And no nation which assumes the responsibility of naturalizing aliens makes any concession as to this, except under the solemnity and sanctity of treaty stipulation, and by the employment of express and explicit language in regard thereto.

"It has already been remarked," says an author whose utterances are everywhere received with respect and confidence (Halleck's International Law and Laws of War 693), "that every independent state has, as one of the incidents of its sovereignty, the right of municipal legislation and jurisdiction over all persons within its territory, whether its own subjects or foreigners, commorant in the land.   With respect to its own subjects this right, it is claimed, includes not only the power to prohibit their egress from its territory, but to recall them from other countries; and with respect to commorant foreigners, not only to regulate their local obligations, but to confer upon them such privileges and immunities as it may deem proper.   It may, therefore, change their nationality by what is called naturalization.   It is believed that every state in christendom accords to foreigners, with more or less restrictions, the right of naturalization, and that each has some positive law or mode of its own for naturalizing the native born subjects of other states, without reference to the consent of the latter for the release or the transfer of the allegiance of such subjects.   It seems, therefore, that so far as the practice of nations is concerned, the right of naturalization is universally claimed and exercised without any regard to the municipal laws of the states whose subjects are so naturalized." Fœlix, Droit International Prive, §§ 27–55 ; 1 Phillimore on Int. Law, §§ 315, *et seq.*; Cushing, Opinions U. S. Attorney-General, vol. 8, p. 125, *et seq.*; Don, Derecho Publico, tome 1, cap. 17 ; Riquelme, Derecho Internacional, tome 1, p. 319; Heffter, Droit International, § 59 ; Westlake, Private Int. Law, § 20, *et seq.*; Bello, Derecho Internacional, pt. 2, cap. 5, § 1.

"Naturalization, in most of its aspects, belongs to the department of Municipal Law, or Private International Law."   *   *   *   "Public international law can seldom be concerned in the question of political citizenship acquired by naturalization, unless, &c." * *   " Every nation claims the right to give the complete character of citizen to an alien, without consulting the wish of the state of his

birth.   Most nations admit, that if a native voluntarily emigrates
and makes a permanent domicile in another country, and receives
from that country the full rights of citizenship, the country of his
birth cannot enforce claims upon him *originating after his natu-
ralization*."   Wheat. Intern. Law, Dana's 8th ed., p. 142 *et seq. ;*
note by the editor.

While laying down the same doctrine, in language at once positive
and conclusive, an eminent publicist (Calvo, Derecho Internacional,
vol. i., pp. 295, *et seq.*), says: "But if it is beyond doubt that every
independent nation has a right to confer the title of citizen upon a
foreigner, it is also true that she can control the loyalty of her own
subjects, and she can impose conditions upon or altogether prohibit
expatriation. With this view the laws of all nations have fixed cer-
tain essential requisites for the complete denationalization of their
subjects or citizens, some going to the extent of requiring the assent
or consent of the supreme executive power.   How then can these
two rights (or claims) be reconciled?   If public law recognises in
each state the power (faculty) to naturalize the subjects or citizens
of another, how can it also admit the power (faculty) in the same
state to make conditions or to prohibit expatriation altogether?   At
first sight it appears that these two rules are irreconcilable ; never-
theless the contradiction is only apparent.   International law
recognises the power (or faculty) in a state to naturalize the subjects
or citizens of another, but naturalization does not take place by
virtue of said international law, but as a consequence of local legis-
lation.   So that the new citizen or subject is the pure and exclusive
creation of the civil and political laws of the country of adoption,
and he will enjoy solely the rights, privileges and immunities which
they confer.   And what has been said of naturalization applies to
expatriation, or the breaking of the natural bonds of citizenship,
which have their origin and are preserved for ever in the shadow of
local legislation.   The right of expatriation, then, like that of nat-
uralization, is subordinated under the point of view of international
law to the general principle that each independent state is sovereign
in its own territory, and that its laws are binding upon all persons
who are within its jurisdiction, but that they have no force beyond
her territory.   It clearly follows then, from the doctrine laid down,
that while the subject or citizen remains within the limits and under
the jurisdiction of his new country, or in any other state, he will
preserve the national character conferred by naturalization.   But if

he has not acquired the new citizenship, by severing, according to local law, the bonds of the country of his birth, it is evident that the return of the naturalized to his native country will place him again under her jurisdiction, subjecting him to the obligations, duties and penalties which the laws impose, or have imposed, unless there are stipulations to the contrary in special (or particular) treaties. These principles have been recognised in the jurisprudence of the United States."

It is believed that cases in which conflicts have heretofore arisen, as well as others which may arise in future, will be relieved of serious embarrassment and much perplexity, when viewed in the light of the distinction drawn and the reasoning invoked by this author.     And if attention is directed to the fact that the conflict between the laws of naturalization and the laws of expatriation is only apparent, much advance will have been made, both in the avoidance of unnecessary controversies and in the settlement of delicate questions of dignity and prerogative between independent states.

"Natural allegiance, or the obligation of perpetual obedience to the government of the country wherein a man may happen to have been born, which he cannot forfeit or cancel, or vary by any change of time, or place, or circumstance, is the creature of civil law, and finds no countenance in the law of nations, as it is in direct conflict with the incontestable rule of that law : *Extra territorium jus dicenti impune non paretur.*"   Twiss, Law of Nations (Peace) 231. See also Riquelme, Derecho International, tom. i., p. 319 ; Puffendorf, de Officio Hominis et Civis, lib. ii., cap. 18.

Since the French Revolution, continental nations generally have given up the Roman civil-law doctrine of perpetual allegiance, and have conceded the right of expatriation.   Foreign Relations of the United States, pt. 2, pp. 1363, 1364.   Washington : Government Printing Office, 1873.

"It is," says Treitt, "in fact, a principle inherent in human liberty, a principle of natural right, that a person may leave the soil on which his birth may by chance have thrown him.   This principle is admitted by all publicists, from Cicero down to our own times."   Ibid. 1280, 1282.

"The doctrine of absolute and perpetual allegiance—the root of the denial of any right of emigration," said Cushing (Opinions of Att.-Gen. U. S., vol. 8, p. 139), "is inadmissible in the United

States. It was a matter involved in, and settled for us by the
Revolution, which founded the American Union."

"The natural right of every free person," said Judge BLACK
(Opinions Att.-Gen. U. S., vol. 9, p. 356), "who owes no debt
and is not guilty of any crime, to leave the country of his birth, in
good faith and for an honest purpose—the privilege of throwing
off his natural allegiance and substituting another allegiance in its
place—is incontestable."

"Expatriation," said the same authority, "includes not only
emigration out of one's native country, but naturalization in the
country adopted as a future residence. When we prove the right
of a man to expatriate himself, we establish the lawful authority
of the country in which he settles to naturalize him if its govern-
ment pleases. What, then, is naturalization? There is no dispute
about the meaning of it. The derivation of the word alone makes
it plain. All lexicographers and all jurists define it one way. In
its popular, etymological and legal sense it signifies the act of
adopting a foreigner, and clothing him with all the privileges of a
native citizen or subject."

One of the obvious conclusions which follow from the train of
reasoning pursued by the Spanish publicist, Calvo, *ante*, is that
there may be, under view of international law, a distinction, im-
portant and material in its effects, between the *personal* rights and
the *property* rights of a naturalized citizen, as follows: If, as
has been shown, the adopted voluntarily returns to his native
country, *animo manendi*, or inherits, purchases or leaves real pro-
perty in its territorial limits, he subjects himself and property to
the obligations, duties and penalties which the laws of the country
of his birth impose, or have imposed, and he can expect no relief
as against these from the country of adoption; and, as to any
right or title to property in the country of birth, during absence
from the territory, the adopted is entitled to the same exemption,
and to the like protection, at the hands of both the country of
origin and the country of adoption, as a native or alien friend would
receive under the same circumstances. And a majority of the cases
which have been the subject of diplomatic negotiation, or have been
before the mixed commissions on claims, and have involved a dis-
cussion of citizenship, will be relieved of much embarrassment if
the above distinction beween property rights and personal rights
be kept in view.

In the absence of treaty stipulations, the personal rights of the naturalized, in the territory of the country of origin, as elsewhere, are inviolable; and in respect of these the country of adoption owes him the protection that it extends to natives; and this obligation to protect continues, *until the naturalized has given unquestionable evidence of renunciation of the acquired, and resumption of natural allegiance;* a return to and commorance in his native country for purposes of business or pleasure alone, is not such evidence. In respect to property rights in realty within said territory, they remain subject to the municipal law of the country where situated; and the measure of protection which may be claimed as to these is the same as that accorded to its own citizens, or alien friends, according to circumstances.

It is important, however, to observe that if the country of origin, from whatever motive, fails to give the naturalized the protection of its municipal laws, in all matters of property, the obligation rests upon the country of adoption to secure to its new citizen or subject, from the mother country, full reparation and indemnity. And this indemnity is, in practice, usually secured by intervention of diplomatic negotiation, or through the instrumentality of mixed commissions established for this purpose and clothed with the jurisdiction necessary to do justice and equity as between the parties.

In cases of the return of naturalized citizens to the country of origin, the same rule as to the burden of proof, which applies to a renunciation of natural allegiance and the acquisition of a new citizenship by individuals, may be invoked; and the *onus* of proving renunciation of the acquired nationality, and the resumption of the natural or original allegiance, usually rests upon the party alleging it.

From time to time cases have arisen where the country of origin has denied the claims of the country of adoption in respect to the exercise of protection over the adopted citizen. One of the historic and familiar cases was that of Koszta, a Hungarian, and one of the refugees of 1848–9. This was an extreme but interesting case. Koszta came to the United States, declared his intention to become a naturalized citizen, then went to Smyrna, where he was seized by some persons in the pay of the Austrian consulate; he was by them taken out into the harbor and thrown overboard; he was picked up by an Austrian man of war, and held as prisoner; the United States consul remonstrated with the commander, and on the latter's refusal to surrender Koszta, the

captain of a United States ship of war demanded his release, and
threatened, if necessary, to resort to force.   The matter was finally
compromised, and Koszta was released and shipped to the United
States, the Austrians formally reserving the empty right of pro-
ceeding against him if he should return to Turkey.   Of this case
it has been said with positiveness by a late writer, that the United
States carried the doctrine of acquired nationality beyond reasonable
bounds ; and the reasoning of Mr. Marcy, in support of the claim
of his government, has been criticised as " remarkable for its bold-
ness ;" and it is pointed out that in his reasoning " the effect of
domicile in respect of civil consequences is confounded with its
effect as to political consequences, which is altogether inadmissible."[1]

In the subsequent case of Simon Tousig, an Austrian, who
voluntarily returned to Austria after domiciliation in the United
States, Mr. Marcy did not assert this doctrine.   In the first case
the American secretary of state was doubtless led into the confusion
indicated by his English critic as a result of following the guidance
and applying the principles laid down in this regard by the late
annotator of Story's Conflict of Laws.   At a later date Lord
WESTBURY insisted that the same distinction had been by the
learned editor confounded by failing to draw a distinction between
the *social* and *political* status—between the *patria* and the *domi-
cilium*.   It is now admitted by the American authorities that the
declaration of the intention to become an American citizen has in
itself no effect on the nationality of the individual ; he remains
an alien till final admission to citizenship.[2]   But when once the
alien has been admitted to citizenship, the American doctrine in its
relation to him has always been consistent and firm, and the United
States extends to the naturalized citizen as well against interference
by the country of origin, as by any other foreign power, protection
as broad and co-extensive as that which it extends to the native
citizen under similar circumstances.   Of the case of Koszta, Lord
Chief Justice COCKBURN says, " both parties were in the wrong ;
the Austrians had no pretence of right for seizing Koszta on Turk-
ish territory.   On the other hand, the American authorities had
no right to claim Koszta as an American subject [?] (citizen), as he
had not actually become naturalized.   The party really entitled to

---

[1] *Nationality*, Lord Chief Justice COCKBURN : London, Ridgway, 1869, p. 122.
[2] See Treaties between United States and Austria, Baden, Bavaria, Hesse,
Mexico, North Germany, Sweden and Norway, Wurtemberg and Ecuador.

complain was the Ottoman government, which refused the application of the Austrians for leave to arrest Koszta, and protested against the outrage offered to their authority, but whose protest does not appear to have been heeded."

To the remonstrance of the Austrian government, as to a violation by the officers of the United States of the neutrality of Turkish territory, Mr. Marcy replied: "If the Ottoman Porte had been able to protect, against Austrian intrusion, the integrity of its territory, by preventing the capture of a person covered by the North American flag, the United States would not have had occasion to interpose their authority for the protection of this person." Reviewing this case, and referring particularly to the position assumed by the Austrian cabinet and by Baron de Cussy, who adopted the view of Austria, and to the response of the American secretary, Calvo (Le Droit International, Paris, 1870, p. 453), seems to justify the position taken by Mr. Marcy, and to regard his answer to Austria, as well as his explanation to the Sultan, as satisfactory.

Alluding to the case of Carl Schurz (actual Secretary of the Interior), Calvo (Id. ib.) says: "Another example, not less interesting, of the power which naturalization by states confers upon their new subjects or citizens, is that of M. Carl Schurz, native of Prussia, condemned to death in 1848, together with Professor Kinkel, by a German tribunal, for having taken part in the revolutionary movements. M. Schurz managed to escape the pursuit of justice, and took refuge in the United States, where he was naturalized, became a member of Congress from the state of Ohio, later general of militia, and finally was appointed minister to Madrid. Before proceeding to occupy this post, M. Schurz returned to Germany, by the help of a disguise, and attempted to bring about the escape of his accomplice, Professor Kinkel; it was then that the cabinet at Washington concluded to appoint him her representative at Berlin, to negotiate with Prussia a treaty on questions relating to the right of naturalization. The Prussian government consented to forget the antecedents of M. Schurz, to recognise his new nationality, and to admit him without difficulty in the character of diplomatic representative of the United States. The selection of a former Prussian subject as minister of the United States at Berlin, had an origin which it is important to recall."

In the case of Zeiter, a native of France, but a naturalized citizen of the United States, which came before the civil tribunal of the first instance in the arrondissement of Wissembourg, Lower Rhine, France, in 1860, the attempt was made to hold Zeiter to the performance of military duty in the French army, on the ground that as a native of France, he was liable to such duty. But when the certificate of naturalization, forwarded by the United States consul at Paris, was registered at Wissembourg, and then produced in court, the judges decided " that Michael Zeiter, by naturalization in a foreign country, had lost his character of Frenchman," and released him.     Foreign Relations of the United States, Part II., 1873.   Washington: Government Printing Office.

In 1860 a case occurred at Havana of Sabino de Liano, a native of Spain, naturalized in the United States, being arrested as a conscript.  In reply to the representations of the United States consul, the captain-general informed him that by a royal decree of the 17th November 1852, " the foreigner obtaining naturalization in Spain, as well as the Spaniard obtaining it within the territory of another power without the knowledge and authorization of his respective government, shall not exempt himself from the obligations which were consequent to his primitive nationality, although the subject of Spain may, in other respects, lose the quality of Spaniard, conformably to what is prescribed in art. 1 of the constitution of the monarchy." But to this pretension the United States would not yield, and the answer to this communication from the representative of Spain was, in substance, a repetition of the doctrine that the United States makes no difference between naturalized and native citizens, and that she does not admit any qualification in respect to them in the matter of protection.    A shield of one figure and the same texture covers naturalized and native.    Eventually the proceedings taken against Mr. Liano were suspended, and a bond which he had entered into to provide a substitute cancelled by the governor-general.[1]

It is not many years since John Mitchel, a native of Great Britain, the Irish patriot, or agitator, as he has been differently characterized, according as the description was by sympathiser or antagonist, became naturalized in the United States.    The history of this case shows that Mitchel, having been convicted in the courts of

---

[1] Papers relating to foreign relations of the United States on Naturalization and Expatriation, vol. 2, p. 1303 : Government Printing Office, Washington, 1873.

Great Britain of a political offence, was condemned to penal servitude in Australasia, and that before his time was completed he made his escape and reached the United States, where he was naturalized. After many years residence in the United States subsequent to naturalization, Mitchel offered himself, or was announced as a candidate from an Irish borough to fill a vacancy in the British House of Commons. This occurred at a time of some political agitation, particularly in Ireland and Canada; and however fictitious the character or however exaggerated the proportions of this agitation may have been, many circumstances combined to give this ardent Irishman a following, and he was elected. The contingency which would arise, should Mitchel present himself or his credentials to the House of Commons, made it of moment to the government of Great Britain to multiply the grounds of his ineligibility. And although at that date the nation still held to the doctrine of perpetual allegiance, and an eminent publicist of Doctors' Commons had declared upon authority cited (1 Phillimore, Commentaries on International Law 380[1]), that, under International Law, banishment itself did not destroy citizenship, it was deemed important to show the American citizenship of this claimant to a seat in one of the Houses of the Parliament of Great Britain. Search was instituted in the courts of the United States, and the record of Mitchel's naturalization having been discovered, a certified copy of the same was forwarded to London by the Minister of Great Britain, Sir Edward Thornton. Mitchel died, however, before the time arrived for the presentation of himself or his credentials to the House of Commons. Had he survived and his right to a seat been insisted upon, some strange and perplexing, though not necessary, questions might have been brought forward for consideration; but it is probable that a near and ready solution would have been reached; for it would have been competent, under the law and custom of Parliament, for the House of Commons to have adjudged Mitchel disabled and incapable to sit as a member, by reason of his previous conviction. (Blackstone, Commentaries, vol. 1, p. 162, and note by Christian.)

"Naturalization is usually called a change of nationality. The naturalized person is supposed, for the purposes of protection and allegiance at least, to be incorporated with the naturalizing country. This proposition is, generally speaking, sound; but it must admit

---

[1] The references to Phillimore are to the London edition, 1871.

Case 6:18-cv-06333-FPG   Document 1   Filed 05/02/18   Page 102 of 152

of one qualification similar to that already mentioned with respect to the domiciled subject, if the naturalized person should have been the original subject of a country which did not allow him to shake off his allegiance (*exuere patriam*)," (1 Phillimore, Internat. Law, p. 380).    The qualification to which reference is here made is contained in the expression *jus avocandi*, which is defined to be a right which every state has of recalling its citizens from foreign countries, especially for the purpose of performing military services to their own country:" (Id. p. 377).   "Great difficulty, however," says the same author "necessarily arises in the enforcement of this right. No foreign nation is bound to publish, much less enforce, such a decree of revocation." And it is further said that the *jus avocandi*, already spoken of, could not be legally denied to the country of origin by the adopting or naturalizing country, though the enforcement of the right could not be claimed.   And it is insisted, on the authority of Sir LIONEL JENKINS, that banishment itself does not destroy the original tie of allegiance: (Id. p. 380).   The conflicts which have occurred on this subject of allegiance between the country of origin and the naturalizing country, in cases where the former has declined to admit the exercise of the right of expatriation in subject or citizen, have seldom been pressed to the point of war.   An historic exception, however, may be found in the war of 1812, between Great Britain and the United States, which was precipitated by the resistance of the United States government to the claim of Great Britain to a right of visitation and search of American vessels on the high seas. "No foreign state," (says Phillimore, p. 377), "can legally be invaded for the purpose of forcibly taking away subjects commorant there.   The high seas, however, are not subject to the jurisdiction of any state; and a question therefore arises whether the state, seeking its recalled subjects, can search for them in the vessels of other nations met with on the high seas.   This question, answered in the affirmative by Great Britain, and in the negative by the United States of North America, has led to very serious quarrels between the two nations—quarrels which it may be safely predicted will not arise again.   For I cannot think that it would be now contended that the claim of Great Britain was founded upon international law.   In my opinion it was not."[1]

---

[1] The editor of Dana's Wheaton, 8th ed., p. 175, note, pointed out that "the subject of the impressment of seamen had been confused by the questions which

The question as to the effect and value of a certificate of natural-
ization, came up for consideration before the umpire of the Ameri-
can and Spanish Commission,[1] in the case of Delgado, where the
arbitrators had disagreed in relation to Delgado's nationality.[2] The
umpire decided: "That the claimant (Delgado) has been natural-
ized an American citizen according to the laws of the United States;
that the judge who ordered him to be admitted a citizen of the
United States was, as it has been decided in many cases by the
Supreme Court of the United States, the competent authority to
decide, if the claimant had sufficiently complied with the law which
prescribed a continued residence of five years in the United States
before having a right to obtain the naturalization."

In this case the advocate of Spain had contended that it ap-
peared from proofs submitted by the defence, that the claimant,
Delgado, was absent from the territory of the United States, and in
the territory of Spain once or twice between the beginning of his
five years of residence in the United States and the issuance of his
certificate of naturalization; and, therefore, it must be held that he
had not complied with the requirement of the law of the United
States in respect to residence. In a subsequent case (*Fernando
Dominguez* v. *Spain*), the same question was presented to the
umpire[3] who had succeeded M. Bartholdi. In sustaining the posi-

have been discussed in connection with it." * * * "In the discussions that arose
out of the case of *The Trent*, neither of the parties to the correspondence, and no
writer on the subject, pretended that Mason and Slidell could be removed as citizens,
rebels or criminals. A right to take them out, as distinct from the arrest of *The
Trent*, as a prize proceeding, was not claimed by the United States government,
and their release was placed on that ground." Id.

It is a part of the secret history of *The Trent* affair, current in Washington,
that when Benjamin F. Butler presented to William H. Seward, Secretary of State,
the opinion of Caleb Cushing, endorsed by the former, to the effect that the United
States would be justified in holding Mason and Slidell, the secretary said: "I
have no doubt you, gentlemen, are right in your law ; *but we are going to give up
Mason and Slidell*."

See Lawrence's "Visitation and Search," p. 13 *et seq.* Also, Lawrence's
Wheaton, pp. 217, 378, 797, 807, 939.

[1] Bartholdi, Envoy Extraordinary and Minister Plenipotentiary from France to
the United States.

[2] The agreement of February 11th 1871, between Spain and the United States,
contained a clause to this effect : " * * * Nevertheless, in any case heard by the
arbitrators, the Spanish government may traverse the allegation of American citi-
zenship, and thereupon competent and sufficient proof thereof will be required."

[3] Baron Blanc, Envoy Extraordinary and Minister Plenipotentiary from Italy.

## II.

The question of domicile has heretofore entered prominently into all discussions on the subject of citizenship, and the difficulty of defining domicile has embarrassed inquiry in this connection. In the light of recent legislation in respect to naturalization by the nations, the discussion as to what does or does not constitute domicile must be of less frequent occurrence and importance.    But it will remain, in the absence of naturalization, the controlling question wherever citizenship is claimed, on the ground of domiciliation alone.

It has been pointed out how much of the confusion has been introduced.    But until advised as to what is the distinction between the *social* and *political* status, between the *patria* and the *domicilium*, there is danger that confusion will remain.    As these latter terms are derived from Roman law, we must look to that system of jurisprudence, and to the exposition of civilians for their definition and signification.    "The title [citizenship, *civitas*] says Ortolan,[1] "was indelible in the pure law of the Romans, when once acquired; for the sentence of the people could deprive a citizen of life, but never of the rights of citizenship without his consent.    The exercise of all civil rights, both as regards the *jus publicum* and the *jus privatum*, depended on this title.    If it were not there, there was no *status.*" * * * "The domicile (*domicilium*) is simply, in a legal sense, the residence of every person—the locality where he is supposed to be, in the eye of the law, for certain applications of the law, whether he is corporeally to be found there or not.    It is to Roman legislation that we are indebted for the following description of the condition which constitutes the domicile: ' *Ubi quis larem rerumque et fortunarum suarum summam constituit, unde non discessurus, si nihil avocet ; unde cum profectus est peregrinari videtur ; quod si rediit, peregrinari jam destitit.*'    The domicile gives to persons not the qualification of *civis*, but that of *incola*, in the town where they are established.    It is closely connected with the obligation to undertake public duties, magistracies, &c. * * *    In Roman law the question of domicile was immediately connected with that of local citizenship. * * * There are, therefore, these three points to be distinguished: first, Rome. the common country [*patria*]; second, the local city, where a man

---

[1] Generalization of Roman Law.    Translation of Pritchard and Nasmith. Butterworths, London, 1871, p. 573 *et seq.*

was *civis, municeps;* and third, the place where he had fixed his domicile, the legal habitation, where he was *incola.*

. It is not admitted "that the domicile is *the place* where a person has his principal establishment; the domicile is not *the place*, it is *at the place*, as our civil code plainly says."[1]   Further on it is added: "The domicile, in its simple and essential meaning, is, 'the *legal seat, the judicial seat* of a person for the exercise or for the application of certain rights.'   The derivation of the word '*domicilium*' is sufficient to show the force of this explanation, as exact as it is simple."

"But why," says the publicist cited, "should the question be asked, whether a man belonged, as citizen, to one town or another? It was, in the first place, on account of the public offices, and the municipal duties to which a man was always liable to be called in his own city, independently of those duties required of him at the place of his domicile—municipal duties which recall to mind the miserable condition into which the *curiales* and the *decurions*, the principal inhabitants of the city, had fallen during the last period of the empire.   It was, in the second place, because the constitution of Caracalla, granting equality of rights to all the inhabitants, did not grant it to all territories.   We have seen that it was only under Justinian that the difference as to the soil was obliterated. In fact it was necessary to ascertain the domicile in order to determine who was liable to the burdens and obligations of each separate municipality to undertake the functions of magistrate; and, in many cases, it was the domicile and not the residence of the defendant which determined the place of litigation."

"Generally," it is said,[2] "the question of domicile is difficult to determine, and it is sometimes connected with or surrounded by circumstances that are transcendent and incalculable.   The only fixed rule, or better said, the only controlling rule which can be adduced is the intention of the party."   This author gives Phillimore's definition as follows: "Domicile corresponds nearly to the signification of our word '*home*,' and when a person has two residences the phrase where '*he has made his home*' indicates which is his domicile."   But he says, "it is considered that the North American Judge RUSH best defined domicile when he said that it

---

[1] Ortolan, Generalization of Roman Law 596, note.

[2] Calvo, Derecho Internacional, vol. 11, p. 94–96.

was ' a residence at a particular place, accompanied with positive or presumptive proof of continuing it an unlimited time:' " *Guier* v. *O'Daniel*, 1 Binn. 349.   "It is important," says another author,[1] "to distinguish between domicile and residence—there might be domicile without residence, or residence without domicile.   Residence is preserved by the act, domicile by the intention." A Spanish publicist, in referring to domicile, describes it as "a certain kind or character of establishment, or a certain number of years of continuous residence, from which is inferred the intention to remain for ever." He adds, in the same connection, "The consent of the individual is necessary, in order that the privilege—*el domicilio a la extraccion*—may impose the obligations appropriate to, or which attach to citizenship."[2]

In this connection Lord Chief Justice COCKBURN says:[3] "*Domicile*, which in legal phraseology is neither more nor less than a name for home, and the establishing of which may be said to be settling in a given locality with a present intention of permanently abiding there, has been suggested by some writers as sufficient to constitute a person a citizen of the country in which it is established, and we have seen that in some countries the being domiciled for a certain period gives the right of citizenship.   But this position is altogether inadmissible.   Jurists have for convenience in determining a man's personal status or capacity, or in administering his effects, or in matters of testamentary disposition, looked to domicile as determining by what law a man's rights and liabilities should be ascertained.   But it is a very different thing to make domicile determine the question of nationality.   Indeed, it may be doubted whether jurists have not gone too far in giving weight to the fact of domicile, even in matters of personal property.   In a recent case in the House of Lords (*Morehouse* v. *Lord*, 10 H. of L. Cas. 272), Lord CRANWORTH and Lord KINGSDOWN held that, even for testamentary purposes, in order to lose a domicile of origin, and acquire a new one, a man must intend to change his nationality as well as his abode, or to use a phrase adopted by Lord CRANWORTH, ' *quatenus in illo exuere patriam !*' "

The learned author gives as a further reason for not permitting

[1] Ortolan, Generalization of Roman Law.   Translation of Pritchard and Nasmith : London, 1871, p. 599.

[2] Pando, Elementos del derecho Internacional: Madrid, 1852, p. 152.

[3] Nationality, Ridgway : London, 1869.

domicile of itself to confer nationality, that "it has the effect of excluding the exercise of that judgment which ought always to be exercised by the proper state or authority as to whether a person applying to be naturalized is, with reference to character and other circumstances one, who ought to be admitted to the status of a subject."

It is submitted, that frequently the conflict as to what is in fact the citizenship of a particular individual, arises from a confusion of ideas in respect of the true signification of the terms "domicile" and "residence," and in giving to the one or the other a too restricted, or a too limited application.

While an individual can have but *one* domicile, he may have many residences:[1] the residence may be constructive; and a familiar instance in the United States, is afforded in the cases of citizens of the several states holding public office at the national capital, who though actually resident there, are, constructively, resident or in fact domiciled in their respective states; their domicile is in a particular state, to which they return or may return to exercise the elective franchise.

Cases have arisen where citizenship by naturalization has been denied by the country of origin, as against the latter, and it has been urged that such citizenship is qualified, and that it cannot avail against the country of origin. But this position has rarely been insisted upon to the point of actual conflict, and we have shown from the authorities that, in practice, except in the case of the voluntary return of the naturalized to the country of birth, *animo manendi*, it is waived by the nations. The serious inconvenience, resulting from the maintenance of any such doctrine at this day, must be apparent; "*a qualified citizen*," is a strange anomaly, and involves a misapplication and abuse of language; such an one would be a political Frankenstein, clothed in the form and with the features of a member of the society into which he is introduced, but without the essential faculties and attributes which constitute an active, intelligent organism. An individual cannot

---

[1] Ch. J. COCKBURN, ("*Nationality*,") says, "it is quite possible for a person to have two domiciles." Support for this position is found in the works of some of the civilians; but the later English and American authorities hold that there is in fact but *one* domicile at a time; the other habitations may be residences.

be at one and the same time a citizen of two states.[1]   And as a
general proposition an individual can have only one allegiance:
(1 Phillim. 378.)   As protection and allegiance are correlative terms,
and involve reciprocity, it may sometimes aid in determining to
whom allegiance is due, if it can be ascertained under whose pro-
tection an individual actually lives and exercises prerogative rights.
He must be held to be a citizen of that nation, upon whom rests, until
forfeiture by some act of the individual, the obligation to protect
these prerogative rights—whether they be rights of property or
rights of person.   On the question of the singleness of *citizenship*,
it is believed that the weight of authority in America sustains the
doctrine laid down by Zouche, and that it is in harmony with that
of Rome after the constitution of Caracalla, which found expression
in the declaration of the Latin citizen, "*Roma communis nostra
patria est.*[2]

"The supposition that a man can have two domiciles," says Ch.
Justice SHAW: (*Abingdon* v. *North Bridgewater*, 23 Pick. 170, 177),
"would lead to the absurdest consequences.   If he had two domi-
ciles within the limits of distant sovereign states, in case of war,
what would be an act of imperative duty to one, would make him a
traitor to the other."   It is laid down: (*White* v. *Brown*, 1 Wall.
Jr. 217), "that all the controversy upon the point of change of
national domicile, must ultimately come to Lord KINGSDOWN'S
rule: the party must intend to put off one nationality and put on
another."

In the case of *Barclay* v. *United States*,[3] the claimant, a Brit-
ish subject, had resided many years in the United States.   The
counsel for the United States, *R. S. Hale*, assisted by *E. Rock-
wood Hoar*, insisted that being *domiciled* in the United States, he
was not within the provisions of the treaty a British subject.   But
Her Britannic Majesty's counsel, *J. Mandeville Carlisle*, would
not concede that the *residence* of claimant in the state of Georgia
could be called a domicile.   Other grounds were suggested in argu-
ment for and against; but the decision, on demurrer, of two com-

---

[1] Zouche, De Jure Feciali (cited by Phillimore, Commentaries on Interna-
tional Law), 2, s. ii., xiii.   Hefter maintains the contrary doctrine, § 59.

[2] Ortolan, Generalization of Roman Law 598; Phillimore, Commentaries on
International Law 378; Austin, Jurisprudence, Student's ed. 163–4.

[3] Mixed Commission on British and American claims, under treaty of Wash-
ington, May 8th 1871.

612        CITIZENSHIP BY NATURALIZATION.

missioners was in favor of the British nationality of claimant.   On
the facts in this case  there would  seem to be no room to doubt the
correctness of this decision; and the language and expressions in
which the decision was announced, indicate that the commissioners
had not failed to draw the distinction between domicile and resi-
dence, or the commorance of an alien for purposes of trade or
pleasure in the territory of a foreign country.

In a case before the commission, which was organized under the
convention of July 4th 1868, between the United States and Mex-
ico, Anderson and Thompson presented a petition claiming indem-
nification for damage suffered by them in their real estate in Mex-
ico.    It appeared that they had purchased land in Mexico under
the Mexican colonization laws, settled upon it, and brought it to a
high state of cultivation.    It was greatly damaged by the Mexican
army in the  operations in  resisting the French invasion, and the
plantation was subsequently declared by Mexico to be public land.
Objection, founded on their domicile, was taken by the counsel
for Mexico, who insisted that in consequence of such domicile they
could not claim against Mexico as American citizens.    On the part
of the United States it was maintained that they were American
citizens, and entitled to claim as such under the treaty.    The com-
missioners differing, referred the question to the umpire, *Dr. Fran-
cis Lieber*.    In his decision the umpire said: "Anderson and
Thompson became citizens, it is asserted, of Mexico, by acquiring
land, for there is a law of the Mexican republic converting every
purchaser of land into a citizen, unless he declares, at the time, to
the contrary.    This law clearly means to confer a benefit upon the
foreigner purchaser of land, and equity would assuredly forbid us
to force this benefit upon claimants (as a penalty, as it were, in this
case) merely on account of omitting the declaration of a negative;
that is to say, they omitted stating that they preferred remaining
American citizens, as they were by birth, one of the very strongest
of all ties."    The question presented to the umpire being, whether
Anderson and Thompson were *bona fide* citizens of Mexico, and
not citizens of the United States, when they suffered the injuries
complained of, he decided that they were citizens of the United
States.

ALEXANDER PORTER MORSE

Washington, D. C.

(*To be continued.*)


PETITIONER'S
EXHIBIT

76

## GRACE COMMISSION REPORT

I realize some of you may be thinking "What will support the services offered by the government if none of us pay Federal Income Tax?" Well, below is a report requested by President Ronald Reagan to see just where the Federal Dollar goes.

The Grace Commission Report has no copyright notice in it. Since it appears to be in the public domain, the beginning of the report is found below. The Grace Commission confirms the allegation that the income tax revenues go 100% to pay the interest on the national debt and not a single nickel of it goes to the government. Whatever government services we have, they are not being financed by the income tax. The underlined section of this report is from the Grace Commission that proves that none of the personal income tax goes to pay for any government services and is used to pay only the interest on the national debt.

# WAR ON WASTE

President's Private Sector Survey on Cost Control

MACMILLAN PUBLISHING COMPANY

New York

Macmillan Publishing Company

866 Third Avenue, New York, N.Y. 10022

ISBN 0-02-074660-I

Macmillan books are available at special discounts for bulk purchases for sales promotions, premiums. fund-raising, or educational use. Special editions or book excerpts can also be created to specification. For details, contact:
Special Sales Director
Macmillan Publishing Company
866 Third Avenue
New York, New York 10022

10 9 X 7 6 5 4 3 2 1

Printed in the United States of America

January 12, 1984

The Honorable Ronald Reagan
President of the United States
The White House
Washington, D.C.

Dear Mr. President,

Following your directive to identify and suggest remedies for waste and abuse in the Federal
Government, the President's Private Sector Survey (PPSS) offers recommendations which
would save:

$424 billion in three years, rising to

$1.9 trillion per year( by the year 2000.

These proposals would transform the Federal debt situation as follows:

|  | Federal Debt (3 trillions) | | Annual Interest on Federal Debt ($ billions) | |
|---|---|---|---|---|
|  | Without PPSS | With PPSS | Without PPSS | With PPSS |
| 1990 | $ 3.2 | $2.0 | $ 232.3 | $89.2 |
| 1995 | 6.2 | 2.2 | 540.9 | 62.3 |
| 2000 | 13.0 | 2.5 | 1,520.7 | 75.1 |

You asked the American people to help you get the Government "off their backs." If the
American people realized how rapidly Federal Government spending is likely to grow under
existing legislated programs, I am convinced they would compel their elected representatives
to "get the Government off their backs." In our survey to search out ways to cut costs in the
Government, great emphasis was placed on the spending outlook, which is as follows:

tion of the United States, and adhering to the decision of his predecessor, Baron Blanc expressed himself as follows: "Finally, neither the authorities on public law nor the agreements between Spain and the United States furnish any unquestioned and controlling definition of what constitutes in fact a legal residence with presumable *animus manendi*, and when absence intervenes with presumable *animus revertendi*, such as would justify or empower the umpire to overrule by force of treaties or of the laws of nations the construction placed by a court of competent jurisdiction upon a municipal law as to the required residence in the United States for the next continued term of five years preceding the admission to American citizenship. Therefore the construction thus given, however broad it may be deemed, must be followed so long as it is unimpeached or unreversed by an American tribunal of superior jurisdiction. The tribunals of the United States are the sole interpreters of the laws of the country, and it is not the privilege of the umpire to review their declarations as to the requirements of these laws."

When this decision of the umpire was filed, the arbitrator on the part of Spain,[1] entered a formal protest to the above extract from the decision, in the following language: "It would be a breach of the proprieties that govern the relations between the arbitrators in a commission like this one and the umpire, for the undersigned to attempt an *argument* on any point that may be embraced or conveyed in a judgment of the latter; he will, therefore, confine himself to making the following statements: It is the belief of the undersigned, that the convention in virtue whereof this tribunal deliberates, grants to Spain, with all its logical and·necessary consequences, the right to review the adjudications of courts of the United States, in the matter of granting certificates of naturalization, and that such certificates, whilst they may be held as valid for every purpose in the United States, are not, from the mere fact of their existence, conclusive upon Spain. It is the belief of the undersigned that the above-mentioned right and privilege *constitutes one of the bases* of the convention of February 1871, *in accordance with which* all claims are to be considered. Every judgment given within the bases established by the convention must be beyond question or criticism. But none of the bases themselves can be set aside by the members of this commission."

---

[1] Marquis de Potestad-Fornari.

In the case of *Portuondo* v. *Spain*, in which the decision of the umpire was rendered subsequent to the filing of the protest of the arbitrator of Spain, the umpire held: "That as to the traversed allegation of American citizenship of the deceased, competent and sufficient proof thereof, as required by the agreement of February 12th 1871, is given by his certificate of naturalization, such certificate not being proved or charged to have been procured by fraud or issued in violation of public law, treaties or natural justice. Such grounds of impeachment, upon which any certificate of naturalization may be declared altogether void, not being found in this case, the umpire called upon to resolve such conflict about the allegiance of the deceased must, following previous adjudications by umpires of this commission, and in the absence of any treaty between Spain and the United States restricting the power of the United States to grant naturalization in accordance with the municipal law as interpreted by the municipal courts, give full force to the naturalization of the deceased even against Spain.

"That the allegation that the deceased had lost or forfeited his right of American citizenship by abandonment or renunciation of such citizenship is not sustained by the evidence. No positive proof has been offered to exclude the intention of the deceased to return to the United States, whose nationality he openly and continually claimed, where he had sent his son, and to which country he had manifestly made preparation to go himself for definite settlement, when he was arrested and shot. No positive proof has been offered of any individual act of the deceased implying the renunciation of his American citizenship acknowledged by the Spanish authorities, which renunciation the said authorities declared should, at some proper time, be ordered as a condition of his free sojourn in Cuba, and no evidence that his continued sojourn there is not to be accounted for by the simple omission of the authorities to enforce such contingent condition."

The scope of this discussion is confined to what may be termed individual naturalization. But it may be here stated that a collective naturalization of all the inhabitants is effected when a country or province becomes incorporated in another country by conquest, cession or free gift: 1 Phillimore, Internat. Law, p. 382, citing 2 Günther, p. 268, note e. The purchase of Louisiana, the annexation of Texas, and the acquisition of California, by the United States, present familiar illustrations of collective naturalization.

January 12, 1984

The Honorable Ronald Reagan
President of the United States
The White House
Washington, D.C.

Dear Mr. President,

Following your directive to identify and suggest remedies for waste and abuse in the Federal
Government, the President's Private Sector Survey (PPSS) offers recommendations which
would save:

$424 billion in three years, rising to

$1.9 trillion per year( by the year 2000.

These proposals would transform the Federal debt situation as follows:

| | Federal Debt ($ trillions) | | Annual Interest on Federal Debt ($ billions) | |
|---|---|---|---|---|
| | Without PPSS | With PPSS | Without PPSS | With PPSS |
| 1990 | $ 3.2 | $2.0 | $ 252.3 | $89.2 |
| 1995 | 6.2 | 2.2 | 540.9 | 62.3 |
| 2000 | 13.0 | 2.5 | 1,520.7 | 75.1 |

You asked the American people to help you get the Government "off their backs." If the
American people realized how rapidly Federal Government spending is likely to grow under
existing legislated programs, I am convinced they would compel their elected representatives
to "get the Government off their backs." In our survey to search out ways to cut costs in the
Government, great emphasis was placed on the spending outlook, which is as follows:



If fundamental changes are not made in Federal spending, as compared with the fiscal 1983 deficit of $195 billion, a deficit of over ten times that amount, $2 trillion, is projected for the year 2000, only 17 years from now. In that year, the Federal debt would be $13.0 trillion ($160,000 per current taxpayer) and the interest alone on the debt would be $1.5 trillion per year ($18,500 per year per current taxpayer).

Mr. President, these projections are the result of a joint effort between PPSS and a leading U.S. economic forecasting firm. They are the result of very careful study and drove us to seek out every possible savings opportunity, a "like tireless bloodhounds," as you requested.

In the course of the search by our 36 Task Forces, chaired by 161 top executives from around the country and staffed by over 2,000 volunteers that they provided, we came up with 2,478 separate, distinct, and specific recommendations which are the basis for the carefully projected savings. For practical purposes, these savings, if fully implemented, could virtually eliminate the reported deficit by the 1990's versus an alternative deficit of $10.2 trillion in the decade of the 1990's if no action is taken.

Equally important, the 2,478 cost-cutting, revenue-enhancing recommendations we have made can be achieved without raising taxes, without weakening America's needed defense build-up, and without in any way harming necessary social welfare programs.

Because we are starting from a deficit of $195 billion, every dollar we can stop spending is a dollar that the Government does not have to borrow. With future Government borrowing costs at 11 percent (versus 10.75 percent now and 14.5 percent when you took office) and inflation taken at 6 percent per year over the longer run, these savings compound quickly.

Applying these interest and inflation rates, the result is that a dollar saved today accumulates to $32 over 12 years and $71 over 17 years. Thus, any potential saving made, as compared to not making the saving, translates into a difference in cumulative spending of 32 times that amount through 1995 and 71 times that amount through the end of the century.

Therefore, $100 billion in reduced Government spending in year one equates cumulatively to

$7.1 trillion in the year 2000. And since borrowings are decreased by this amount, so will the national debt decrease.

This is, of course, a horrendous prospect. If the American people understood the gravity of the outlook, they would not, I believe, support representatives who might let it happen.

Mr. President, you have been so correct in resisting attempts to balance the budget by increasing taxes. The tax load on the average American family is already at counterproductive levels with the underground economy having now grown to an estimated $500 billion per year, costing about $100 billion in lost Federal tax revenues per year.

The size of the underground economy is understandable when one considers that median family income taxes have increased from $9 in 1948 to $2,218 in 1983, or by 246 times. This is runaway taxation at its worst.

Importantly, any meaningful increases in taxes from personal income would have to come from lower and middle income families, as 90 percent of all personal taxable income is generated below the taxable income level of $35,000.

Further, there isn't much more that can be extracted from high income brackets. If the Government took 100 percent of all taxable income beyond the $75,000 tax bracket not already taxed, it would get only $17 billion, and this confiscation, which would destroy productive enterprise, would only be sufficient to run the Government for seven days.

Resistance to additional income taxes would be even more widespread if people were aware that:

One-third of all their taxes is consumed by waste and inefficiency in the Federal Government as we identified in our survey. Another one-third of all their taxes escapes collection from others as the underground economy blossoms in direct proportion to tax increases and places even more pressure on law abiding taxpayers, promoting still more underground economy-a vicious cycle that must be broken.

With two-thirds of everyone's personal income taxes wasted or not collected, 100 percent of what is collected is absorbed solely by interest on the Federal debt and by Federal Government contributions to transfer payments. In other words, all individual income tax revenues are gone before one nickel is spent on the services which taxpayers expect from their Government.

Our survey studied the small as well as the major items of cost savings, items of broad national impact as well as those of a more localized nature. I believe you will be interested in a few random examples of what we found:

In the Northwest, the Federal Power Marketing Administration is selling subsidized power at one-third of market rates. If the Federal power were priced at market, there would be a three-year increase in revenues of $4.5 billion, which equates to the three-year personal income

taxes of 676,000 median income American families who are thus subsidizing a discrete group in one part of the country.

The Civil Service and Military Retirement Systems provide to participants three times and six times the benefits, respectively, of the best private sector plans. The Government's civilian and military employees retire at an earlier age, typically age 55 and 40, respectively, versus 63 to 64 in the private sector, with substantially more liberal benefit formulas than their private sector counterparts. In addition, the pensions of Federal retirees are fully indexed for inflation-a rarity in the private sector. Modifying major Federal pensions to provide benefits comparable to those of the best private sector plans, slightly better in the case of military pensions, would result in three-year savings of $60.9 billion, equivalent to the three-year income taxes of 9.2 million median income families.

A relatively small item in the overall, but representative of many, is the prohibition of competitive bidding on the movement of military personnel household goods to and from Alaska and Hawaii, despite a DOD test showing that competitive bidding would reduce costs by as much as 26 percent. Elimination of this provision would save $69.5 million in three years, equivalent to the three-year income taxes of 10,400 median income families.

We found Congressional interference to be a major problem. For example, because Congress obstructs the closing of bases that the military wants to close, the three-year waste is $367 million. In total, PPSS recommends three-year savings of $3.1 billion by closing excess military bases, equivalent to the three-year income taxes of 466,000 median income families.

Mr. President, these are just a few of the absurd situations that we found throughout the Government that add up to billions of dollars per year and where the opportunities for savings are clearly available.

Some of the recommendations made by PPSS have been made before. Others are entirely new. Regardless of their origins, the focus must now be on implementation. The current economic trends are simply too serious to delay action any longer.

PPSS has submitted 36 major Task Force reports and II studies on special subjects such as subsidies and retirement. In total, these reports substantiate three-year ongoing savings of $424.4 billion, plus cash accelerations of $66 billion.

These are all analyzed and supported in great detail. Capsuled in terms of the functional problems to which they relate, the savings are as follows:

## PPSS Savings Recommendations

|  | $ Billions | % of Total |
|---|---|---|
| Program Waste | $160.9 | 37.9% |
| System Failures | 151.3 | 35.7 |
| Personnel Mismanagement | 90.9 | 21.4 |
| Structural Deficiencies | 12.7 | 3.0 |
| Other Opportunities | 8.6 | 2.0 |
| **Total** | $424.4 | 100.0% |

These data confirm our findings that system failures and personnel mismanagement together comprise well over one-half 57.1 percent, of the total savings possibilities. They are at the foundation of inefficiencies in the Federal Government. Program waste, which accounts for 37.9 percent of the savings recommendations, would also be substantially eliminated if proper systems and personnel management were in place.

The above underscores one of our most important recommendations, which is the establishment of an Office of Federal Management in the Executive Office of the President. This Federal Government top management office would include 0MB, GSA and OPM and have Government-wide responsibility for establishing, modernizing, and monitoring management systems.

If it is set up and staffed properly, it could go a long way to avoid in the future the thousands of deficiencies and examples of waste that we have identified. We would not feel our task complete if we just identified past deficiencies without recommendations for a management and organizational structure that would be best suited for preventing the errors of the past.

Additionally, the establishment of this new office would be beneficial in the implementation process of the PPSS recommendations.

In this regard, we believe that your Cabinet Council on Management and Administration, working in concert with the Office of Cabinet Affairs, is uniquely suited to lead a Government-wide effort to restore sound principles of management and efficiency to the Federal Government. While the Cabinet Council already has taken a leadership role in this regard, we urge you to call upon it to make implementation of the PPSS recommendations Government-wide its highest priority.

Mr. President, it was a great honor to have been asked by you to engage in this effort to identify ways to eliminate inefficiency, waste and abuse in the Federal Government. The

project was structured and staffed to effect enduring improvement so that our children and grandchildren would not inherit a situation that would be devastating to them and to the values of our economic and social system. It was in this vein that we were able to enlist the 161 top executives from private business and other organizations to chair and to staff our 36 Task Forces at a cost to the private sector of over $75 million and at no cost to the Government.

All the participants join with me in thanking you for the opportunity to be of service and in looking forward to whatever additional help we may be able to provide to assure that the greatest practical results are obtained from the work of this Commission.

Respectfully,

J. Peter Grace
Chairman



PETITIONER'S EXHIBIT 7

The provisions in section 376 of title 28, U.S.C., 1940 ed., with respect to the powers of a justice or judge in issuing writs of ne exeat were changed and made the basis of subsection (b) of the revised section but the conditions and limitations on the writ of ne exeat were omitted as merely confirmatory of well-settled principles of law.

The provision in section 377 of title 28, U.S.C., 1940 ed., authorizing issuance of writs of scire facias, was omitted in view of rule 81(b) of the Federal Rules of Civil Procedure abolishing such writ. The revised section is expressive of the construction recently placed upon such section by the Supreme Court in *U.S. Alkali Export Assn. v. U.S.*, 65 S.Ct. 1120, 325 U.S. 196, 89 L.Ed. 1554, and *De Beers Consol. Mines v. U.S.*, 65 S.Ct. 1130, 325 U.S. 212, 89 L.Ed. 1566.

1949 ACT

This section corrects a grammatical error in subsection (a) of section 1651 of title 28, U.S.C.

AMENDMENTS

1949—Subsec. (a). Act May 24, 1949, inserted "and" after "jurisdictions".

WRIT OF ERROR

Act Jan. 31, 1928, ch. 14, § 2, 45 Stat. 54, as amended Apr. 26, 1928, ch. 440, 45 Stat. 466; June 25, 1948, ch. 646, § 23, 62 Stat. 990, provided that: "All Acts of Congress referring to writs of error shall be construed as amended to the extent necessary to substitute appeal for writ of error."

## § 1652. State laws as rules of decision

The laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply.

(June 25, 1948, ch. 646, 62 Stat. 944.)

HISTORICAL REVISION NOTES

Based on title 28, U.S.C., 1940 ed., § 725 (R.S. § 721).
"Civil actions" was substituted for "trials at common law" to clarify the meaning of the Rules of Decision Act in the light of the Federal Rules of Civil Procedure. Such Act has been held to apply to suits in equity.

Changes were made in phraseology.

## § 1653. Amendment of pleadings to show jurisdiction

Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts.

(June 25, 1948, ch. 646, 62 Stat. 944.)

HISTORICAL AND REVISION NOTES

Based on title 28, U.S.C., 1940 ed., § 399 (Mar. 3, 1911, ch. 231, § 274c, as added Mar. 3, 1915, ch. 90, 38 Stat. 956).

Section was extended to permit amendment of all jurisdictional allegations instead of merely allegations of diversity of citizenship as provided by section 399 of title 28, U.S.C., 1940 ed.

Changes were made in phraseology.

## § 1654. Appearance personally or by counsel

In all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein.

(June 25, 1948, ch. 646, 62 Stat. 944; May 24, 1949, ch. 139, § 91, 63 Stat. 103.)

HISTORICAL REVISION NOTES

1948 ACT

Based on title 28, U.S.C., 1940 ed., § 394 (Mar. 3, 1911, ch. 231, § 272, 36 Stat. 1164).

Words "as, by the rules of the said courts respectively, are permitted to manage and conduct causes therein," after "counsel," were omitted as surplusage. The revised section and section 2071 of this title effect no change in the procedure of the Tax Court before which certain accountants may be admitted as counsel for litigants under Rule 2 of the Tax Court.

Changes were made in phraseology.

1949 ACT

This section restores in section 1654 of title 28, U.S.C., language of the original law.

AMENDMENTS

1949—Act May 24, 1949, inserted "as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein".

## § 1655. Lien enforcement; absent defendants

In an action in a district court to enforce any lien upon or claim to, or to remove any incumbrance or lien or cloud upon the title to, real or personal property within the district, where any defendant cannot be served within the State, or does not voluntarily appear, the court may order the absent defendant to appear or plead by a day certain.

Such order shall be served on the absent defendant personally if practicable, wherever found, and also upon the person or persons in possession or charge of such property, if any. Where personal service is not practicable, the order shall be published as the court may direct, not less than once a week for six consecutive weeks.

If an absent defendant does not appear or plead within the time allowed, the court may proceed as if the absent defendant had been served with process within the State, but any adjudication shall, as regards the absent defendant without appearance, affect only the property which is the subject of the action. When a part of the property is within another district, but within the same state, such action may be brought in either district.

Any defendant not so personally notified may, at any time within one year after final judgment, enter his appearance, and thereupon the court shall set aside the judgment and permit such defendant to plead on payment of such costs as the court deems just.

(June 25, 1948, ch. 646, 62 Stat. 944.)

HISTORICAL AND REVISION NOTES

Based on title 28, U.S.C., 1940 ed., § 118 (Mar. 3, 1911, ch. 231, § 57, 36 Stat. 1102).

Word "action" was substituted for "suit," in view of Rule 2 of the Federal Rules of Civil Procedure.

In view of Rule 4(f) of the Federal Rules of Civil Procedure permitting service of process anywhere within the territorial limits of the States, the word "State" was substituted for "district" in the first and third paragraphs.

Changes were made in phraseology.

## § 1656. Creation of new district or division or transfer of territory; lien enforcement

The creation of a new district or division or the transfer of any territory to another district



UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
BUFFALO, NEW YORK 14202



| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *Plaintiff* | § | |
| v | § | |
| CHARLES WEBER, *Defendant* | § | JUDGE ARCARA |
| Charles Weber, *Intervenor* | § | |
| | § | CASE # 15 CR 0010 |

## I.    MOTION FOR AMENDED DISCOVERY

FIRST DEMAND

1    The United States has 2 charges under 26 USC 7206(1), (1) Declaration under penalties of perjury for years 2006 and 2007,

2    'Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter;'

3    The controversy in this case is the political status of one who is made liable for the individual income tax under the implementing regulation 26 CFR § 1.1, and if that status applies to Weber.

(a)General rule.

(1) Section 1 of the Code imposes an income tax on the income of every individual who is a citizen or resident of the United States

4       The 14th Amendment is naturalization law under Congressional grant of authority from

Article 1 Section 8 Clause 4, An Uniform Rule of Naturalization.

5       The claim made of 14th Amendment citizenship is simply an allegation that has never

been supported by evidence on the record produced by the U.S. Attorney under oath on the

record.

6       Title 8 USC Aliens and Nationality Chapter 12 Subchapter 3 enumerates those conditions

in      §§ 1401-1409.

Identify the condition(s) of Weber's birth that required the federal government to confer

the collective naturalization citizenship of the United States under the 14th Amendment to

his person in need of naturalization, instead recognizing birthright citizenship (jus soli,

jus sanguinis) for a natural born Citizen of the several States.

SECOND DEMAND

7       Weber's direct ancestors are documented as Founders of the United States of America.

The government framework was created by my ancestors and others prior to the establishment of

all the Immigration and Nationality Acts commencing March 26, 1790 (1 Stat. 103).

If Weber is the Posterity of the People by direct ancestry, thereby an Article IV Section II

Clause 1 Citizen of the several States, identify the authority of the U.S. Attorney to

continue to prosecute a Citizen of the several States for 26 CFR Subchapter A individual

income taxes enumerated in the implementing regulation § 1 1.1. x

THIRD DEMAND

Identify the statutory authority the US Attorney to justify prosecution of Weber as a 14th

Amendment citizen of the United States when the conditions of my nativity requiring

naturalization law have not been alleged.

Charles Weber

January 19, 2018

Signature

Date

Charles Weber
c/o 25 Greenbrier Road
Snyder, New York 14226   716-510-3047

I hereby certify a true and exact copy of the foregoing has been furnished to the U.S. Asst.

Attorney on this nineteenth day of January, 2018.


UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
BUFFALO, NEW YORK 14202

UNITED STATES OF AMERICA

v

Charles Weber, Article IV Citizen of one of the several States, *Petitioner*

*15 CR 0010*

## I.   MOTION FOR ORDER TO SHOW CAUSE:  FAILURE TO CORRECT PETITIONER'S RECORDS WITH AFFIDAVIT IN SUPPORT

1     I, Charles Weber, hereafter Petitioner, respectfully move this court to grant Order requiring Respondent, Mary Ellen Kresse, *Assistant U. S Attorney, Buffalo District U.S. Court,* , to show cause for failing to correct and update government records pursuant to New York State Supreme Court ORDER entered June 16 2017, acknowledging Petitioner's true Citizenship with attached political status.

2     The U.S. Attorney must prove Petitioner has either the physical characteristics or went through naturalization procedures contemplated by Section one of the 1868 14th Amendment.

The historical, legal, and physical facts presented in the Memorandum will provide incontrovertable legally sufficient evidence that proves the innocence of Petitioner as charged in 15 CR 0010 UNITED STATES DISTRICT COURT , Buffalo District.

## II.   MOTION TO JOIN PARTIES

3     Petitioner respectfully moves the court to command Respondents to appear and be joined to the prima facie case set forth in the complaint and affidavit in support of Petition, and grant relief requested.

1



## III.   MOTION FOR ADMINISTRATIVE RELIEF TO CORRECT PETITIONER'S RECORD

4     Petitioner respectfully moves the court to demand Respondents comply with New York State court ORDER 00265/2017 and correct government records to acknowledge Petitioner's true Article IV Citizenship of the several States, separate and distinct from the diminished capacity 1868 14th Amendment citizenship of the United States.

## IV.   MOTION FOR INJUNCTIVE RELIEF

5     Petitioner respectfully moves the court enjoining Respondents from proceeding in current case 15 CR 0010, misconstruing Petitioner as a 14th Amendment citizen of the United States.

## V.   PARTIES

6     Petitioner is a sixty-one year old white civilian male, by birthright an original jurisdiction United States Constitution Article IV Citizen of the several States (New York) having reached the age of majority, has firsthand knowledge of the facts contained herein, am competent to testify in the present matter, and retains all rights, substantive and procedural, in law and equity, and further, Petitioner reserves the right to amend this Petition without leave of court.

7     Petitioner maintains this action in his personal capacity and has a constitutional right to refuse counsel and conduct his own defense before the court without representation.[1]

'... the Court of Appeals for the Second Circuit emphasized that the Sixth Amendment grants the accused the rights of confrontation, of compulsory process for witnesses in his favor, and of assistance of counsel as minimum procedural requirements in federal criminal prosecutions. The right to the assistance of counsel, the court concluded, was intended to supplement the other rights of the defendant, and not to impair "the absolute and primary right to conduct one's own defense in propria persona." Id., at 274. United States v. Plattner, 330 F.2d 271

---

[1] United States Supreme Court FARETTA v. CALIFORNIA, (1975) No. 73-5772

2

8      Accordingly, this court must hear and acknowledge all Petitioner's motions, testimony, and exhibits in compliance with its own rules and statutes. Title 28 USC § 1654 does state:

'In all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein.'
(June 25, 1948, ch. 646, 62 Stat. 944; May 24, 1949, ch. 139, § 91, 63 Stat. 103.)

9      Respondents are officers of the court, within judicial knowledge and subject to the jurisdiction on of this Court. The U.S. Attorney's maintain offices at 138 Delaware Avenue, Buffalo, New York. The Clerk of Courts maintains a second- floor office at 2 Niagara Square, Buffalo, New York.

## VI.     AFFIDAVIT OF FACTS IN SUPPORT OF MOTION TO SHOW CAUSE

10     Petitioner enters into this court to declare his proper and lawful political status as a Citizen of New York by birthright, one of the several States, the original foundational jurisdiction citizenship established April 20, 1777 in the New York State Constitution with attached fundamental Privileges and Immunities.[2]

11     Petitioner's interest in understanding the nature of U.S. citizenship dates back to the 2009/2010 time frame. Letters with questions and clarification of that interest, desiring of reciprocal correspondence, were sent to the United States Department of State (2) and New York State (1). Answers to questions were not forthcoming from either government.

12     After years of research and inquiry, an action was commenced in Erie County, to state and support with legally sufficient evidence Petitioner's correct Article IV Citizenship in one of the several States in New York State Supreme Court, a court of record, May 11, 2017.

13     The given Baptism name is Charles Weber, not the LEGAL ENTITY CHARLES WEBER. The Petition of May 11 2017 and the evidence in support is a good faith action to correct the facts of the events surrounding my birth record.

---

[2] Corfield v Coryell  6 F. Cas. 546, 551 (C.C.E.D. Pa. 1823) (No. 3,230).

14      The proper Article IV Citizenship and associated political status was stated in paragraph 4, the baptismal name associated with that Citizenship was stated in paragraph 3, and grounds for the Petition for Name Change and status correction were listed in paragraphs 10 (A) (B) and (C).

15      Petitioner has documented Citizenship of the several States by birthright. The Preamble to the 1789 United States Constitution states six purposes for the establishment of our federal Constitution, the sixth of which secures 'the Blessings of Liberty to ourselves and our Posterity,' does state in its entirety: "We the People of the United States, in Order to form a more perfect Union, establish Justice, insure domestic Tranquility, provide for the common Defence, promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity, do ordain and establish this Constitution for the United States of America."

16      The United States Supreme Court recognizes this birthright Citizenship, to whit:

> "It is true, every person, and every class and description of persons who were at the time of the adoption of the Constitution recognized as citizens in the several states, became also citizens of this new political body; but none other; it was formed by them and for them and their posterity, but for no one else. And the personal rights and privileges guaranteed to citizens of this new sovereignty were intended to embrace those only who were then members of the several State communities, or who should afterwards by birthright or otherwise become members, according to the provisions of the Constitution and the principles on which it was founded." Dred Scott v Sandford 60 US 393, p 407…..19 How. US 404, (1857)15 L. Ed. 691, and Bouvier's Third Edition 1859.

17      Evidence to support the Petition with Constitutionally recognized birthright Citizenship included genealogical records attached to those constituent members of that new political society, a Private Counter Deed, Record of Live Birth-Charles, attested by three(3) competent family witnesses with 15th and 16th U.S. Census, authenticated government documents with seals, direct ancestor Judge Philip Van Horn House 941 Main Street NR 3-8-02   SR 12-20-01 Historic Sites and Districts in Somerset County, New Jersey National and New Jersey Registers of Historic Places Page 24,  Historic Site #25, Articles on Van Horne House (2), historical documents regarding the acquisition of Citizenship of the several States, and a gpo.gov document on the 14th Amendment.

18      Petitioner is a direct descendant of three great-grandfathers that became constituent members of that new political class as Citizens of the several States. Ancestor #135 Philip Van

Horne, ancestor #125 William Van Horne, and ancestor # 113 Johnathan Van Horne, all provided military support in either the War of Independence 1775-1783 or the War of 1812.

19    The Petition was granted, an Order issued (index # 600265/2017) and entered into the Court Record June 16, 2017. Numerous federal, State, and local agencies were notified of the Name change and status correction.

20    Respondents received ORDER 600265/2017 July, 2017 regarding Petitioner's Name Change and political status correction, and were given notice to correct their records.

21    The U.S. Attorney's Office, and the Clerk of Courts has been given well over 90 days to comply but has not given legal notice Petitioner is considered other than a 14th Amendment citizen of the United States in case # 15 CR 0010.

22    Petitioner in good faith attempted to give Respondents in that time frame to clarify, verify, ascertain, and discover the true legal relationship, status, rights, duties, and obligations which apparently exist between the parties.

23    Those said Respondents, adverse parties to Petitioner, have failed to comply with a valid New York State Supreme Court Order in violation of their own statute, 28 USC 1652.

24    By said statute, Respondents have a legal duty to maintain correct records, but have remained silent.

25    Proper service has been achieved in accordance with due process and provisions of statutes concerning entities, artificial persons, and registered agents.

26    All parties have been given notice of this action by Petitioner and this Court in accordance with law.

27    Copies of this court order were certified received by all Respondents by USPS as shown by the enclosed exhibits. The court Order recognizes Charles Weber as an Article IV Citizen of the several States (New York) based on physical, historical, and legal evidence in contradistinction of those physical, historical, and legal characteristics of the 1868 14th Amendment citizen.

28    The United States Attorney's Office continue their attempt to prosecute Petitioner in IRS case 15 CR 0010 based on false presumptions.

5

## DECLARATIONS

29    The legal entity, CHARLES WEBER, is not the name given to me by my parents at birth, and I cannot be forced to operate someone else's property, and stated as such in the NYS Petition dated May 11 2017.

30    Petitioner Charles Weber does not consent to represent any LEGAL ENTITY known as CHARLES WEBER, CHARLES JOHN WEBER, Charles J. Weber, or any derivative thereof, nor acts in the capacity of registered agent, fiduciary, trustee, surety, or taxpayer, and does not consent to any undisclosed rights, duties, obligations, or liabilities.

31    Petitioner is not the LEGAL ENTITY CHARLES WEBER, or any derivative thereof, is not a 14th Amendment citizen of the United States, as this lesser political status is historically, physically, and legally impossible.

32    Any and all documents in the governments possession, or those documents whose whereabouts are known to the government, that lack full disclosure regarding the legal, equitable or beneficial ownership/Title of this LEGAL ENTITY, CHARLES WEBER, identity of principals of CHARLES WEBER, in the presumed trustee capacity, presumed surety capacity, presumed registered agent capacity, presumed fiduciary capacity, liability of Charles Weber as CHARLES WEBER or any derivative thereof, who, under any presumed obligations, duties, or performance required by a government or quasi government instrument or agency, are hereby declared void *ab initio*.

33    As a result of the governments non-compliance, Petitioner is in jeopardy from an unlawful deprivation of life, liberty, and pursuit of happiness, foundational rights for Citizens of the several States.

## VI.    MEMORANDUM OF LAW FOR ARTICLE III STANDING

34    As a result of the governments non-compliance, Petitioner is in jeopardy from an unlawful deprivation of life, liberty, and pursuit of happiness, foundational rights for Citizens of the several States.

35    Petitioner has met the burden for Article III standing by injury to his person and personal property directly related to the IRS and US Attorney's conduct, and will be redressed by a

favorable decision based on the US District Court recognizing Petitioner's correct citizenship and political status.

36      1) There is a real injury to life , liberty, and property; Petitioner was arrested in his office property driveway, handcuffed, arraigned on making false statements 26 USC 7206(1), had his arrest published in the Buffalo News, damaged his personal and professional reputation, jailed twice overnight, placed on home confinement going on seven months, lost his building and the dental practice housed within, went through divorce proceedings, lost future compensation from providing dental services to patients of record, and has been unable to leave the Western New York area since January of 2015. Further injury of cause involved Petitioner's right to a grand jury of his peers to hear the US Attorney present evidence in the proper venue, ie., fellow New York State nationals, not U.S. citizens of the 14th Amendment variety.

37      2) This injury is directly connected to US Attorney Kresse's conduct; The US Attorney is presumed to know the law, or know where to find it. Kresse insists on prosecuting Petitioner as a 14th Amendment citizen of the United States as an individual who owes that income tax duty.

38      3) Petitioner is very likely to have redress by a favorable decision. The Article IV Citizen of the several States is a different jurisdiction than a 14th Amendment citizen of the United States. The 'individual' liable for income taxes by 26 CFR § 1. 1-1 excludes Citizens of the several States in its statutory construction.

39      The following sequence demonstrates the direct connection between the 14th Amendment citizen of the United States described in Section 1 of that instrument, which does state:

> 'All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.'

40      The court should take particular notice of the last phrase 'equal protection of the laws'....Equal to whom? The 14th Amendment citizen was an additional citizenship to the original State Citizenship, ninety-one (91) years after the New York State Constitution was established.

7

Black's Law 4th Edition does state on page 785:

> FOURTEENTH AMENDMENT. The Fourteenth Amendment of the constitution
> of the United States. It became a part of the organic law July 28, 1868, and *its*
> importance entitles it to special mention. It creates or at least recognizes for the
> first time a citizenship of the United States, as distinct from that of the states;
> forbids the making or enforcement by any state of any law abridging the
> privileges and immunities of citizens of the United States; and secures all
> "persons" against any state action which is either deprivation of life, liberty, or
> property without due process of law or denial of the equal protection of the laws.

41    The only answer is the Article IV Citizens of the several States, the original political
status jurisdiction contemplated by the States in their Constitutions and the United States
Constitution. There can be no other political class referred to by the language stipulated in this
instrument.

42    The government admits as much in their own publications, the Treatise on the 1868 14th
Amendment states the following on page 1566 referring to the Slaughterhouse Cases 83 US 36,
74 (1873): "...the Fourteenth Amendment did not obliterate the distinction between national and
state citizenship, but rather preserved it."


26 CFR PART 1

SUBCHAPTER A—INCOME TAX
26 CFR § 1. 1-1
> 'Section 1 of the Code imposes an income tax on the income of every individual
> who is a citizen or resident of the United States...'

43    The 'individual' in 26 CFR § 1. 1-1 is defined in Title 5 USC 552(a)

> (2) the term "individual" means a citizen of the United States or an alien lawfully
> admitted for permanent residence;

44    The United States government admitted citizenship of the United States is separate and
distinct from a Citizen of the several States in the following federal criminal appellate court case,

> *"...it is held that "citizen" means "citizen of the United States", and
> not person generally, **nor citizen of a State**;"* POWE v. UNITED STATES, 109
> F.2d 147 (5th Cir. 1940)

45      Furthermore, the Internal Revenue Service admits its jurisdiction is limited to citizens of
the United States in the 50 States and not Citizens of the several States for purposes of tax code
prosecution, as articulated in US v SLATER, to whit:

> "......Unless the defendant can establish that he is not a citizen of the United States, the
> IRS possesses authority to attempt to determine his federal tax liability." UNITED
> STATES of America v. William M. SLATER (1982) (D. Delaware) 545 F.Supp 179.
> 182.

> Maxim: *Inclusio Unius est Exclusio Alterius*, the exclusion of one is the
>
> exclusion of all others. ..."for federal tax purposes, regulations govern." Dodd v
>
> US 223 F. Supp. 785,

...     "failure to adhere to agency regulations may amount to denial of due process, if

> required by constitution or statute..." Curley v US 791 F. Supp. 52,

> "Affirmative testimony as to a fact is entitled to greater weight than negative
> testimony as to the same fact"). P. 43

> The current federal rule is that "(a)ll relevant evidence is admissible" (Fed.R.Evid.
> 402), and relevant evidence "means evidence having any tendency to make the
> existence of any fact that is of consequence to the determination of the action
> more probable or less probable than it would be without the evidence."
> Fed.R.Evid. 401.5   P. 44  United States v Curly

46      The factual evidence provided herein will establish this as an (a) historical, (b) legal, and
(c) physical impossibility according to the provisions of that instrument.

47      The 14th Amendment does state the following:

> *All persons born or naturalized in the United States, and subject to the jurisdiction
> thereof, are citizens of the United States and of the state wherein they reside. No state shall make
> or enforce any law which shall abridge the privileges or immunities of citizens of the United
> States; nor shall any state deprive any person of life, liberty, or property, without due process of
> law; nor deny to any person within its jurisdiction the equal protection of the laws.*

48      The following are indisputable facts, and will prove the historical impossibility petitioner is under the 14th Amendment.

49      New York established its Constitution April 20, 1777 as a Republic with common law as the law of the land.  The People of New York established that independent nation four years prior to the articles of Confederation with the original jurisdiction Citizenship known as New Yorkers.

50      New York was established as a free, sovereign, and independent nation 12 years prior to the present US Constitution of 1789, and recognized as such by the A.D. 1783 Treaty of Paris. New York was never dependent on the federal government to declare their citizens, the original People were the sovereigns and declared their own.  They made their law through the representatives in government.

51      The 14th Amendment added a second citizenship to the United States Constitution, but the 14th never altered nor abolished the original jurisdiction Article IV Citizens of the several States nor those attached Privileges and Immunities.

52      The Supreme Court defined the contours of that language in Elk v Wilkins 112 US 94, to whit:

> P. 114 "By the first section of the bill all persons born in the United States, and not subject to any foreign power, excluding Indians not taxed, are declared to be citizens of the United States. This provision comprehends the Chinese of the Pacific states, *Indians subject to taxation,* the people called gypsies, as well as the entire race designated as blacks, persons of color, negroes, mulattoes, and persons of African blood. Every individual of those races, born in the United States, is, by the bill, made a citizen of the United States."
>
> P. 116  "And certainly it must be conceded that, except in cases of persons "naturalized in the United States," which phrase refers only to those who are embraced by the naturalization laws,….. the Fourteenth Amendment does not require the citizenship granted by it to be evidenced by the record of any court, or of any department of the government. Such citizenship passes to the person of whatever race who is embraced by its provisions, leaving the fact of citizenship to be determined, when it shall become necessary to do so in the course of legal inquiry, in the same way that questions as to one's nativity, domicile, or residence are determined."

53      From the above statement, it is impossible for physically and legally impossible for Petitioner to be classified as a 14th Amendment citizen, in this case brought by the Plaintiff in error.

10

54    Petitioner denies possessing the racial characteristics the Chinese or African race, is not a gypsy, or a person of color, and has never been naturalized in a Court of Record nor under the operation of any naturalization laws of the United States.

55    In light of the elements considered by the 14th Amendment Assistant excluding Petitioner, US Attorney Mary Ellen Kresse continues to prosecute Petitioner as a 14th Amendment citizen of the United States in lght of the facts and in defiance of the NYS Court Order.

56    In the current baseless prosecution, Attorney Kresse is exposing her ignorance of the fundamental differences between an Article IV Citizen of the several States, New York, and the 1868 14th Amendment citizen of the United States, an additional citizenship created 91 years after the New York State Constitution, and which had no effect whatsoever on the original, common law jurisdiction citizenship of the several States.

57    Numerous Supreme Court and Appellate Court holdings acknowledge the difference between the Privileges and Immunities of Article IV Citizens if the United States compared to the Privileges or Immunities of the 14th Amendment citizen.

> *"....(6) Finally, respondents contend that the words "native citizens" as used in the treaty in article I thereof, whereby it is sought to confer upon subjects of one country residing within the territory of the other the right "generally to do anything incident to or necessary for trade upon the same terms as native citizens," are employed in a restrictive sense, and that this provision of the treaty deals only with native citizens and subjects of the United States and their privileges and immunities as such and not with the privileges and immunities of the citizens and subjects of the several states.* **That there is a citizenship of the United States and a citizenship of a state, and the privileges and immunities of one are not the same as the other is well established by the decisions of the courts of this country.** *The leading cases upon the subjects are those decided by the supreme court of the United States and reported in 16 Wall. 36, and known as the Slaughter House cases...." United States citizenship* **does not** *entitle citizens to rights and privileges of state citizenship."*
> [K. Tashiro v. Jordan, 201 Cal. 236, 256 P. 545 (1927), 48 Supreme Court 527. United States v. Cruikshank, 92 U. S. 542, 23 L. ed. 588,  TWINING v NEW JERSEY, MAXWELL v DOW, TEMMER v JONES

58    To date, Petitioner has received no evidence this information was presented to the Grand Jury, if a Grand Jury of Petitioner's peers was ever assembled.

CONCLUSION

59      As a result of the non-compliance, the government has trespassed on Petitioner's Article IV Privileges and Immunities, unlawfully deprived of life, liberty, and pursuit of happiness, those fundamental rights for Citizens of the several States.

60      Petitioner has never belonged to the class of person as described by the 14th Amendment, and by virtue of the taxing regulations, has never been liable for Subchapter A income taxes under 26 CFR § 1. 1-1

PRAYERFOR RELIEF

61      First Prayer for Relief, Petitioner moves this court to demand the United States Attorney comply with the New York State Court Order, to update and correct Petitioner's political status to that of the Article IV Citizen of the several States.

62      Second Prayer for Relief, demand the US Attorney enter evidence in possession of that office that proves the official record Petitioner fulfills the physical characteristics or naturalization requirements of the first section in the 14th Amendment in accordance with Fed. R.Cr.27 in order to proceed. With 15 CR 0010.

63      Third Prayer for Relief, upon the inability of the US Attorney to produce such evidence to sustain a conviction, immediately dismiss 15 CR 0010 pursuant to Rule 12(b)(2) and 12(b)(6).

*Charles Weber*                                                          *October 16, 2017*

Charles Weber
c/o 25 Greenbrier Road
Snyder, New York 14226
716-839-1376

*Charles Weber*

*October 26, 2017*

STATE OF NEW YORK )

                SS. :          INDIVIDUAL VERIFICATION

COUNTY OF *Erie* )

*On the 26 th day of October, in the year 2017, before me, the undersigned, personally appeared Charles Weber, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.*

I certify under PENALTY OF PERJURY under the laws of The State of New York that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

**John Alec Duffy**
**Notary Public, State of New York**
**No. 01DU6345226**
**Qualified in Erie County**
**Commission Expires July 25, 2020**

13

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
BUFFALO, NEW YORK 14202



UNITED STATES OF AMERICA

v

Charles Weber, Article IV Citizen of one of the several States, *Petitioner*

*15 CR 0010*

## EXHIBIT LIST

1. Elk v. Wilkins selected citations and entire text pp 1-12.
2. PETITION OF NAME CHANGE of Charles Weber 3 pages
3. Copy of ORDER GRANTING LEAVE TO CHANGE NAME with Court Seal 4 pages
4. ORDER GRANTING LEAVE TO CHANGE NAME copy to US Probation Service. 1 page
5. Authenticated GPO.gov document for treatise on 14th Amendment. 3 pages
6. Letter to NYS Supreme Court Judge with additional information regarding the separate and distinct political status associated with different American citizenships. 2 pages
7. NYS Supreme Court Clerk Summary list re: Name Change 2 pages
8. Authenticated GPO.gov document Title 42 Civil Rights §§ 1981-1997, Elective Franchise § 1971, See Codification Notes, Code Sections originally from Title 8, Aliens and Nationality.
9. Notarized Copies of Surrendered CITY OF NEW YORK Certificate of Birth with attached Authenticated Official Government Documents. Mailed April 29, 2017, Received May 2, 2017. [Original to be submitted upon court appearance.]
A. NEW YORK CITY Certificate of Birth 156-55-428119 with Seals, issued May 27,2015.
B. Queens County Certificate of Authenticity #342235 with Seal, issued March 7, 2016.
C. C. State of New York Department of State Certificate of Authenticity #548019 with Seal, issued March 10, 2016.
D. United States of America, Department of State authenticated document 17009019-1 with Seal, issued December 5, 2016.
10. Correspondence to Secretary of Treasury re: surrendered U.S. PERSON CHARLES WEBER dated April 29, 2017, delivered 4:10am May 2, 2017, recipient M.NALDO, EL79759931US. 4 pages
11. Private Counter Deed, Record of Live Birth-Charles, attested by three(3) competent witnesses with 15th and 16th U.S. Census. [Original by request.)
12. A Genealogy Report for Charles Weber June 27, 2015 (Shortened and restricted for purposes of this court action)





# SUPREME COURT DECISIONS
## OVERRULED BY SUBSEQUENT DECISION

## SUPREME COURT DECISIONS OVERRULED BY SUBSEQUENT DECISION

While the Supreme Court sometimes expressly overrules a prior decision, in other instances the overruling must be deduced from the principles of related cases. Obviously, there is a chance here for a difference of opinion and this will be reflected in any listing.

The present compilation was initially based primarily upon the following sources:

Justice Brandeis dissenting in *Burnet v. Coronado Oil and Gas Co.*, 285 U.S. 393, 406–409 nn.1–4 (1932).
Emmet E. Wilson, "Stare Decisis, Quo Vadis?" 33 Geo. L.J. 251, 254 n.17, 265 (1945);
William O. Douglas, "Stare Decisis", 49 Colum. L. Rev. 735–43, 756–58 (1949);
Albert R. Blaustein and Andrew H. Field, "Overruling Opinions in the Supreme Court", 57 Mich. L. Rev. 151, 184–94 (1958).

Asterisks (*) identify cases expressly overruled.

| | Overruling Case | Overruled Case |
|---|---|---|
| * | 1. Hudson v. Guestier 10 U.S. (6 Cr.) 281, 285 (1810) | Rose v. Himley 8 U.S. (4 Cr.) 241 (1808) |
| | 2. Gordon v. Ogden 28 U.S. (3 Pet.) 33, 34 (1830) | Wilson v. Daniel 3 U.S. (3 Dall.) 401 (1798) |
| | 3. Greene v. Lessee of Neal 31 U.S. (6 Pet.) 291 (1832) | Patton v. Easton 14 U.S. (1 Wheat.) 476 (1816) Powell's Lessee v. Harmon 27 U.S. (2 Pet.) 241 (1829) |
| | 4. Louisville R.R. v. Letson 43 U.S. (2 How.) 497, 554–556 (1844) | Commercial and Railroad Bank v. Slocomb 39 U.S. (14 Pet.) 60 (1840) Strawbridge v. Curtiss 7 U.S. (3 Cr.) 267 (1806); and qualifying, Bank of the United States v. Deveaux 9 U.S. (5 Cr.) 61 (1809) |
| * | 5. The Genessee Chief 53 U.S. (12 How.) 443, 456 (1851) | The Thomas Jefferson 23 U.S. (10 Wheat.) 428 (1825); The Orleans v. Phoebus 36 U.S. (11 Pet.) 175 (1837) |
| * | 6. Gazzam v. Phillip's Lessee 61 U.S. (20 How.) 372, 377–378 (1858) | Brown's Lessee v. Clements 44 U.S. (3 How.) 650 (1845) |
| | 7. Suydam v. Williamson 65 U.S. (24 How.) 427 (1861) | Williamson v. Berry 49 U.S. (8 How.) 495 (1850); Williamson v. Irish Presbyterian Congregation 49 U.S. (8 How.) 565 (1850); Williamson v. Ball 49 U.S. (8 How.) 566 (1850) |
| * | 8. Mason v. Eldred 73 U.S. (6 Wall.) 231, 238 (1868) | Sheehy v. Mandeville 10 U.S. (6 Cr.) 253 (1810) |
| | 9. The Belfast 74 U.S. (7 Wall.) 624, 641 (1869) | Allen v. Newberry 62 U.S. (21 How.) 244 (1858) (in part) |
| | 10. Knox v. Lee (Legal Tender Cases) 79 U.S. (12 Wall.) 457, 553 (1871) | Hepburn v. Griswold 75 U.S. (8 Wall.) 603 (1870) |

2387

2388        SUPREME COURT DECISIONS OVERRULED

| *Overruling Case* | *Overruled Case* |
|---|---|
| 11. Trebilcock v. Wilson 79 U.S. (12 Wall.) 687 (1871) | Roosevelt v. Meyer 68 U.S. (1 Wall.) 512 (1863) |
| * 12. Hornbuckle v. Toombs 85 U.S. (18 Wall.) 648, 652–653 (1874) | Noonan v. Lee 67 U.S. (2 Black) 499 (1863); Orchard v. Hughes 68 U.S. (1 Wall.) 73, 77 (1864); Dunphy v. Kleinsmith 78 U.S. (11 Wall.) 610 (1871) |
| * 13. Union Pac. Ry. v. McShane 89 U.S. (22 Wall.) 444 (1874) | Kansas Pac. Ry. v. Prescott 83 U.S. (16 Wall.) 603 (1873) (in part) |
| * 14. County of Cass v. Johnston 95 U.S. 360 (1877) | Harshman v. Bates County 92 U.S. 569 (1875) |
| * 15. Fairfield v. County of Gallatin 100 U.S. 47 (1879) | Town of Concord v. Savings-Bank 92 U.S. 625 (1875) |
| * 16. Tilghman v. Proctor 102 U.S. 707 (1880) | Mitchell v. Tilghman 86 U.S. (19 Wall.) 287 (1873) |
| 17. Kilbourn v. Thompson 103 U.S. 168, 192–200 (1881) | Anderson v. Dunn 19 U.S. (6 Wheat.) 204 (1821) |
| * 18. United States v. Phelps 107 U.S. 320, 323 (1883) | Shelton v. The Collector 72 U.S. (5 Wall.) 113, 118 (1867) |
| * 19. Kountze v. Omaha Hotel Co. 107 U.S. 378, 387 (1883) | Stafford v. The Union Bank of Louisiana 57 U.S. (16 How.) 135 (1853) |
| * 20. Morgan v. United States 113 U.S. 476, 496 (1885) | Texas v. White 74 U.S. (7 Wall.) 700 (1869) |
| 21. Wabash St.L. & P. Ry. v. Illinois, 118 U.S. 557 (1886) | Peik v. Chicago & N.W. Ry. 94 U.S. 164 (1877) ("substantially though not expressly overruled") |
| 22. Philadelphia Steamship Co. v. Pennsylvania 122 U.S. 326 (1887) | State Tax on Railway Gross Receipts 82 U.S. (15 Wall.) 284 (1873) ("basic grounds of decision repudiated") |
| 23. In re Ayers 123 U.S. 443 (1887) | Osborn v. Bank of the United States 22 U.S. (9 Wheat.) 738 (1824) |
| * 24. Leloup v. Port of Mobile 127 U.S. 640, 647 (1888) | Osborne v. Mobile 83 U.S. (16 Wall.) 479 (1873) |
| * 25. Leisy v. Hardin 135 U.S. 100, 118 (1890) | Pierce v. New Hampshire 46 U.S. (5 How.) 504 (1847) |
| * 26. Brenham v. German-American Bank 144 U.S. 173, 187 (1892) | Rogers v. Burlington 10 U.S. (3 Wall.) 654 (1866); Mitchell v. Burlington 71 U.S. (4 Wall.) 270 (1867) |
| * 27. Roberts v. Lewis 153 U.S. 367, 377 (1894) | Giles v. Little 104 U.S. 291 (1881) |
| 28. Pollock v. Farmers' Loan & Trust Co. 158 U.S. 601 (1895) | Hylton v. United States 3 U.S. (3 Dall.) 171 (1796) |
| * 29. Garland v. Washington 232 U.S. 642, 646 (1914) | Crain v. United States 162 U.S. 625 (1896) |
| * 30. United States v. Nice 241 U.S. 591, 601 (1916) | Matter of Heff 197 U.S. 488 (1905) |
| 31. Pennsylvania R.R. v. Towers 245 U.S. 6, 17 (1917) | Lake Shore & Mich. So. Ry. v. Smith 173 U.S. 684 (1899) (in part) |
| * 32. Rosen v. United States 245 U.S. 467, 470 (1918) | United States v. Reid 53 U.S. (12 How.) 361 (1851) |

SUPREME COURT DECISIONS OVERRULED          2389

|  | *Overruling Case* | *Overruled Case* |
|---|---|---|
| * | 33. Boston Store v. American Graphophone Co. 246 U.S. 8, 25 (1918); and Motion Picture Co. v. Universal Film Co. 243 U.S. 502, 518 (1917) | Henry v. Dick Co. 224 U.S. 1 (1912) |
| * | 34. Terrel v. Burke Constr. Co. 257 U.S. 529, 533 (1922) | Doyle v. Continental Ins. Co. 94 U.S. 535 (1877); Security Mut. Life Ins. Co. v. Prewitt 202 U.S. 246 (1906) |
| * | 35. Lee v. Chesapeake & Ohio Ry. 260 U.S. 653, 659 (1923) | Ex parte Wisner 203 U.S. 449 (1906); and qualifying, In re Moore 209 U.S. 490 (1908) |
| * | 36. Alpha Cement Co. v. Massachusetts 268 U.S. 203, 218 (1925) | Baltic Mining Co. v. Massachusetts 231 U.S. 68 (1913) |
|  | 37. Chesapeake & Ohio Ry. v. Leitch 276 U.S. 429 (1928) (rehearing) | Chesapeake & Ohio Ry. v. Leitch 275 U.S. 507 (1927) |
| * | 38. Gleason v. Seaboard Ry. 278 U.S. 349, 357 (1929) | Friedlander v. Texas & Pac. Ry. 130 U.S. 416 (1889) (in part) |
| * | 39. Farmers Loan Co. v. Minnesota 280 U.S. 204, 209 (1930) | Blackstone v. Miller 188 U.S. 189 (1903) |
| * | 40. East Ohio Gas Co. v. Tax Comm'n 283 U.S. 465, 472 (1931) | Pennsylvania Gas Co. v. Public Serv. Comm'n 252 U.S. 23 (1920) |
| * | 41. Chicago & E.I.R.R. v. Industrial Comm'n 284 U.S. 296 (1932) | Erie R.R. v. Collins 253 U.S. 77 (1920); Erie R.R. v. Szary 253 U.S. 86 (1920) |
|  | 42. Fox Film Corp. v. Doyal 286 U.S. 123 (1932) | Long v. Rockwood 277 U.S. 142 (1928) |
|  | 43. New York ex rel. Northern Finance Corp. v. Lynch 290 U.S. 601 (1933) *See also:* United States v. City of Detroit 355 U.S. 466, 472 n.2 (1958) | Macallen Co. v. Massachusetts 279 U.S. 620 (1929) |
| * | 44. Funk v. United States 290 U.S. 371, 373, 386 (1933); *See also:* Hawkins v. United States 358 U.S. 74, 76 (1958) | * Stein v. Bowman 38 U.S. (13 Pet.) 209 (1839) (in part); * Hendrix v. United States 219 U.S. 79 (1911); Logan v. United States 144 U.S. 263 (1892); * Jin Fuey Moy v. United States 254 U.S. 189 (1920) |
| * | 45. West Coast Hotel Co. v. Parrish 300 U.S. 379 (1937) | Adkins v. Children's Hospital 261 U.S. 525 (1923) Morehead v. New York ex rel. Tipaldo 298 U.S. 587 (1936) |
|  | 46. Railroad Comm'n v. Pacific Gas Co. 302 U.S. 388 (1938) (rehearing) | Railroad Comm'n v. Pacific Gas Co. 301 U.S. 669 (1937) |
| * | 47. Helvering v. Producers Corp. 303 U.S. 376 (1938) | Gillespie v. Oklahoma 257 U.S. 501 (1922); Burnet v. Coronado Oil & Gas Co. 285 U.S. 393 (1932) |
| * | 48. Erie R.R. v. Tompkins 304 U.S. 64, 69, 79 (1938) | Swift v. Tyson 41 U.S. (16 Pet.) 1 (1842) |

2390          SUPREME COURT DECISIONS OVERRULED

| *Overruling Case* | *Overruled Case* |
|---|---|
| *   49. Graves v. New York ex rel. O'Keefe 306 U.S. 466 (1939) | Dobbins v. Commissioners of Erie County 41 U.S. (16 Pet.) 435 (1842); Collector v. Day 78 U.S. (11 Wall.) 113 (1871); New York ex rel. Rogers v. Graves 299 U.S. 401 (1937); Brush v. Commissioners 300 U.S. 352 (1937) |
| 50. Rochester Tel. Corp. v. United States 307 U.S. 125 (1939) | Procter & Gamble v. United States 225 U.S. 282 (1912) |
| *   51. O'Malley v. Woodrough 307 U.S. 277 (1939) | Evans v. Gore 253 U.S. 245 (1920) Miles v. Graham 268 U.S. 501 (1925) |
| *   52. Madden v. Kentucky 309 U.S. 83 (1940) | Colgate v. Harvey 296 U.S. 404 (1935) |
| *   53. Helvering v. Hallock 309 U.S. 106 (1940) | Helvering v. St. Louis Trust Co. 296 U.S. 39 (1935); Becker v. St. Louis Trust Co. 296 U.S. 48 (1935) |
| 54. Tigner v. Texas 310 U.S. 141 (1940) | Connolly v. Union Sewer Pipe Co. 184 U.S. 540 (1902) |
| *   55. United States v. Darby 312 U.S. 100 (1941) | Hammer v. Dagenhart 247 U.S. 251 (1918); Carter v. Carter Coal Co. 298 U.S. 238 (1936) (limited) |
| *   56. United States v. Chicago M. St. P. & P.R.R. 312 U.S. 592 (1941) | United States v. Lynah 188 U.S. 445 (1903) (in part); United States v. Heyward 250 U.S. 633 (1919) |
| *   57. Nye v. United States 313 U.S. 33 (1941) | Toledo Newspaper Co. v. United States 247 U.S. 402 (1918) |
| *   58. California v. Thompson 313 U.S. 109 (1941) | Di Santo v. Pennsylvania 273 U.S. 34 (1927) |
| 59. United States v. Classic 313 U.S. 299 (1941) | Newberry v. United States 256 U.S. 232 (1921) |
| *   60. Olsen v. Nebraska 313 U.S. 236 (1941) | Ribnik v. McBride 277 U.S. 350 (1928) |
| *   61. Alabama v. King & Boozer 314 U.S. 1 (1941) | Panhandle Oil Co. v. Knox 277 U.S. 218 (1928); Graves v. Texas Company 298 U.S. 393 (1936) |
| 62. Toucey v. N.Y. Life Ins. Co. 314 U.S. 118 (1941) | Supreme Tribe of Ben-Hur v. Cauble 255 U.S. 356 (1921) |
| 63. Edwards v. California 314 U.S. 160 (1941) | City of New York v. Miln 36 U.S. (11 Pet.) 102 (1837) |
| *   64. State Tax Comm'n v. Aldrich 316 U.S. 174 (1942) | First Nat'l Bank v. Maine 284 U.S. 312 (1932) |
| *   65. Williams v. North Carolina 317 U.S. 287 (1942) | Haddock v. Haddock 201 U.S. 562 (1906) |
| *   66. Brady v. Roosevelt S.S. Co. 317 U.S. 575 (1943) | Johnson v. Fleet Corp. 280 U.S. 320 (1930) |
| *   67. Jones v. Opelika 319 U.S. 103 (1943) (re-argument); Murdock v. Pennsylvania 319 U.S. 105 (1943) | Jones v. Opelika 316 U.S. 584 (1942) |

SUPREME COURT DECISIONS OVERRULED          2391

| *Overruling Case* | *Overruled Case* |
|---|---|
| 68. Oklahoma Tax Comm'n v. United States 319 U.S. 598 (1943) | Childers v. Beaver 270 U.S. 555 (1926) |
| * 69. West Virginia Bd. of Educ. v. Barnette 319 U.S. 624 (1943) | Minersville School Dist. v. Gobitis 310 U.S. 586 (1940) |
| 70. FPC v. Hope Gas Co. 320 U.S. 591 (1944) | United Railways v. West 280 U.S. 234 (1930) (in part) |
| 71. Mercoid Corp. v. Mid-Continent Co. 320 U.S. 661 (1944) | Leeds & Catlin Co. v. Victor Talk. Mach. (No. 2) 213 U.S. 325 (1909) (limited) |
| 72. Mahnich v. Southern S.S. Co. 321 U.S. 96 (1944) | Plamals v. Pinar Del Rio 277 U.S. 151 (1928) (in part) |
| * 73. Smith v. Allwright 321 U.S. 649 (1944) | Grovey v. Townsend 295 U.S. 45 (1935) |
| 74. United States v. South-Eastern Underwriters' Ass'n 322 U.S. 533 (1944) | Paul v. Virginia 75 U.S. (8 Wall.) 168 (1869) |
| * 75. Girouard v. United States 328 U.S. 61 (1946) | United States v. Schwimmer 279 U.S. 644 (1929); United States v. MacIntosh 283 U.S. 605 (1931); United States v. Bland 283 U.S. 636 (1931) |
| 76. Halliburton Co. v. Walker 329 U.S. 1 (1946) (rehearing) | Halliburton Co. v. Walker 326 U.S. 696 (1946) |
| 77. MacGregor v. Westinghouse Co. 329 U.S. 402 (1947) (rehearing) | MacGregor v. Westinghouse Co. 327 U.S. 758 (1946) |
| * 78. Angel v. Bullington 330 U.S. 183 (1947) | David Lupton's Sons v. Auto. Club of Am. 225 U.S. 489 (1912) (rendered obsolete by prior change in law) |
| 79. Zap v. United States 330 U.S. 800 (1947) (rehearing) | Zap v. United States 328 U.S. 624 (1946) |
| 80. Thibaut v. Car and General Ins. Corp. 332 U.S. 828 (1947) (on rehearing) | Thibaut v. Car and General Ins. Corp. 332 U.S. 751 (1947) |
| 81. Sherrer v. Sherrer 334 U.S. 343 (1948) | Andrews v. Andrews 188 U.S. 14 (1903) (in part) |
| 82. Lincoln Fed. Labor Union v. Northwestern 335 U.S. 525 (1949) *See also:* Phelps Dodge Corp. v. NLRB 313 U.S. 177 (1941) | Adair v. United States 208 U.S. 161 (1908) Coppage v. Kansas 236 U.S. 1 (1915) |
| * 83. Commissioner v. Estate of Church 335 U.S. 632, 637 (1949) | May v. Heiner 281 U.S. 238 (1930) |
| 84. Ott v. Mississippi Barge Line 336 U.S. 169 (1949) | St. Louis v. Ferry Company 78 U.S. (11 Wall.) 423 (1870); Old Dominion S.S. Co. v. Virginia 198 U.S. 299 (1905); Ayer & Lord Co. v. Kentucky 202 U.S. 409 (1906) |
| * 85. Oklahoma Tax Comm'n v. Texas Co. 336 U.S. 342 (1949) | Choctaw O. & G. R.R. v. Harrison 235 U.S. 292 (1914); Indian Oil Co. v. Oklahoma 240 U.S. 522 (1916); |

2392        SUPREME COURT DECISIONS OVERRULED

| *Overruling Case* | *Overruled Case* |
|---|---|
| | Howard v. Gipsy Oil Co. 247 U.S. 503 (1918); |
| | Large Oil Co. v. Howard 248 U.S. 549 (1919); |
| | Oklahoma v. Barnsdall Corp. 296 U.S. 521 (1936) |
| * 86. Cosmopolitan Co. v. McAllister 337 U.S. 783 (1949) | Hust v. Moore-McCormack Lines 328 U.S. 707 (1946) |
| * 87. United States v. Rabinowitz 339 U.S. 56, 66, 85 (1950) | Trupiano v. United States 334 U.S. 699 (1948); |
| | McDonald v. United States 335 U.S. 451 (1948) |
| * 88. Joseph Burstyn Inc. v. Wilson, 343 U.S. 495, 502 (1952) | Mutual Film Corp. v. Ohio Indus. Comm'n 236 U.S. 230 (1915) |
| * 89. Brown v. Board of Education 347 U.S. 483, 491, 494–495 (1954) | Cumming v. Richmond County Bd. of Educ. 175 U.S. 528 (1899); |
| | Gong Lum v. Rice 275 U.S. 78 (1927) |
| 90. In re Isserman 348 U.S. 1 (1954) (on rehearing) | In re Isserman 345 U.S. 286 (1953) |
| 91. Gayle v. Browder 352 U.S. 903 (1956) | Plessy v. Ferguson 163 U.S. 537 (1896) |
| * 92. Reid v. Covert 354 U.S. 1 (1957) | Kinsella v. Krueger 351 U.S. 470 (1956); |
| | Reid v. Covert 351 U.S. 487 (1956) |
| * 93. Vanderbilt v. Vanderbilt 354 U.S. 416, 419 (1957); *See also:* Armstrong v. Armstrong 350 U.S. 568, 581 (1956) | Thompson v. Thompson 226 U.S. 551 (1913) |
| * 94. Ladner v. United States 358 U.S. 169 (1958) (on rehearing) | Ladner v. United States 355 U.S. 282 (1958) |
| * 95. United States v. Raines 362 U.S. 17, 27 (1960) | United States v. Reese 92 U.S. 214, 220–221 (1876) |
| * 96. Elkins v. United States 364 U.S. 206, 210, 212–213, 283 (1960); Rios v. United States 364 U.S. 253 (1960) | Weeks v. United States 232 U.S. 383, 398 (1914) (in part); |
| | Center v. United States 267 U.S. 575 (1925); |
| | Byars v. United States 273 U.S. 28, 33 (1927) (in part); |
| | Feldman v. United States 322 U.S. 487, 492 (1944) (in part) |
| * 97. James v. United States 366 U.S. 213, 215, 221, 223, 241 (1961) | Commissioner v. Wilcox 327 U.S. 404 (1946) |
| * 98. Mapp v. Ohio 367 U.S. 643, 653–655 (1961); *See also:* Ker v. California 374 U.S. 23, 45, 53, 59 (1963) | Wolf v. Colorado 338 U.S. 25 (1949) (in part); |
| | Irvine v. California 347 U.S. 128 (1954) (in part) |
| * 99. Baker v. Carr 369 U.S. 186, 277, 280 (1962) | Colegrove v. Green 328 U.S. 549 (1946) (in part); |
| * 100. Wesberry v. Sanders 376 U.S. 1 (1964) | Colegrove v. Barrett 330 U.S. 804 (1947) |

SUPREME COURT DECISIONS OVERRULED          2393

| *Overruling Case* | *Overruled Case* |
|---|---|
| * 101. Smith v. Evening News Ass'n 371 U.S. 195, 199 (1962);<br>*See also:*<br>Truck Drivers Union v. Riss & Co. 372 U.S. 517, 520 (1963) | Westinghouse Employees v. Westinghouse Corp. 348 U.S. 437 (1955) (in part) |
| * 102. Construction Laborers v. Curry 371 U.S. 542, 552, 554 (1963) | Building Union v. Ledbetter Co. 344 U.S. 178 (1952) (in part) |
| * 103. Gideon v. Wainwright 372 U.S. 335 (1963) | Betts v. Brady 316 U.S. 455 (1942) |
| * 104. Gray v. Sanders 372 U.S. 368, 383 (1963) | Cook v. Fortson 329 U.S. 675 (1946)<br>Turman v. Duckworth 329 U.S. 675 (1946);<br>South v. Peters 339 U.S. 276 (1950);<br>Cox v. Peters 342 U.S. 936 (1952);<br>Hartsfield v. Sloan 357 U.S. 916 (1958) |
| * 105. Fay v. Noia 372 U.S. 391, 435 (1963) | Darr v. Burford 339 U.S. 200 (1950) (in part) |
| * 106. Ferguson v. Skrupa 372 U.S. 726, 731 (1963) | Adams v. Tanner 244 U.S. 590 (1917) |
| 107. Schneider v. Rusk 377 U.S. 163 (1964) | Mackenzie v. Hare 239 U.S. 299 (1915) |
| * 108. Malloy v. Hogan 378 U.S. 1, 6 (1964) | Twining v. New Jersey 211 U.S. 78 (1908)<br>Adamson v. California 332 U.S. 46 (1947) |
| * 109. Murphy v. Waterfront Comm'n 378 U.S. 52, 57, 77 (1964) | Jack v. Kansas 199 U.S. 372 (1905);<br>United States v. Murdock 284 U.S. 141 (1931);<br>Feldman v. United States 322 U.S. 487 (1944);<br>Knapp v. Schweitzer 357 U.S. 371 (1958);<br>Mills v. Louisiana 360 U.S. 230 (1959) |
| * 110. Jackson v. Denno 378 U.S. 368, 391 (1964) | Stein v. New York 346 U.S. 156 (1953) |
| 111. Escobedo v. Illinois 378 U.S. 478, 491–492 (1964) | Crooker v. California 357 U.S. 433 (1958);<br>Cicenia v. LaGay 357 U.S. 504 (1958) |
| * 112. Pointer v. Texas 380 U.S. 400, 406 (1965) | West v. Louisiana 194 U.S. 258 (1904) |
| 113. Gold v. DiCarlo 380 U.S. 520 (1965) | Tyson & Bro. v. Banton 273 U.S. 418 (1927) |
| * 114. Swift & Co. v. Wickham 382 U.S. 111 (1965) | Kesler v. Department of Pub. Safety 369 U.S. 153 (1962) (in part) |
| * 115. Harris v. United States 382 U.S. 162 (1965) | Brown v. United States 359 U.S. 41 (1959) |
| * 116. Harper v. Virginia Bd. of Elections 383 U.S. 663 (1966) | Breedlove v. Suttles 302 U.S. 277 (1937)<br>Butler v. Thompson 341 U.S. 937 (1951) |
| * 117. Spevack v. Klein 385 U.S. 511 (1967) | Cohen v. Hurley 366 U.S. 117 (1961) |
| 118. Keyishian v. Board of Regents 385 U.S. 589 (1967) | Adler v. Board of Education 342 U.S. 485 (1952) |

2394          SUPREME COURT DECISIONS OVERRULED

| *Overruling Case* | *Overruled Case* |
|---|---|
| \* 119. Afroyim v. Rusk 387 U.S. 253 (1967) | Perez v. Brownell 356 U.S. 44 (1958) |
| \* 120. Warden v. Hayden 387 U.S. 294 (1967) | Gouled v. United States 255 U.S. 298 (1921) |
| \* 121. Camara v. Municipal Court 387 U.S. 523 (1967) | Frank v. Maryland 359 U.S. 360 (1959) |
| 122. Berger v. New York 388 U.S. 41 (1967) | Olmstead v. United States 277 U.S. 438 (1928) (in part) |
| \* 123. Katz v. United States 389 U.S. 347 (1967) | Olmstead v. United States 277 U.S. 438 (1928); Goldman v. United States 316 U.S. 129 (1942) |
| \* 124. Peyton v. Rowe 391 U.S. 54 (1968) | McNally v. Hill 293 U.S. 131 (1934) |
| \* 125. Bruton v. United States 391 U.S. 123 (1968) | Delli Paoli v. United States 352 U.S. 232 (1957) |
| 126. Duncan v. Louisiana 391 U.S. 145 (1968) | Maxwell v. Dow 176 U.S. 581 (1900) |
| \* 127. Carafas v. LaVallee 391 U.S. 234 (1968) | Parker v. Ellis 362 U.S. 574 (1960) |
| \* 128. Lee v. Florida 392 U.S. 378 (1968) | Schwartz v. Texas 344 U.S. 199 (1952) |
| \* 129. Jones v. Alfred H. Mayer Co. 392 U.S. 409, 441–443 (1968) | Hodges v. United States 203 U.S. 1 (1906) |
| \* 130. Moore v. Ogilvie 394 U.S. 814 (1969) | MacDougall v. Green 335 U.S. 281 (1948) |
| \* 131. Brandenburg v. Ohio 395 U.S. 444 (1969) | Whitney v. California 274 U.S. 357 (1927) |
| \* 132. Chimel v. California 395 U.S. 752 (1969) | Harris v. United States 331 U.S. 145 (1947); United States v. Rabinowitz 339 U.S. 56 (1950) |
| \* 133. Benton v. Maryland 395 U.S. 784 (1969) | Palko v. Connecticut 302 U.S. 319 (1937) |
| 134. Ashe v. Swenson 397 U.S. 436 (1970) | Hoag v. New Jersey 356 U.S. 464 (1958) |
| \* 135. Boys Markets v. Retail Clerks Union 398 U.S. 235 (1970) | Sinclair Refining Co. v. Atkinson 370 U.S. 195 (1962) |
| \* 136. Price v. Georgia 398 U.S. 323, 329–330 (1970) | Brantley v. Georgia 217 U.S. 284 (1910) |
| \* 137. Moragne v. States Marine Lines 398 U.S. 375 (1970) | The Harrisburg 119 U.S. 199 (1886) |
| \* 138. Williams v. Florida 399 U.S. 78 (1970) | Thompson v. Utah 170 U.S. 343 (1898) (in part); Rassmussen v. United States 197 U.S. 516 (1905) (in part) |
| \* 139. Blonder-Tongue Labs v. University of Ill. Found. 402 U.S. 313 (1971) | Triplett v. Lowell 297 U.S. 638 (1936) |
| \* 140. Perez v. Campbell 402 U.S. 637 (1971) | Kesler v. Department of Pub. Safety 369 U.S. 153 (1962); Reitz v. Mealey 314 U.S. 33 (1941) |
| \* 141. Griffin v. Breckenridge 403 U.S. 88 (1971) | Collins v. Hardyman 341 U.S. 651 (1951) (in part) |

SUPREME COURT DECISIONS OVERRULED        2395

| *Overruling Case* | *Overruled Case* |
|---|---|
| \* 142. Dunn v. Blumstein 405 U.S. 330 (1972) | Pope v. Williams 193 U.S. 621 (1904) |
| \* 143. Andrews v. Louisville & Nashville R.R. 406 U.S. 320 (1972) | Moore v. Illinois Cent. R.R. 312 U.S. 630 (1941) |
| \* 144. Lehnhausen v. Lake Shore Auto Parts Co. 410 U.S. 356 (1973) | Quaker City Cab Co. v. Pennsylvania 277 U.S. 389 (1928) |
| \* 145. Braden v. 30th Judicial Circuit Court 410 U.S. 484 (1973) | Ahrens v. Clark 335 U.S. 188 (1948) |
| \* 146. Miller v. California 413 U.S. 15 (1973) | A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General 83 U.S. 413 (1966) |
| \* 147. North Dakota Pharmacy Bd. v. Snyder's Drug Stores 414 U.S. 156 (1973) | Liggett Co. v. Baldridge 278 U.S. 105 (1928) |
| \* 148. Edelman v. Jordan 415 U.S. 651 (1974) | Shapiro v. Thompson 394 U.S. 618 (1969) (in part); State Dep't of Health & Rehab. Servs. v. Zarate 407 U.S. 918 (1972) Sterrett v. Mothers' & Children's Rights Organization 409 U.S. 809 (1973); Wyman v. Bowens 397 U.S. 49 (1970) |
| \* 149. Mitchell v. W. T. Grant Co. 416 U.S. 600 (1974) | Fuentes v. Shevin 407 U.S. 67 (1972) (in part) |
| \* 150. Taylor v. Louisiana 419 U.S. 522 (1975) | Hoyt v. Florida 368 U.S. 57 (1961) (in effect) |
| \* 151. United States v. Reliable Transfer Co. 421 U.S. 397 (1975) | The Schooner Catherine v. Dickinson 58 U.S. (17 How.) 170 (1854) |
| \* 152. Michelin Tire Corp. v. Wages 423 U.S. 276 (1976) | Low v. Austin 80 U.S. (13 Wall.) 29 (1872) |
| \* 153. Dove v. United States 423 U.S. 325 (1976) | Durham v. United States 401 U.S. 481 (1971) |
| \* 154. Hudgens v. NLRB 424 U.S. 507 (1976) | Amalgamated Food Employees Union v. Logan Valley Plaza 391 U.S. 308 (1968) |
| \* 155. Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council 425 U.S. 748 (1976) | Valentine v. Chrestensen 316 U.S. 52 (1942) |
| \* 156. National League of Cities v. Usery 426 U.S. 833 (1976) | Maryland v. Wirtz 392 U.S. 183 (1968) |
| \* 157. Machinists & Aerospace Workers v. WERC 427 U.S. 132 (1976) | UAW v. WERB 336 U.S. 245 (1949) |
| \* 158. City of New Orleans v. Dukes 427 U.S. 297 (1976) | Morey v. Doud 354 U.S. 457 (1957) |
| \* 159. Gregg v. Georgia 428 U.S. 153, 195 n.47 (1976) | McGautha v. California 402 U.S. 183 (1971) |
| \* 160. Craig v. Boren 429 U.S. 190, 210 n.23 (1976) | Goesaert v. Cleary 335 U.S. 464 (1948) |
| \* 161. Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co. 429 U.S. 363 (1977) | Bonelli Cattle Co. v. Arizona 414 U.S. 313 (1973) |
| \* 162. Complete Auto Transit v. Brady 430 U.S. 274 (1977) | Spector Motor Service v. O'Connor 340 U.S. 602 (1951) |
| \* 163. Continental T. V. v. GTE Sylvania 433 U.S. 36 (1977) | United States v. Arnold Schwinn & Co., 388 U.S. 365 (1967) |

2396        SUPREME COURT DECISIONS OVERRULED

| *Overruling Case* | *Overruled Case* |
|---|---|
| * 164. Shaffer v. Heitner 433 U.S. 186 (1977) | Pennoyer v. Neff 95 U.S. 714 (1878) |
| * 165. Department of Revenue v. Washington Stevedoring Cos. 435 U.S. 734 (1978) | Puget Sound Stevedoring Co. v. State Tax Comm'n 302 U.S. 90 (1937);<br>Joseph v. Carter & Weekes Stevedoring Co. 330 U.S. 422 (1947) |
| * 166. Monell v. New York City Dep't of Social Services 436 U.S. 658 (1978) | Monroe v. Pape 365 U.S. 167 (1961) (in part);<br>City of Kenosha v. Bruno 412 U.S. 507 (1973) (in part);<br>Moor v. County of Alameda 411 U.S. 693 (1973) (in part);<br>Aldinger v. Howard 427 U.S. 1 (1976) |
| * 167. Burks v. United States 437 U.S. 1 (1978) | Bryan v. United States 338 U.S. 552 (1950) (in part);<br>Sapir v. United States 348 U.S. 373 (1955) (in part);<br>Yates v. United States 354 U.S. 298 (1957) (in part);<br>Forman v. United States 361 U.S. 416 (1960) (in part) |
| * 168. United States v. Scott 437 U.S. 82 (1978) | United States v. Jenkins 420 U.S. 358 (1975) |
| 169. Duren v. Missouri 439 U.S. 357 (1978) | Hoyt v. Florida 368 U.S. 57 (1961) |
| 170. Hughes v. Oklahoma 441 U.S. 322 (1979) | Geer v. Connecticut 161 U.S. 519 (1896) |
| 171. Trammel v. United States 445 U.S. 40 (1980) | Hawkins v. United States 358 U.S. 74 (1958) |
| * 172. United States v. Salvucci 448 U.S. 83 (1980) | Jones v. United States 362 U.S. 257 (1960) |
| 173. Commonwealth Edison Co. v. Montana 453 U.S. 609 (1981) | Heisler v. Thomas Colliery Co. 260 U.S. 245 (1922) |
| * 174. United States v. Ross 456 U.S. 798 (1982) | Robbins v. California 453 U.S. 420 (1981) |
| * 175. Sporhase v. Nebraska ex rel. Douglas 458 U.S. 941 (1982) | Hudson County Water Co. v. McCarter 209 U.S. 349 (1908) |
| * 176. Illinois v. Gates 462 U.S. 213 (1983). | Aguilar v. Texas 378 U.S. 108 (1964);<br>Spinelli v. United States 393 U.S. 410 (1969). |
| 177. Pennhurst State School & Hosp. v. Halderman 465 U.S. 89 (1984). | Rolston v. Missouri Fund Comm'rs 120 U.S. 390 (1887) (in part);<br>Siler v. Louisville & Nashville R.R. 213 U.S. 175 (1909) (in part);<br>Atchison T. & S.F. Ry. v. O'Connor 223 U.S. 280 (1912) (in part);<br>Greene v. Louisville & Interurban R.R. 244 U.S. 499 (1917) (in part); |

SUPREME COURT DECISIONS OVERRULED            2397

*Overruling Case*                           *Overruled Case*

Johnson v. Lankford 245 U.S. 541 (1918) (in part); Numerous other cases fall more or less under the Pennhurst doctrine. See 465 U.S. 109–111 nn.17–21, 117–121 (maj.op.), and id. at 130–37, 159–163, 165–166 nn.50 & 52 (dissent) (listing 28 cases).

\*   178. United States v. One Assortment of 89 Firearms 465 U.S. 354 (1984).   Coffey v. United States 116 U.S. 436 (1886).

\*   179. Limbach v. Hooven & Allison Co. 466 U.S. 353 (1984).   Hooven & Allison Co. v. Evatt 324 U.S. 652 (1945).

180. Copperweld Corp. v. Independence Tube Corp. 467 U.S. 752 (1984).   United States v. Yellow Cab Co. 332 U.S. 218 (1947); Kiefer-Stewart Co. v. Jos. E. Seagram & Sons 340 U.S. 211 (1951).

\*   181. Garcia v. San Antonio Metro. Transit Auth. 469 U.S. 528 (1985).   National League of Cities v. Usery 426 U.S. 833 (1976).

\*   182. United States v. Miller 471 U.S. 130 (1985).   Ex parte Bain 121 U.S. 1 (1887) (in part).

\*   183. Daniels v. Williams 474 U.S. 327 (1986).   Parratt v. Taylor 451 U.S. 527 (1981) (in part).

184. United States v. Lane 474 U. S. 438 (1986).   McElroy v. United States 164 U.S. 76 (1896).

\*   185. Batson v. Kentucky 476 U.S. 79 (1986).   Swain v. Alabama 380 U.S. 202 (1965) (in part).

\*   186. Puerto Rico v. Branstad 483 U.S. 219 (1987).   Kentucky v. Dennison 65 U.S. (24 How.) 66 (1861).

\*   187. Solorio v. United States 483 U.S. 435 (1987).   O'Callahan v. Parker 395 U.S. 258 (1969).

\*   188. Welch v. Texas Dep't of Highways and Transp. 483 U.S. 468 (1987).   Parden v. Terminal Ry. 377 U.S. 184 (1964) (in part).

\*   189. Gulfstream Aerospace Corp. v. Mayacamas Corp. 485 U.S. 271 (1988).   Enelow v. New York Life Ins. Co. 293 U.S. 379 (1935); Ettelson v. Metropolitan Life Ins. Co. 317 U.S. 188 (1942).

\*   190. South Carolina v. Baker 485 U.S. 505 (1988).   Pollock v. Farmers' Loan & Trust Co. 157 U.S. 429 (1895).

\*   191. Thornburgh v. Abbott 490 U.S. 401 (1989).   Procunier v. Martinez 416 U.S. 396 (1974) (in part).

\*   192. Rodriguez de Quijas v. Shearson/American Express 490 U.S. 477 (1989).   Wilko v. Swann 346 U.S. 427 (1953).

\*   193. Alabama v. Smith 490 U.S. 794 (1989).   Simpson v. Rice 395 U.S. 711 (1969).

\*   194. Healy v. Beer Institute 491 U.S. 324 (1989).   Joseph E. Seagram & Sons v. Hostetter 384 U.S. 35 (1966).

195. W.S. Kirkpatrick & Co. v. Environmental Tectronics Corp. 493 U.S. 400 (1990).   American Banana Co. v. United Fruit Co. 213 U.S. 347 (1909).

\*   196. Collins v. Youngblood 497 U.S. 37 (1990).   Kring v. Missouri 107 U.S. 221 (1883);

2398        SUPREME COURT DECISIONS OVERRULED

| *Overruling Case* | *Overruled Case* |
|---|---|
| | Thompson v. Utah 170 U.S. 343 (1898). |
| 197. Arizona v. Fulminante 499 U.S. 279 (1991) | Chapman v. California 386 U.S. 18 (1967) (in part). |
| * 198. California v. Acevedo 500 U.S. 565 (1991) | Arkansas v. Sanders 442 U.S. 743 (1979). |
| * 199. Exxon Corp. v. Central Gulf Lines Inc. 500 U.S. 603 (1991). | Minturn v. Maynard 58 U.S. (17 How.) 476 (1855). |
| 200. Coleman v. Thompson 501 U.S. 722 (1991). | Fay v. Noia 372 U.S. 391 (1963). |
| * 201. Payne v. Tennessee 501 U.S. 808 (1991). | Booth v. Maryland 482 U.S. 496 (1987); South Carolina v. Gathers 490 U.S. 805 (1989). |
| * 202. Keeney v. Tamayo-Reyes 504 U.S. 1 (1992). | Townsend v. Sain 372 U.S. 293 (1963) (in part). |
| * 203. Quill Corp. v. North Dakota 504 U.S. 298 (1992). | National Bellas Hess Inc. v. Department of Revenue, 386 U.S. 753 (1967) (in part). |
| * 204. Planned Parenthood of S.E. Pennsylvania v. Casey 505 U.S. 833 (1992). | City of Akron v. Akron Center for Reproductive Health 462 U.S. 416 (1983) (in part); Thornburgh v. American College of Obstetricians and Gynecologists 476 U.S. 747 (1986) (in part). |
| * 205. United States v. Dixon 509 U.S. 688 (1993). | Grady v. Corbin 495 U.S. 508 (1990). |
| * 206. Nichols v. United States 511 U.S. 738 (1994). | Baldasar v. Illinois 446 U.S. 222 (1980). |
| * 207. Hubbard v. United States 514 U.S. 695 (1995). | United States v. Bramblett 348 U.S. 503 (1955). |
| * 208. Adarand Constructors Inc. v. Pena 515 U.S. 200 (1995). | Metro Broadcasting Inc. v. FCC 497 U.S. 547 (1990); Fullilove v. Klutznick 448 U.S. 448 (1990) (in part). |
| * 209. United States v. Gaudin 515 U.S. 506 (1995). | Sinclair v. United States 279 U.S. 263 (1929). |
| * 210. Fulton Corp. v. Faulkner 516 U.S. 325 (1996). | Darnell v. Indiana 226 U.S. 390 (1912). |
| * 211. Seminole Tribe of Florida v. Florida 517 U.S. 44 (1996). | Pennsylvania v. Union Gas Co. 491 U.S. 1 (1989). |
| * 212. 44 Liquormart Inc. v. Rhode Island 517 U.S. 484 (1996). | California v. LaRue 409 U.S. 109 (1972) (in part); New York State Liquor Auth. v. Bellanca 452 U.S. 714 (1981) (in part); City of Newport v. Iacobucci 479 U.S. 92 (1986) (in part). |
| * 213. Agostini v. Felton 521 U.S. 203 (1997). | Aguilar v. Felton 473 U.S. 402 (1985); Grand Rapids School Dist. v. Ball 473 U.S. 373 (1985) (in part). |
| * 214. State Oil Co. v. Khan 522 U.S. 3 (1997). | Albrecht v. Herald Co. 390 U.S. 145 (1968). |
| * 215. Hudson v. United States 522 U.S. 93 (1997). | United States v. Halper 490 U.S. 435 (1989). |

SUPREME COURT DECISIONS OVERRULED    2399

*Overruling Case*

* 216. Hohn v. United States 524 U.S. 236 (1998).

* 217. Minnesota v. Mille Lacs Band of Chippewa Indians 526 U.S. 172 (1999).

* 218. College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd. 527 U.S. 666 (1999).

* 219. Mitchell v. Helms 530 U.S. 793 (2000).

* 220. United States v. Hatter 532 U.S. 557 (2001).

*Overruled Case*

House v. Mayo 324 U.S. 42 (1945).

Ward v. Race Horse 163 U.S. 504 (1896) (in part).

Parden v. Terminal Ry. 377 U.S. 184 (1964) (in part).

* Meek v. Pittinger 421 U.S. 349 (1975); Wolman v. Walter 433 U.S. 229 (1977). Evans v. Gore 253 U.S. 245 (1920).

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Charles Weber | Richard J. Arcara, et al. |

| **(b)** County of Residence of First Listed Plaintiff    Erie | County of Residence of First Listed Defendant    Erie |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |
| | NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

MAY -2 2018

| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| pro se | |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*

*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | | ☐ 893 Environmental Matters |
| | Medical Malpractice | | Leave Act | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | Act |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | Agency Decision |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | State Statutes |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation - Transfer
- ☐ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

- ☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND:  ☐ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE

DOCKET NUMBER

DATE

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____